## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>SEONG YEOL LEE and AMERITRUST CORPORATION,<br><br><br>　　　　　Defendants,<br><br>and<br><br>BEESPOKE CAPITAL, INC., BEESPOKE CAPITAL, LLC, ALICE MEE-HYANG CHOI, APRIL SUE-CHANG LEE, and ELAINE CHOUNG-HEE LEE,<br><br>　　　　　Relief Defendants. | **Civil Action No.** |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER FREEZING AND REPATRIATING ASSETS AND FOR OTHER EQUITABLE RELIEF

Dated: February 1, 2023

Respectfully submitted,

On behalf of the Commission,

*Rua M. Kelly*

Rua M. Kelly
Michael C. Moran
U.S. Securities and Exchange Commission
Boston Regional
33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573-8941 (Kelly)
kellyru@sec.gov

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 3

STATEMENT OF FACTS ...................................................................................................... 5

    RELEVANT INDIVIDUALS AND ENTITIES.................................................................5

    OVERVIEW OF LEE'S FRAUDULENT CONDUCT…………………….............9

    MISREPRESENTATIONS/OMISSIONS IN AMERITRUST SEC FILINGS…….15

ARGUMENT ............................................................................................................... 17

**I.**    <u>DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND PRELIMINARILY ENJOINED FROM FURTHER VIOLATIONS OF THE FEDERAL SECURITIES LAWS.</u>…………………………………………………17

**II.**    <u>THE COURT SHOULD ORDER THAT THE DEFENDANTS AND CERTAIN RELIEF DEFENDANT ASSETS BE FROZEN AND REPATRIATED PENDING A FINAL ADJUDICATION OF THIS ACTION.</u>………………………………....18

**III.**    <u>THE COMMISSION IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS AGAINST THE DEFENDANTS BECAUSE OF SUBSTANTIAL EVIDENCE OF FRAUD.</u>……………….…..……………………………………19

**IV.**    <u>ABSENT AN ASSET FREEZE AND REPATRIATION ORDER, THERE IS A SERIOUS RISK THAT THE PROCEEDS OF THE FRAUD WILL BE DISSIPATED AND/OR TRANSFERRED TO KOREA.</u>…………...…………….27

CONCLUSION ........................................................................................................ 30

ii

# TABLE OF AUTHORITIES

**Cases**

*Aaron v. SEC*, 446 U.S. 680 (1980)……………………………………………………17, 20

*Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012) …………..27

*Aldridge v. A.T. Cross Corp.* 284 F.3d 72 (1st Cir. 2002)……………………….……………..25

*Basic v. Levinson*, 485 U.S. 224 (1988)………………………………….…………...................21

*Chadbourne & Parke LLP v. Troice,* 571 U.S. 377 (2014)……………………………….20 n.3

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)................................................. ………24

*Gonzalez de Castilla*, 145 F. Supp. 2d 402 (S.D.N.Y. 2001)…………………………….…...27-28

*In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36 (2d Cir. 2000). …………………………25

*In re St. Clair*, 533 B.R. 331 (E.D.N.Y. 2015) …………………………………………26

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006)…………………………………24

*Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010)………………………………27

*SEC v. Ahmed*, 123 F.Supp.3d 301 (D. Conn. 2015)…………………………………19, 29

*SEC v. Ahmed*, 308 F.Supp.3d 628 (D. Conn. 2018)…………………………………20 n.3

*SEC v. Anticevic*, No. 05 Civ. 6991 (KMW), 2005 WL 1939946 (S.D.N.Y. Aug. 5, 2005)……28

*SEC v. Byers*, No. 08 Civ. 7104 (DC), 2009 WL 33434 (S.D.N.Y. Jan. 7, 2009)…………...18-19

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ...................................................... 17-18

*SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y. 1998) …………………………………...28-30

*SEC v. China Northeast Petroleum Holdings Ltd.,* 27 F. Supp. 3d 379 (S.D.N.Y. 2014)……...20

*SEC v. Dubovoy*, No. 15-cv-6067, 2015 WL 6122261 (D.N.J. Oct. 16, 2015) ……………….19

*SEC v. Esposito*, 260 F. 3d 79 (D. Mass. 2017) …………………………………………25

*SEC v. Fife*, 311 F.3d 1 (1st Cir. 2002)……………………………………………………...17

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996)…………………….…………..20

*SEC v. Frank*, 388 F.2d 486 (2d Cir. 1968)……………………………………………....17

*SEC v. George*, 426 F.3d 786 (6th Cir. 2005)……………………………………………....25

*SEC v. Heden*, 51 F.Supp. 2d 296 (S.D.N.Y. 1999)…………………………………………..19

*SEC v. I-Cubed Domains, LLC*, 664 Fed. Appx. 53 (2d Cir. 2016) …………………...29-30

*SEC v. Illarramendi*, 2011 WL 2457734 (D. Conn. June 16, 2011)…………………….... 28

*SEC v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010)……………………………………… …...23

*SEC v. Maillard*, No. 13-cv-5299 (VEC), 2014 WL 1660024……………………………………19

*SEC v. Materia*, 745 F.2d 197 (2d Cir. 1984)………………………….…………… ……......28

*SEC v. Mayhew*, 121 F.3d 44 (2d Cir. 1997)……………………………………………….....21

*SEC v. Monarch Funding*, 192 F.3d 295 (2d Cir. 1999)………………………………………24

*SEC v. McGinn, Smith & Co.*, 753 F. Supp. 2d 194 (N.D.N.Y. 2010)…………………………29

*SEC v. McNulty*, 137 F.3d 732 (2d Cir. 1998) ………………………………………………24

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975)…………………………………17

*SEC v. One Wall Street, Inc.*, 2008 WL 5082294 (E.D.N.Y. 2008)……………………………23

*SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279 (2d Cir. 2013)………………….….........20

*SEC v. Research Automation Corp.*, 585 F.2d 31 (2d Cir. 1978)………………………………22

*SEC v. Syron*, 934 F. Supp. 2d 609 (S.D.N.Y. 2013)…………………………………………24

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990)..................................................................19

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994)………………….....……...24

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011)...........................................................……18-19

*United States v. Aloi*, 511 F.2d 585 (2d Cir. 1975) …………………………………………23

**Statutes and Rules**

15 U.S.C. § 77q(a)………………………………………………………………………………21

15 U.S.C. § 77t(b)………………………………………………………………………………17

15 U.S.C. § 77v(c) ………………………………………………………………………………26

15 U.S.C. § 78aa(b)……………………………………………………………………………26

15 U.S.C. § 78(j)(b)……………………………………………………………………………21

15 U.S.C. § 78u(d)……………………………………………………………………………....17

17 C.F.R. § 240.10b-5...........................................................................................................21

Plaintiff, the United States Securities and Exchange Commission (the "Commission") respectfully submits this Memorandum of Law in support of its motion for a temporary restraining order, an order freezing and repatriating assets, and an order for additional equitable relief (the "Motion") against Defendants Seong Yeol Lee ("Lee") and Ameritrust Corporation ("Ameritrust") (together, the "Defendants") and Relief Defendants Beespoke Capital, Inc. and Beespoke Capital, LLC (together, the "Beespoke Relief Defendants").  In further support of its Motion, the Commission submits the Declaration of John McCann ("McCann Decl."), the Declaration of Naomi Sevilla ("Sevilla Decl."), and accompanying evidentiary materials.

By filing this Motion, the Commission seeks immediate relief to protect investor funds, including an order to freeze and repatriate funds currently held by the Defendants (collectively, the "Defendant Accounts") and real property in the name of the Defendants located in Bedford, New York and in Lander County, Nevada.  Based on Lee's conduct to date, these assets may be dissipated absent a freeze.  The Commission seeks both an asset freeze and a repatriation order to ensure that these assets can be marshaled[1] for distribution to investor victims.  The Commission also seeks an asset freeze and repatriation order as to the Beespoke Relief Defendants, both of which are controlled by Lee and Ameritrust, and both of which received traceable investor funds. The Commission is likely to succeed on the merits of showing that Lee and Ameritrust repeatedly violated the federal securities laws and that the Beespoke Relief Defendants received the proceeds of fraud that, in equity, they have no right to retain.  At this time, the Commission is

---

[1] The Motion also seeks a court order to place a *lis pendens* on certain real property in the name of the Defendants in the appropriate courts in New York and Nevada, pending the final resolution of this case.

not moving for emergency relief or an asset freeze as to Relief Defendants Alice Choi, April Lee, and/or Elaine Lee.

## PRELIMINARY STATEMENT

In an ongoing fraudulent scheme that began in July of 2019, Lee and his U.S.-based company Ameritrust have raised at least $20 million from investors – primarily in Korea – by making false promises of riches from buying Ameritrust stock.  The Commission seeks a temporary restraining order to halt the Defendants' misconduct immediately and to freeze and repatriate their assets for the protection of investors.

Lee has used a substantial portion of investor money for his personal expenses, and diverted other funds to his family.  He has also used investor funds to pay a network of recruiters in Korea to solicit investors.  Since 2019, and continuing to present, Lee has misled Korean investors by promising that they will become wealthy because he will list Ameritrust stock on a U.S. stock exchange.  Ameritrust stock is instead traded on the penny stock market.  Ameritrust is a company with no real value or operations, and serves no real purpose but to provide Lee with a veneer of legitimacy by virtue of his title as CEO of an American public company.  As a publicly traded company, with a class of securities registered with the Commission, Ameritrust has been required to file periodic reports with the Commission to update the investing public about the company's finances and operations.  Lee and Ameritrust, however, have failed for eighteen months to make required filings, while continuing to solicit investors in Korea.  When Lee and Ameritrust did make public filings, they misled investors by filing numerous false and misleading reports with the Commission.

The Commission now asks that the Court enter a temporary restraining order to preserve

3

the status quo pending resolution of the case.  Specifically, the Commission seeks:

(1) a temporary restraining order to maintain the status quo for the protection of investors and a preliminary injunction to stop Defendants Lee and Ameritrust from committing further acts of securities fraud, including through misappropriation of investor assets;

(2) an order freezing and repatriating any assets remaining in the bank accounts controlled by Defendants as well as the Beespoke Relief Defendants, and freezing all real property owned by the Defendants, including property in Bedford, New York and Lander County, Nevada;

(3) an order prohibiting Lee and Ameritrust from soliciting, accepting, or depositing any new investments until a resolution of this action.

## STATEMENT OF FACTS

**RELEVANT INDIVIDUALS AND ENTITIES**

### DEFENDANTS

**Seong Yeol Lee ("Lee")**, age 70, is a Korean national and has resided in Stamford, Connecticut since at least 2020.  He has been Ameritrust's Chairman and Chief Executive Officer since April 2020.  Lee was Ameritrust's sole board member from November 2020, when Ameritrust's one other board member resigned, until November 2021, when Lee appointed his daughter to the board.  Lee lived outside of the United States for portions of the period between 2002 and 2020, including a period when he claimed was a lecturer at a university in Korea.  He lectured on the topics of banking and securities.  Prior to 2002, Lee was a registered representative of a registered broker-dealer in the United States, and held certain brokerage licenses in the U.S., which are expired.

4

**Ameritrust Corporation ("Ameritrust")** incorporated in Wyoming in April 2020. Ameritrust was previously incorporated in Michigan and Georgia, with the prior Ameritrust entities ultimately merging into the Wyoming entity by August 2020. In August 2020, Ameritrust merged with a publicly-traded Nevada company, Gryphon Resources, Inc. ("Gryphon") and the combined entity took the Ameritrust name. Ameritrust purports to be in the business of acquiring, holding, and developing commercial real estate. Ameritrust is a publicly traded company that has registered securities with the Commission pursuant to Section 12(g) of the Securities and Exchange Act of 1934 ("Exchange Act"). Ameritrust has filed certain periodic reports with the Commission, as required by Section 13 of the Exchange Act, but is now delinquent in required periodic filings. Ameritrust's stock is a "penny stock", meaning it trades at less than $5.00 per share and is not eligible for listing on a national exchange. Ameritrust's common stock trades on the over-the-counter ("OTC") market under the ticker symbol "ATCC." Since April 2022, Ameritrust stock has been subject to heightened trading restrictions in the OTC market, because it is delinquent in making current information available to the public.

## RELIEF DEFENDANTS

Relief Defendant **Beespoke Capital, Inc. ("Beespoke Inc.")** is a Connecticut corporation. Lee is the president, secretary, and treasurer of Beespoke Inc. Its principal place of business is listed as Lee's home address. Beespoke Inc.'s predecessor entity was Relief Defendant **Beespoke Capital LLC ("Beespoke LLC")**, a Colorado entity registered with the Commission and the Financial Industry Regulatory Authority ("FINRA") as a broker-dealer from September 2018 to September 2020. In September 2019, Lee, purportedly acting as Chairman and President of Ameritrust (which at the time was incorporated in Michigan and not

publicly-traded) entered into an agreement to acquire Beespoke LLC.  In early 2020, Lee began a process of filing an application with FINRA to continue to operate Beespoke LLC as a broker-dealer, but the process was not completed and Lee never obtained the required approval from FINRA.  FINRA is a self-regulatory organization that, among other things, administers membership requirements for brokerage firms and their individual registered representatives.  Ameritrust subsequently changed Beespoke LLC's domicile from Colorado to Connecticut, and incorporated it as Beespoke Inc.  Lee has maintained bank accounts Beespoke Inc.'s name that hold investor funds.  Between May 2020 and December 2022, Lee transferred $3.3 million in investor assets to a Korean bank account in the name of Beespoke LLC.  The payments to Beespoke LLC in Korea were to fund a similarly named entity in Korea ("Beespoke Korea") that was used to solicit Ameritrust investors.

**Alice Mee-Hyang Choi**, age 36, is a resident of Avon, Connecticut.  She is one of Lee's daughters.  On November 22, 2021, Ameritrust announced Choi's appointment as the second member of Ameritrust's Board of Directors, along with Lee.  Choi, however, has not performed any services in that capacity.  Lee provided a cashier's check to Choi for $500,000 dated July 15, 2021, remitted on a Beespoke Inc. bank account, which she deposited in a personal bank account.

**April Sue-Chang Lee**, age 40, is a resident of Torrington, Connecticut.  She is one of Lee's daughters.  April Lee deposited a cashier's check for $650,000 dated July 15, 2021, remitted on a Beespoke Inc. bank account and payable to another family member, who endorsed the check to April Lee.  Neither April Lee nor the family member who endorsed the check to her is an employee of, or provided any services to, Ameritrust or Beespoke.

6

**Elaine Choung-Hee Lee**, age 42, is a resident of Ashford, Connecticut.  She is one of Lee's daughters.  Lee provided a cashier's check to Elaine Lee for $100,000 dated August 15, 2022, remitted from a Beespoke Inc. bank account, which Elaine Lee deposited in her personal bank account.  Elaine Lee is not been an employee of, and has not provided any services to, Ameritrust or Beespoke.

### OTHER RELEVANT INDIVIDUAL

**Jong Sun Kim** resided in Korea at times relevant to this Complaint.  In an August 2020 public filing, Ameritrust announced that Kim was its corporate secretary, describing her as a licensed nurse and a certified pastor in Korea.  According to two witnesses, Kim resided with Lee for a period of time in Korea, and the witnesses understood them to be domestic partners.

### <u>OVERVIEW OF LEE'S FRAUDULENT CONDUCT</u>

Lee began soliciting Ameritrust investors in 2019 with the promise that the company would be listed on a U.S. stock exchange.  In 2019, Ameritrust was not a publicly traded company.  It was a private company owned by Lee.  Not until March 2020 did Lee purchase a controlling interest in Gryphon, a publicly traded "penny stock" company.  Complaint at ¶16.  In its annual report for fiscal year 2019, filed with the Commission, Gryphon reported that it was a shell company with no revenues and that it was seeking a merger partner.  *Id*.  In June 2020, Lee submitted a public filing with the Commission, announcing that Gryphon was changing its state of domicile from Nevada to Wyoming through a merger into Ameritrust Corporation in Wyoming.  Complaint at ¶17.  The filing announced that the combined entity would take the name Ameritrust Corporation.  *Id*.

7

Lee has controlled Ameritrust since its merger with Gryphon, acting as Chairman, Chief Executive Officer, and Chief Financial Officer.  Complaint at ¶18.  Lee was also Ameritrust's sole board member from November 2020 until November 2021, when he appointed his daughter Alice Choi to the board.  *Id*. at ¶19.  The only other named officer or director for Ameritrust was an individual named Jong Sun Kim, whom Ameritrust listed in public filings as the corporate secretary.  *Id*. at ¶20; *see also* McCann Declaration at ¶18(a) n. 5 (Ameritrust's 2020 Form 10-K describing Kim's professional experience as including work "as a licensed practical nurse" and receiving "a pastor certificate from Korea Presbyterian Theological Seminary").  Lee knew Choi and Kim to be lacking in experience or education relating to corporate management.  Complaint at ¶¶19-20.  Lee used an organized network of recruiters in Korea, through Beespoke Korea, to solicit investors in Ameritrust.  *Id*. at ¶¶24-25.  Lee and his representatives in Korea recruited investors through information sessions, email solicitations, and word of mouth.  *Id*.  Some of the information sessions took place at churches. *Id*.  at ¶27.  Ms. Kim, the purported "corporate secretary" of Ameritrust, was in charge of running Beespoke Korea.  *Id*. at ¶24.  Witnesses in Korea understood Lee and Kim to be domestic partners.  Sevilla Decl. at ¶20, ¶62.

Between July 2019 and November 2022, bank accounts in the United States in the names of Ameritrust, Beespoke LLC, and Beespoke Inc. received millions of dollars from individuals in Korea.  Complaint at ¶23.  Ameritrust's stock records maintained by a U.S.-based transfer agent reflect over 2,000 shareholders with names that appear to be Korean, including approximately 1,300 names that correspond to individuals who sent money from Korea directly to bank accounts in the United States.  *Id*.; *see also* McCann Decl. at ¶11.  Witnesses in Korea, however, estimate the total number of investors to be closer to 4,000.  *Id*.; Sevilla Decl. at ¶¶14, 37, 51.

8

As set forth in greater detail in the Sevilla Declaration, the Commission staff has communicated with several investors in Korea about their investments in Ameritrust and the statements made to them by Lee and his associates over the last three years.  In addition, the Commission staff has reviewed the bank and brokerage records for Ameritrust, as set forth in the declaration of staff accountant John McCann.  Based on witness statements, testimony, and other evidence obtained by the Commission, it appears that Lee and his Korean associates have solicited more than $20 million from investors through this scheme, and that Lee has absconded with much of the money he raised – some of which is still held in Lee's, Ameritrust's, Beespoke LLC's, and Beespoke Inc.'s bank accounts in the United States and, based on information currently available to the Commission, in at least one bank account in Korea.

The investor recruitment scheme by Lee and Ameritrust was expansively orchestrated. According to an individual who worked at Beespoke Korea in 2022 ("Witness 1"), the company had anywhere from four to eight permanent salaried employees, and approximately ten temporary employees.  Complaint at ¶25; Sevilla Decl. at ¶¶12, 28.  Lee transferred millions of dollars of investor funds to Korea for salaries and operational expenses, but Ameritrust has no employees or operations in Korea and the money could only be for financing his recruitment scheme.  McCann Decl. at ¶26.  Witness 1 described Beespoke Korea as an investment bank that recruits investors for Ameritrust.  Complaint at ¶25; Sevilla Decl. at ¶13.  Witness 1 now understands Ameritrust to be a company on paper only, with no real operations and with a nonsensical balance sheet.  Complaint at ¶25; Sevilla Decl. at ¶15-16.

In 2019, before Lee merged Ameritrust with a publicly traded company, Lee and his recruiters purported to offer investors Ameritrust shares in a private offering, but with the

9

promise that Ameritrust would soon be a public company traded on a U.S. stock exchange, and

that investors would become rich.  Complaint at ¶¶34-35, 37.  According to an individual

("Witness 2") who attended an Ameritrust information session in July 2019 at a church in Korea,

attendees were offered Ameritrust shares for $1.00 per share.  *Id*. at ¶27; Sevilla Decl. at ¶34-35.

Witness 2 was hired as an Ameritrust recruiter shortly after attending the information session,

and hosted information sessions.  Complaint at ¶28; Sevilla Decl. at ¶34.  Witness 2 was a

recruiter until late 2021.  Complaint at ¶28; Sevilla Decl. at ¶44.  Witness 2 and other recruiters

consistently talked about: (i) the fact that Lee held professional securities licenses, and (ii) the

pledge that Ameritrust would be listed on Nasdaq or the New York Stock Exchange (NYSE)

once it raised enough capital.  Complaint at ¶30; Sevilla Decl. at ¶¶40-41.

Witness 2 showed prospective investors a "private placement memorandum" (or "PPM")

as part of his sales pitch.  Complaint at ¶35.  The PPM is a lengthy securities offering document,

written in English, and was likely meaningless to most of the Korean investors.  Complaint at

¶35.  The PPM purported to relate to an offering of Ameritrust shares to wealthy and experienced

investors, which the Korean investors were not.  Complaint at ¶¶28, 35.  The PPM falsely stated

that investor funds would be escrowed at the Bank of New York Mellon, which they were not.

Complaint at ¶35.

According to Witness 2, Lee and his Beespoke Korea recruiters manipulated the

purported value of Ameritrust shares by selling shares to new investors at increasing prices.

Complaint at ¶36; Sevilla Decl. at ¶38.  An October 10, 2019 email from a Beespoke Korea

email address represented to investors that trading among shareholders had caused Ameritrust's

stock price to rise drastically, and that investors had become billionaires. Complaint at ¶37;

Exhibit 9 to Sevilla Decl.  Lee and Beespoke Korea representatives also falsely represented to investors that the value of their investment had increased from "stock splits."  Complaint at ¶32; Sevilla Decl. at ¶¶34, 63.  Lee wrote in his email that Ameritrust had a 10-to-1 stock split in September 2019 and that the value of shares had increased tenfold.  Exhibit 9 to Sevilla Decl.  In his October 10, 2019 email, Lee wrote that once Ameritrust went public, the stock price would be between $30 and $40.  Exhibit 9 to Sevilla Decl.  He also wrote that, based on the projected price of $30 or $40 per share, early investors would have between $38 million and $50 million.  *Id.*  Lee claimed in his October 10, 2019 email that he bought land in the United States to build investors luxury homes.  *Id.*  Lee's statements were false and misleading.  He threw stock trading jargon at investors whom he knew to be inexperienced.  Lee's statements about stock splits made no economic sense and his numbers were made up.  Ameritrust, and its stock, had no real value.

In October 2020, after Ameritrust merged with Gryphon and became a public company, Lee caused Ameritrust to begin issuing shares to Korean investors who had sent money for investment in 2019.  Complaint at ¶38.  The share issuances were recorded with Ameritrust's transfer agent in the United States.  *Id.*  These share issuances were not part of an offering registered with the Commission, and the shares were therefore not freely tradeable in the U.S. securities market.  *Id.*  On or about October 27, 2020, a Beespoke Korea email address distributed to investors a message from Lee.  *Id*; Sevilla Decl. at ¶53 (attaching the October 27, 2020 email as Exhibit 13).  Lee now represented that the investors were in fact not qualified to have purchased Ameritrust shares in a private transaction because they did not meet wealth or income qualifications.  *Id.*  He also wrote that the investors lacked required investment knowledge and were inexperienced.  *Id.*  Lee suggested that he had solved this problem by

11

donating stock to the investors, and this stock was issued with a "proper stock certificate." *Id*.
Lee represented falsely that the Korean investors now held registered shares that were "legally
qualified and listed stock." *Id*. Lee further misrepresented to investors that the shares were
registered with the American government and organizations, and that the investors had been
transformed from poor to rich. *Id*. Lee's October 27, 2020 message noted that investors "may
be restricted in some trades in America." *Id*. In an email sent on or about December 4, 2020,
however, Lee wrote that "ATCC stocks were available for trade and to be cashed out on October
20th." *Id*.; Sevilla Decl. at ¶53 (attaching the December 4, 2020 email as Exhibit 14). He also
wrote on December 4, 2020 that Ameritrust stock had been registered in the over-the-counter
market and could be traded like other companies. *Id*. Lee's statements were false and
misleading. When Ameritrust issued shares to the Korean investors in October 2020, the shares
were restricted because they were issued directly from Ameritrust or Lee, and not part of a
securities offering registered with the Commission. Complaint at ¶38. The shares were not
freely tradeable in the U.S. securities market at that time. *Id*.

Even if the shares issued to Korean investors in October 2020 could have been sold in the
securities market, the investors held, and continue to hold, a much different investment than what
was promised by Lee. Complaint at ¶39. Ameritrust was not a company listed on Nasdaq or
NYSE, and it had no realistic prospect of being listed on Nasdaq or NYSE. *Id*; Sevilla Decl. at
¶83-84. While many investors had paid $1.00 per share in the 2019 private offering,
Ameritrust's price per share on the over-the-counter market on October 27, 2020 was $0.45 per
share. Complaint at ¶39. Lee, however, in his October 27, 2020 email, congratulated investors
on now holding purportedly registered shares and their "success and new wealth, and a brighter

12

future." *Id*.  Lee and his Ameritrust recruiters have continued the scheme into early 2023, with the same false promise of wealth when Ameritrust is listed on Nasdaq or NYSE. *Id*.

When investors in Korea sent money to buy shares, the investors did not understand that their shares would be restricted. *Id*. at ¶40; Sevilla Decl. at ¶42, 51, 64.  For example, one Korean investor ("Witness 3") was led to believe that the investor was buying shares of Ameritrust that would be freely tradeable and that the investor would be able to sell Ameritrust shares. *Id*.  Witness 3 has said that Lee continues to promise investors that shares will be unrestricted soon, but that this has not happened. *Id*.  According to Witness 2, investors are angry and confused about their shares being restricted, and investors are desperate for Lee to fulfill his promise of making the shares freely tradeable.  Complaint at ¶40; Sevilla Decl. at ¶64. According to Witness 2, investors have asked why Ameritrust is not listed on an exchange or asked why it has been delayed, and Lee has responded only by threatening to take shares away from ungrateful investors.  Complaint at ¶40; Sevilla Decl. at ¶41.

False statements regarding listing on a U.S. exchange are ongoing.  In November 2022, one of the email accounts used by Beespoke Korea for investor communications distributed to investors a letter from Lee.  Complaint at ¶42.  Lee claimed that Ameritrust was going to be registered on NYSE and that it had begun the process of being listed. *Id*.  In a January 5, 2023 email to investors, a Beespoke Korea representative wrote that 2023 will be an amazing year as Ameritrust would be listed on NYSE.  Complaint at ¶48.  These representations were false; Ameritrust has not contacted NYSE to begin the process of listing. *Id*. at ¶42; Sevilla Decl. at ¶83.  Further, Ameritrust has no realistic prospect of being listed on NYSE, because of its low (penny per share) trading price and its delinquency in making required public filings.  Complaint

13

at ¶43.  Ameritrust shares are in fact subject to heightened trading restrictions in the over-the-counter market because of the dearth of publicly available information.  *Id*. at ¶9; Sevilla Decl. at 82.¶  In November 2022, Lee, fully aware that Ameritrust has no real value, encouraged investors in Korea to bolster its stock price by buying shares at increasing prices.  *Id*. at ¶44.

Lee also directed his Beespoke Korea recruiters to tell investors not to label money transfers as being for investment purposes, because to do so risked the transfers being flagged for violating Korean law.  Complaint at ¶50; Sevilla Decl. at ¶28, 39.  Rather, Lee directed his associates to have investors describe the transfers as for "living expenses" on the paperwork.  *Id*.; *see also* McCann Decl. at ¶¶12-13 (analysis of bank records shows that check notations from Korean investors often used language like "living expenses" to describe the transfers).  Investors reached by the Commission staff have uniformly said that their money was transferred for purposes of investment only, and not to support Lee personally.  *Id*.  Lee also hid $10 million in investor proceeds from Ameritrust's auditor.  Complaint at ¶52; McCann Decl. at ¶27.

Lee has absconded with investor proceeds.  As detailed in the McCann Declaration, Lee has moved approximately $1.9 million to his personal bank accounts, used over $800,000 in investor funds to make charitable donations in his own name, and given at least $1.3 million to his daughters.  Lee gave his daughter Alice Choi $500,000 in July 2021, and when he learned that she had been subpoenaed by Commission staff, he texted her that she should state the money was a loan.  Complaint at ¶54-55; Sevilla Decl. at ¶89; *see also* Exhibit 22 (copy of text message from Lee to Choi).  Further, Lee has used investor funds to fuel his scheme, transferring nearly $3.4 million to a Beespoke LLC account in Korea and another $460,000 to individuals in Korea for salary and operating expenses.  McCann Decl. at ¶¶19, 26.

14

Lee's scheme is ongoing.  According to Witness 2, a recent Ameritrust information session in Korea was held with approximately fifty people in attendance, and there are at least 200 people on a waiting list to send money to Lee in the United States because Lee has said he cannot currently deposit money in the United States.  Complaint at ¶47; Sevilla Decl. at ¶45-46. Witness 1 similarly understood that as of early January 2023, Beespoke Korea was continuing to hold Ameritrust information sessions.  Complaint at ¶47; Sevilla Decl. at ¶21, 28.  And, Lee continues to use investor funds for what appears to be personal benefit -- as recently as December 2022, Lee transferred another $50,000 to one of his daughters from a Beespoke account.  McCann Decl. at ¶22.

At bottom, Lee's scheme hinges on his purported expertise in the American securities market and his control of a publicly-traded U.S. company.  Lee convinced investors that he was giving them an opportunity to get in on the ground floor of a company that would become listed on a U.S. stock exchange and explode in value.

B.     *Misrepresentations and Omissions in Ameritrust's SEC Filings*

Once it became a public company with securities registered with the Commission, Ameritrust was required to file quarterly and annual reports with the Commission.  Public companies file quarterly reports on Form 10-Q and annual reports on Form 10-K.  Forms 10-Q include, among other things, unaudited financial statements that provide shareholders and the public with periodic updates on the company's performance.  Forms 10-K include, among other things, audited financial statements and narratives from management.  Ameritrust has been delinquent in filing its quarterly and annual reports, but since April 2020, Lee has signed all of Ameritrust's filings with the Commission.  Complaint at ¶¶60-62.

As further detailed in the Complaint, these filings are replete with misinformation and material misrepresentations and omissions.  Among other things:

- Ameritrust reported in its 2020 Annual Report, filed with the Commission on Form 10-K and signed by Lee, that it had total assets of approximately $4 million, including less than $1 million in real estate assets under development.  Ameritrust thereafter filed quarterly reports for 2021 fiscal year (the quarters ending 12/31/2020, 3/31/2021, and 6/30/2021). On July 2022, Ameritrust filed amended reports for each 2021 quarter, signed by Lee.  In the amended quarterly reports, Ameritrust reported $70 *billion* in Chinese real estate assets.  As Lee well knew, however, Ameritrust had not completed the acquisition of real estate assets purportedly underlying the $70 billion figure.

- Ameritrust's reported cash assets of approximately $2.5 million in its Form 10-K for 2020, which included certain bank accounts of Beespoke LLC.  However, Lee failed to disclose to the auditor another Beespoke LLC account that received incoming cash from Korean investors, and which had a balance of nearly $10 million as of the fiscal year end. This omission rendered statements in Ameritrust's 10-K misleading, because the reported cash balance was materially false, or at least misleading by understating cash assets.

- Also in Ameritrust's Form 10-K, the company reported that management was in the process of renewing the broker-dealer registration for Beespoke, Inc., a subsidiary of Ameritrust purchased by Lee earlier in 2020.  That statement was false; Beespoke LLC was inactive, and the application to register Beespoke LLC as a broker-dealer had lapsed by the time of the 10-K, nor had Lee had not taken any further steps to apply for or renew its application.

16

**ARGUMENT**

I.   **DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND PRELIMINARILY ENJOINED FROM FURTHER VIOLATIONS OF THE FEDERAL SECURITIES LAWS.**

Upon "a proper showing" that violations of federal securities laws have occurred, a court shall order a temporary restraining order.  *See* Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)]; Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].  A "proper showing" includes, "'at a minimum, proof that a person is engaged in or is about to engage in a substantive violation of either one of the Acts or of the regulations promulgated thereunder.'"  *SEC v. Fife*, 311 F.3d 1, 8 (1st Cir. 2002) (quoting *Aaron v. SEC*, 446 U.S. 680, 100 (1980)).  Courts have broad discretion to consider and weigh evidence submitted by affidavit rather than live testimony.  *See, e.g., SEC v. Frank*, 388 F.2d 486, 490 (2d Cir. 1968).

Because Defendants are engaged in an ongoing scheme to defraud investors, the Court should grant temporary and preliminary injunctive relief to prevent Defendants from continuing their scheme while this action is pending.  Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act authorize the Commission to seek, and the Court to enter, preliminary relief against future securities law violations upon a "substantial showing of likelihood of success as to both a current violation and the risk of repetition."  *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998) ("*Cavanagh I*").  Because the Commission is "not . . . an ordinary litigant, but . . . a statutory guardian charged with safeguarding the public interest in enforcing the securities laws[,]" its burden to secure temporary or preliminary relief is less than that of a private party. *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).  It need not show irreparable

17

injury, a balance of equities in its favor, or the unavailability of remedies at law.  *Id.*; *Cavanagh I*, 155 F.3d at 132.

As further discussed below, the Commission meets this standard here.  The Commission has made a substantial showing that Defendants have violated the antifraud provisions of the Securities Act and Exchange Act.  Much of the conduct underlying their violations is ongoing.  If a temporary restraining order is not entered, the Defendants' ongoing scheme will likely ensnare new victims.  Indeed, as set forth in the proposed Temporary Restraining Order, the Commission asks that this Court explicitly preclude Defendants from soliciting any new investors, or accepting any monies from any prospective investors, given the grievous risk that irreparable harms could result if the Defendants continue taking in money.

## II.   THE COURT SHOULD ORDER THAT THE DEFENDANTS AND BEESPOKE RELIEF DEFENDANTS' ASSETS BE FROZEN AND REPATRIATED PENDING A FINAL ADJUDICATION OF THIS ACTION.

In this emergency action, the Commission seeks an immediate asset freeze of the accounts owned and controlled by the Defendants, including but not limited to those into which Lee is alleged to have deposited investor funds obtained by fraudulent means.  Such relief turns, in part, on the showing of at least an inference that the Defendants have violated the securities laws.  *See, e.g.*, *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011).  "An asset freeze is a provisional remedy, the purpose of which is to ensure that, in the event the SEC obtains a judgment, money will be available to satisfy that judgment."  *SEC v. Byers*, No. 08 Civ. 7104 (DC), 2009 WL 33434, at *2 (S.D.N.Y. Jan. 7, 2009).  To obtain an asset freeze, the Commission "must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws."  *Smith*, 653 F.3d at 128 (citing

18

*Byers*, 2009 WL 33434, at \*3).  As emphasized by the Second Circuit in *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990), "the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged."  This is a lesser showing than is required to obtain a preliminary injunction against future violations of the securities laws.  *Id.*; *see also Byers*, 2009 WL 33434, at \*2 ("[T]he SEC's burden of proof on an asset freeze is not as onerous as its burden would be for an injunction.").

Upon making the required showing, the Commission is entitled to a freeze of assets "sufficient to preserve its disgorgement remedy as well as assets necessary to pay civil monetary penalties."  *SEC v. Maillard*, No. 13-cv-5299 (VEC), 2014 WL 1660024, at \*4 (S.D.N.Y. April 23, 2014); *see also SEC v. Dubovoy*, No. 15-cv-6067, 2015 WL 6122261, at \*9 (D.N.J. Oct. 16, 2015) ("[T]he fact that [the defendant] who controls the foreign entities, lives abroad raises a serious concern that he may transfer corporate funds beyond the Court's jurisdiction and dissipate the assets available for any potential award").  The Commission is not only entitled to freeze the assets of the Defendants, but those of the Beespoke Relief Defendants, as the "freeze sought is" considered to be "against the defendant's assets."  *SEC v. Ahmed*, 123 F.Supp. 3d 301, 308 (D. Conn. 2015 (freezing real property owned by defendant's wife named as a relief defendant) (*quoting SEC v. Heden*, 51 F.Supp. 2d 296, 299 (S.D.N.Y. 1999)).

## III.   THE COMMISSION IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS AGAINST THE DEFENDANTS BECAUSE OF SUBSTANTIAL EVIDENCE OF FRAUD.

The Commission has brought two separate, but interrelated, claims for relief:  Section 17(a) of the Securities Act; and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Section 17(a) requires a showing that, in the offer or sale of securities, Lee and Ameritrust (1)

19

employed a device, scheme, or artifice to defraud; (2) obtained money or property by means of an untrue statement or omission of a material fact; or (3) engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon a purchaser.  *See* 15 U.S.C. § 77q(a). Section 10(b) and Rule 10b-5 similarly require a showing that, in connection with the purchase or sale of securities, Lee and Ameritrust (1) employed a device, scheme, or artifice to defraud; (2) made an untrue statement or omitted a material fact; or (3) engaged in an act, practice, or course of business which operated as a fraud or deceit upon a person.  *See* 15 U.S.C. § 78(j)(b); 17 C.F.R. 240.10b-5.  To establish primary liability under these antifraud provisions, the Commission must show that the defendants, acting with scienter, engaged in a fraudulent scheme or made material misrepresentations or omissions in connection with the offer, purchase, or sale[2] of securities.  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996); *see also SEC v. China Northeast Petroleum Holdings Ltd.,* 27 F. Supp. 3d 379, 387 (S.D.N.Y. 2014) ("*China Northeast*").  The Commission need not plead scienter for a claim under subsections (2) and (3) of Section 17(a), for which negligence is sufficient.  *See Aaron v. SEC*, 446 U.S. 680, 695-96 (1980); *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013).

The Commission has made a substantial showing that Defendants' conduct satisfies each

---

[2] Securities Act Section 17(a) prohibits certain conduct "in the offer or sale" of securities, whereas Exchange Act Section 10(b) and Rule 10b-5 prohibit certain conduct "in connection with the purchase or sale" of securities.  Since Lee lied and omitted material information in the course of offering and selling registered securities in Ameritrust, a public company registered with the Commission, Defendants' fraud indisputably occurred in connection with the offer, purchase, and sale of securities, as required by Section 17(a) and Section 10(b), as a matter of law.  *See Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 394 (2014)(noting that the term 'security' under Section 10(b) covers a wide range of financial products beyond those traded on national exchanges" and noting the SEC's "broad Section 10(b) enforcement powers"); *see also SEC v. Ahmed*, 308 F.Supp.3d 628, 658 (D. Conn. 2018) (describing Section 17(a)'s requirement "that the misconduct occur in the 'offer' or 'sale' of securities" as "expansive").

of these elements.  As the Complaint illustrates, and as supported by the McCann and Sevilla

Declarations, there is strong evidence that Lee and Ameritrust, with scienter, made material

misrepresentations and omissions to investors and engaged in a fraudulent course of conduct in

connection with the purchase and sale of securities, and in the offering of securities to the

investing public.

***The Defendants' False Statements and Omissions Are Material.***

Defendants' misstatements and omissions are material, as each goes to the very core of

the investment—*i.e.*, the value and prospects of the underlying business.  *See Basic Inc. v.*

*Levinson,* 485 U.S. 224, 231-32 (1988) (misstatements and omissions are material if a substantial

likelihood exists that a reasonable investor would consider the information important in making

an investment decision); *SEC v. Mayhew*, 121 F.3d 44, 51 (2d Cir. 1997) (same).

First, Lee and Ameritrust made false and misleading statements in public filings,

including by overstating its Chinese real estate assets by at least **$70 billion**.  It is beyond dispute

that a reasonable investor would want to know whether a company's assets were overstated by

$70 billion dollars – especially if they are investing in a thinly traded microcap company with

few assets.  In reality, Ameritrust was nothing more than a "paper company" that lent Lee an air

of legitimacy, and helped him to recruit investors in Korea, who were unaware that this U.S.

public company was a mirage.  And, Lee has failed to correct these 10-Ks and 10-Qs containing

these lies and omissions, so U.S. investors continue to be misled about Ameritrust even today.

Second, Lee failed to tell investors that he was siphoning their money for personal use,

not for any business-related purposes. It is fundamental that the misuse of offering proceeds is

material.  As the Second Circuit long ago held: "What reasonable investor would not wish to

21

know that the money raised by stock sales would not be used for working capital but be diverted to [defendant corporation's] officers?  It is beyond cavil that appellants' misleading statements and omissions concerned facts that were material as a matter of law." *SEC v. Research Automation Corp.*, 585 F.2d 31, 35-36 (2d Cir. 1978).

Third, and perhaps most egregiously, Lee solicited at least $20 million from Korea by making fantastical promises about wealth in America to investors, many of whom were elderly and vulnerable.  *See* Sevilla Decl. at ¶14 (witness describing "95%" of Ameritrust investors as "over the age of sixty (60) and… poor and uneducated.").  Lee and his recruiters told Korean investors that Ameritrust would soon be listed on NASDAQ, "which would make the stock price go up and make them rich."  *Id*. at ¶17, 41 (witness stating that "the listing of [Ameritrust] on a major exchange in the United States is important to Koreans because the company has said … that it assures an increase in the stock price.")  However, shareholders were not told that Ameritrust was a "paper company" and that they were buying restricted stock that could not easily be sold.  *Id*. at ¶¶15-16, 51, 68.  Nor were investors aware that Lee's representation about Ameritrust soon trading on Nasdaq was a flat-out lie.  Nasdaq (and, similarly, NYSE) has no record of Ameritrust submitting or commencing a listing application, nor any contact from anyone at Ameritrust.  *See* Sevilla Decl. at ¶74, 76, 78, 79, 83, 84.  In reality, Ameritrust is subject to heightened trading restrictions in the over-the-counter market because of the dearth of current information available to the investing public.  *Id*. at ¶82.

In sum, Lee and Ameritrust made repeated misrepresentations and omissions over a period of years about the company's financial condition, the terms on which investors were buying securities, and the prospect of Ameritrust trading on Nasdaq or NYSE.  These lies and

omissions not only *would have* been material to a reasonable investor seeking to buy stock in a public company – but *were* material, especially to the vulnerable people on whom Lee preyed.

**Defendants Are Engaged in an Ongoing Fraudulent Scheme.**

Defendants' misuse of investor funds also constitutes a fraudulent scheme in violation of Section 10(b) of the Exchange Act, Rules 10b-5(a) and (c) thereunder, and Sections 17(a)(1) and (3) of the Securities Act.  Scheme liability under Sections 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) generally requires a showing that the defendant committed a manipulative or deceptive act in furtherance of the alleged scheme to defraud.  *See, e.g., SEC v. Lee*, 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010).

Falsely representing to investors that their money will be used for one purpose and then using it for another purpose is by definition a fraudulent scheme.  *See United States v. Aloi*, 511 F.2d 585, 591 (2d Cir. 1975) ("Again to summarize, what had started as an effort to raise money . . . had been taken over by [defendants] as a scheme to obtain money from the public via the sale of . . . stock for their own use and purpose without disclosure of this fact to the purchasers."); *SEC v. One Wall Street, Inc.*, 2008 WL 5082294, at *1 (E.D.N.Y. 2008) (default judgment entered in case in which "defendants perpetrated a fraudulent scheme targeting senior citizens and inducing at least 64 investors to purchase One Wall Street stock on the basis of blatantly false representations, while defendant Jarvis used the investors' funds as a 'personal piggy bank' to benefit himself and the other Defendants.").  Lee represented to investors that he would use investor funds to buy shares in an American company, and to make them rich.  Yet, over the life of the company, a large portion of Ameritrust's spending has been payments to Lee and his family directly, .  This conduct, which goes beyond the misrepresentations Lee employs to

23

induce investments, is actionable as a fraudulent scheme.

Lee has also engaged in other wrongful conduct in furtherance of his scheme.  As detailed in the Complaint, he has raised millions from investors by making materially misleading statements and omitting critical information about the company's prospects and how investor money will be used.  Taken together, these facts indicate that Ameritrust does not operate for the benefit of investors, but rather, unbeknownst to investors, is simply a means for Lee to enrich himself, by telling fantastical lies about Ameritrust's financial condition and future prospects.

***Defendants Have Acted with Intent to Defraud, and/or Negligently***

To be liable under the antifraud provisions of the federal securities laws, a defendant generally must have acted with scienter.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).  Proof of scienter is not required, however, to establish violations of Sections 17(a)(2) or (a)(3) of the Securities Act, for which proof of negligence is sufficient.  *See SEC v. Monarch Funding*, 192 F.3d 295, 308 (2d Cir. 1999).  Scienter may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)) (internal quotation marks omitted); *see also SEC v. Syron*, 934 F. Supp. 2d 609, 631 (S.D.N.Y. 2013).  While manifest in knowing misconduct, scienter also may be found in circumstances where there has been a "reckless disregard for the truth," including "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care."  *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998) (citation omitted).  Such recklessness may be inferred from an

24

"egregious refusal to see the obvious, or to investigate the doubtful." *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 40 (2d Cir. 2000).

There is substantial evidence that Lee and Ameritrust acted with scienter. First, Lee's misuse of investment proceeds to enrich himself and his family, standing alone, is sufficient to establish scienter. *See SEC v. George*, 426 F.3d 786, 795-96 (6th Cir. 2005) (diverting shareholder money to personal use is "a fact that itself establishes the requisite state of mind for committing securities fraud"); *SEC v. Esposito*, 260 F. 3d 79, 91 (D. Mass. 2017) (defendant acted with scienter when he misappropriated investor funds). Further, where Lee was the person who both made the misrepresentations *and* who directly received and misused investor money, it is logical to infer that he knowingly made false statements. *See Aldridge v. A.T. Cross Corp.* 284 F.3d 72, 83 (1st Cir. 2002) ("the fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter"). In fact, the investors interviewed by the Commission uniformly stated that they were directed to lie by Lee about the nature of their money transfers. Instead of telling the truth – namely, that the Korean investors were purchasing Ameritrust securities – Lee and his network of recruiters directed Korean investors to label the money transfers as "living expenses" rather than the purchase of stock. *See* Sevilla Decl. at ¶28, 39; McCann Decl. at ¶¶12-13 (observing that certain deposit records "included transactional memos stating 'Family Assistance and Expenses,' 'Education Fee,' or similar notations, purporting to describe the purpose of the payments to Ameritrust.")

Lee's deceptive intent was further manifest in his obstructive conduct both in preparing his public filings and in the Commission's investigation. Among other things, Lee concealed

corporate bank accounts that received foreign investor funds from two auditors over two fiscal years and directed one of his daughters to lie to the Commission, and to describe the money he gave to her as a corporate loan, despite originally telling her it was a gift.  *See* McCann Decl. at ¶27; Sevilla Decl. at ¶¶86-89.  Such obstructive conduct shows that Lee acted with willful and fraudulent intent in connection with the allegations of fraud in the Complaint.  *See In re St. Clair*, 533 B.R. 331 at *35 (E.D.N.Y. 2015) ("pattern of obstruction … and record of contradictory and untruthful statements … demonstrates both willful and fraudulent intent.").

***Defendants' Conduct is Subject to Federal Antifraud Provisions of U.S. Securities Laws***

Defendants' defrauding of Korean investors is conduct subject to the antifraud provisions of the federal securities laws.  Investors in Korea sent money to bank accounts in the United States for purposes of investing in an American company.  Lee acquired a U.S.-based company, and then issued its shares to Korean investors, recording those transfers with Ameritrust's U.S.-based transfer agent, and funneled the proceeds of investor fraud to his own bank account in the U.S. and his family members in the U.S., all while holding himself out as the CEO and Chairman of a U.S. company.

Section 929P(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") grants jurisdiction to United States District Courts in Commission enforcement actions alleging violations of the anti-fraud provisions for (1) conduct within the United States in furtherance of the violation, even if a transaction occurs outside the United States and involves only foreign investors, or (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States.  *See* 15 U.S.C. § 78aa(b)(codifying "conduct and effects" test for antifraud provisions of the Exchange Act); 15 U.S.C. § 77v(c)

26

(Securities Act).  Defendants' above-described conduct in the United States was central to their fraud perpetrated on Korean investors.  In addition to alleging fraud upon Korean investors, the Commission's complaint concerns Defendants' false and misleading statements in Commission filings, relating to Ameritrust's securities that were registered with the Commission and traded on the domestic over-the-counter market.

Defendants' misconduct would also be subject to the anti-fraud provisions under the transaction-based test announced by the Supreme Court in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), before the passage of Section 929P(b) of the Dodd-Frank Act.  The *Morrison* transactional test limited the reach of Section 10(b) of the Exchange Act to fraud in connection with "the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States."  *Id.* at 273.  Lee and Ameritrust engaged in selling transactions in the United States, by accepting money from investors in U.S. bank accounts and then issuing stock from the United States to Korean investors, and recording the transfer with Ameritrust's U.S.-based transfer agent.  *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012) (domestic securities transactions include those where "title was transferred within the United States").

## IV.   ABSENT AN ASSET FREEZE AND REPATRIATION ORDER, THERE IS A SERIOUS RISK THAT THE PROCEEDS OF THE FRAUD WILL BE DISSIPATED AND/OR TRANSFERRED TO KOREA.

An asset freeze is particularly appropriate here given the clear risk of imminent asset dissipation, considering that Lee has ties outside of the United States and maintains foreign accounts.  *See*, *e.g.*, *Gonzalez de Castilla*, 145 F. Supp. 2d 402, 420 (S.D.N.Y. 2001) (defendant's "status as a citizen and resident of Mexico with accounts at Mexican banks raises a

danger that the funds would be dissipated or transferred beyond this Court's jurisdiction if his account did not remain frozen."); *SEC v. Anticevic*, No. 05 Civ. 6991 (KMW), 2005 WL 1939946 (S.D.N.Y. Aug. 5, 2005) (freezing the assets of a foreign citizen to avoid dissipation of assets).  In connection with the scheme described in the Complaint, Lee has already transferred millions in investor funds to at least one offshore account in Korea between 2019 and 2022. McCann Decl. at ¶19.  A list of the bank and brokerage accounts of which the Commission is aware is contained in paragraph III.A of the proposed Order filed herewith.

Further, courts may impose an order requiring defendants to repatriate funds that were transferred from the United States to foreign jurisdictions.  *See SEC v. Illarramendi*, 2011 WL 2457734, at *6 (D. Conn. June 16, 2011); *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 372 (S.D.N.Y. 1998) (ordering repatriation of assets); *see also SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984) ("once the equity jurisdiction of the district court has been invoked, the court has power to order all equitable relief necessary under the circumstances").  Much of the conduct described in the complaint that occurred in Korea was at the direction of Lee, who maintains accounts at financial institutions in Korea.

If Lee transfers his U.S.-based assets offshore, or further transfers the funds held in Korea, it will be very difficult for the Commission to track those assets in a timely manner.  The Commission believes that amounts traceable to the fraud already have been transferred overseas. An asset freeze and repatriation order will further protect any remaining funds from dissipation and put the funds in a frozen account under this Court's control until it is able to adjudicate this case, and if appropriate, order funds returned to harmed investors.  Accordingly, the Commission seeks an asset freeze and repatriation order to ensure full recovery of investor funds from the

28

Defendants.

Further, it is black letter law that this Court has the equitable authority to freeze assets of relief defendants, who by definition have not engaged in wrongdoing, so long as "that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds."  *SEC v. Cavanagh*, 155 F.3d. at 136.  Here, as set forth in the McCann Declaration, Lee is the signatory or a joint signatory on all accounts held by the Beespoke Relief Defendants.  McCann Decl. at ¶9, 17.  Moreover, the Commission can meet the *SEC v. Cavanagh* standard.  *See SEC v. I-Cubed Domains, LLC*, 664 Fed. Appx. 53, 55 (2d. Cir. 2016) (upholding freeze of two apartments held by relief defendant in SEC action in D. Conn.), *quoting CFTC v. Walsh*, 618 F.3d 218, 226 (2d. Cir. 2010).

Indeed, the Commission submits that the Court need not even consider the two-part test under *Cavanagh* – because Beespoke Inc. and Beespoke LLC are entirely owned by Lee and Ameritrust.  *See, e.g., SEC v. Ahmed*, 123 F. Supp. 3d 301, 308 (D. Conn. 2015 ("This two-part test is not applicable where an asset claimed to belong to a relief defendant 'is, in reality, also an asset of the defendant.'") (internal citations omitted); *SEC v. McGinn, Smith & Co*., 753 F. Supp. 2d 194, 208 (N.D.N.Y. 2010) ("Where a defendant treated an asset as his own, the asset should be treated as that of the defendant and the *Cavanagh* test becomes irrelevant.").  Here, Beespoke Inc. and Beespoke LLC were pure nominees for Lee, as Lee directed the flow of investor funds in and out of Beespoke Inc. and Beespoke LLC.  *See, e.g.*, *SEC v. Feingold*, 20-cv-1881, Dkt. No. 12 (LAP) (S.D.N.Y.) (freezing relief defendant bank accounts held in the name of corporate entities owned and controlled by the defendants).  However, where the Commission can meet the two-part test under *Cavanagh*, the Court need not even reach this issue, and can simply order the

asset freeze under the traditional analysis. *See, e.g.*, *ICubed Domains LLC*, 664 Fed. Appx. at 55 (rejecting entity relief defendants' appeal of preliminary injunction freezing their assets, claiming that the Commission had failed to show that they were nominees for the Defendant, because the assets satisfied the *Cavanagh* test to permit "freezing the assets of relief defendants who have received ill-gotten gains to which they have no legitimate claim").

Accordingly, the Court should freeze all funds held by the Defendants, along with all assets in the names of the Beespoke Relief Defendants, pending the disposition of this case, since they are all under the control of Lee and Ameritrust, the perpetrators of this ongoing fraud, and have no legitimate claim.

## **CONCLUSION**

For the foregoing reasons, and those set forth in the accompanying declarations and exhibits, the Commission respectfully requests that the Court enter a temporary restraining order, an order freezing and repatriating the assets of the Defendants and the Beespoke Relief Defendants, and imposing additional equitable relief, in the form attached hereto.

Dated: February 1, 2023

Respectfully submitted,
On behalf of the Commission,

*Rua M. Kelly*

Rua M. Kelly
Michael C. Moran
U.S. Securities and Exchange Commission
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA  02139
(617)-573-8941 (Kelly)
kellyru@sec.gov

31