UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

        Plaintiff,

v.

SEONG YEOL LEE and AMERITRUST
CORPORATION,

        Defendants,

and

BEESPOKE CAPITAL, INC., BEESPOKE
CAPITAL, LLC, ALICE MEE-HYANG CHOI,
APRIL SUE-CHANG LEE, and ELAINE
CHOUNG-HEE LEE,

        Relief Defendants.

Civil Action No.

## DECLARATION OF NAOMI SEVILLA

I, Naomi Sevilla, pursuant to 28 U.S.C. § 1746, declare the following:

### Introduction

1.      I am an investigative attorney employed by the United States Securities and Exchange Commission ("SEC" or "Commission") in the Division of Enforcement since 2005.  I make this declaration in support of the Commission's Motion for a Temporary Restraining Order and Order Freezing and Repatriating Assets and for Other Equitable Relief.

2.      I was the primary investigative attorney in the SEC's investigation that preceded the filing of this action.

3.      Except as otherwise noted, I have personal knowledge of the information set forth in this declaration, based on my work on the SEC's investigation.  If called as a witness, I would be able to testify competently to these facts under oath.

<u>Overview of Witness Communications</u>

4.      In the SEC's investigation, the SEC staff learned of several thousand individuals living in the Republic of Korea ("Korea") who were Ameritrust shareholders and/or transferred money to bank accounts in the United States of Seong Yeol Lee ("Lee"), Ameritrust Corporation ("Ameritrust"), Beespoke Capital, Inc., or Beespoke Capital, LLC (the latter Beespoke entities are collectively referred to herein as "Beespoke").  The SEC staff obtained the names of Korean shareholders from records maintained by Ameritrust's transfer agent in the United States, and the names of Korean depositors from bank records.

5.      In connection with the SEC's investigation, in late November 2022, I sent a series of identical messages by electronic mail to a total of approximately 2,000 individuals in Korea. The SEC staff established a dedicated email address, <u>SECAmeritrustInvestigation@sec.gov</u>, to communicate with witnesses in Korea regarding the Defendants.  The content of the message was in both English and Korean.  An SEC staff member who is fluent in Korean translated the message from English to Korean.  A copy of a representative email I sent is attached hereto as **Exhibit 1**.

6.      The SEC staff's email message to Korean individuals stated that the SEC was requesting information, on a voluntary basis, in connection with an ongoing investigation.  The email identified Lee, Ameritrust, and the Beespoke entities and asked the following questions about these parties:

i.      Do you know or have you heard of any of the people or companies listed above?

     ii.    Have you ever invested any money with any of these people or companies, or otherwise sent or given any money to any of these people or companies for any purpose?

     iii.    If you invested money, what were you told about how your money would be used or invested?

     iv.    Did anyone tell you about any promised or guaranteed investment returns?

     v.    Do you have any written materials about the companies or your investment? (e.g., brochures or account statements)

7.    Thereafter, between late November 2022 and mid-January 2023, I communicated by email with various individuals in Korea.  I also participated in telephone interviews of three (3) witnesses in Korea.  This declaration summarizes the content of these interviews and emails.

8.    For any interviews of witnesses in Korea, either the SEC staff retained an outside interpreter to translate during the interview, or an SEC staff member who is fluent in Korean participated and acted as an interpreter during the interview.  I note the method of interpretation for any interview summarized in this declaration.

9.    For any emails referenced herein that the SEC staff received in Korean, the SEC staff obtained an outside translator to translate the emails to English.  For any emails attached hereto as exhibits, we have redacted the sender's name and other personal identifiers.

<u>Interview of Witness 1</u>

10.    On January 13, 2023, the SEC staff conducted a two-hour telephone interview with a witness in Korea, Witness 1.  I was the primary person asking questions.  Another SEC staff member took notes.  Witness 1 speaks Korean and some English.  The SEC staff retained an outside interpreter to translate during the interview.  Following is a summary of information the SEC staff learned from Witness 1 during the interview.

3

11.      Witness 1 formerly worked for Beespoke in Korea ("Beespoke Korea") in an administrative capacity across several areas of the business.

12.      During the time that Witness 1 worked for Beespoke Korea in 2022, there were four (4) permanent employees receiving salaries and another approximately ten (10) temporary employees receiving an allowance.  During the time that Witness 1 worked for Beespoke Korea, Jong Sun Kim was the head of Beespoke Korea and was Witness 1's supervisor.  Witness 1 received instructions about day-to-day work responsibilities from Jong Sun Kim.  Witness 1 did not know Jong Sun Kim before Witness 1 began working for Beespoke Korea.

13.      Witness 1 described Beespoke Korea's business as an investment bank and said that people in Korea gave money to Beespoke Korea to buy stock in Ameritrust, a company based in the United States.  According to Witness 1, Korean shareholders believed they were buying shares of Ameritrust.  Witness 1 understands that Lee is the CEO of Ameritrust and the Chairman and President of Beespoke.  Witness 1 has not met Lee in person and has not spoken directly with him.  Witness 1 understands that Lee currently lives in the United States.

14.      According to Witness 1, Ameritrust currently has more than four thousand (4,000) shareholders in Korea.  Approximately ninety-five percent (95%) of the shareholders are over the age of sixty (60), and most shareholders are very poor and uneducated.

15.      Through Witness 1's work at Beespoke Korea, Witness 1 learned that Ameritrust is what Witness 1 described as a "paper company."  Witness 1 said that Ameritrust's financial balance sheet is nonsense.

16.      According to Witness 1, Korean shareholders do not know that, in reality, Ameritrust is a "paper company," and Korean shareholders did not know they were buying stocks that they could not sell.

17.     According to Witness 1, to convince Koreans to buy Ameritrust stock, Beespoke

Korea representatives told Korean individuals, in information session and emails, that Ameritrust

would be listed on Nasdaq, which would make the stock price go up and make them rich.

18.     Witness 1 said Beespoke Korea was able to find Korean people to buy stock in

Ameritrust in several ways, as described below.

19.     Witness 1 understood that, in 2018, Lee gave a seminar at a university in Korea

for approximately six (6) months, where Lee talked about Ameritrust, including his plans to list

Ameritrust on Nasdaq.  Since then, Lee has employed people in Korea to sell Ameritrust stock.

20.     According to Witness 1, Jong Sun Kim also found people to invest in Ameritrust.

Witness 1 understands Jong Sun Kim and Lee lived together as domestic partners in Korea for

approximately fifteen (15) years.  In email communications, Jong Sun Kim claimed to be Lee's

wife, and Ameritrust shareholders in Korea believed that to be the case.  Jong Sun Kim also

claimed to be a pastor, but Witness 1 understands that Jong Sun Kim merely paid for a pastor's

license.  Witness 1 said that Jong Sun Kim has recruited investors through churches, but this is

only one way that Beespoke Korea finds investors for Ameritrust.  Over the past few years, other

people who are close to Jong Sun Kim have worked to sell Ameritrust stock to Koreans, but

Witness 1 personally did not do that.  Also, according to Witness 1, current shareholders bring in

more new shareholders.

21.     Witness 1 told us that, for the past several years, Beespoke Korea held

information sessions about Ameritrust at its offices in or near Seoul, Korea.  These information

sessions are currently still ongoing at Beespoke Korea's office near Seoul, Korea.

22.     According to Witness 1, Beespoke Korea also sends out regular emails to

shareholders with information about Ameritrust.  This information includes the fact that

Ameritrust would be listed on Nasdaq.  According to Witness 1, the content of the emails comes from Lee in the United States.  Based on Witness 1's work at Beespoke Korea, Witness 1 knows that Lee sends the emails to Jong Sun Kim, and Jong Sun Kim sent the emails out to Ameritrust's Korean shareholders.  Witness 1 said that emails generally went out under Lee's name, so Korean shareholders could see that the information in the emails was coming from Lee.

23.     According to Witness 1, Korean shareholders were told information that was not true and were issued stock they cannot sell.  Witness 1 said that, if Ameritrust is not listed on Nasdaq, this will be detrimental to Korean shareholders.  Witness 1 believes that serious harm will result to Ameritrust's Korean shareholders if Lee is not stopped from taking money from Koreans.

<u>Emails from Witness 1</u>

24.     Between December 30, 2022 and January 17, 2023, the SEC staff received several emails from Witness 1.  Witness 1 speaks some English, and some of the emails Witness 1 sent to the SEC staff were in English, while other emails were in Korean, as noted below.  For any emails in Korean, the SEC staff obtained a translation of the email from an outside translator.

25.     Certain of Witness 1's emails are summarized below.  We are not attaching copies of the emails as exhibits at this time in order to protect Witness 1's identity.  Even redacted, Witness 1's identity could be determined from the content of the emails.

26.     On December 30, 2022, Witness 1 sent an email to the SEC staff in Korean, which provided background information about Witness 1's role at Beespoke Korea.

27.     On January 10, 2023, Witness 1 sent an email to the SEC staff in English, which had four (4) attachments, two of which were photos in JPEG files, and two of which were PDF files.  The two JPEG files are date-stamped on December 15, 2022 and appear to show a room

where people are attending a seminar.  One photo shows an in-person presenter, and one photo

shows a presenter by video.  One of the two PDF documents included identifying details for two

Ameritrust bank accounts in the United States.  The second PDF document was a narrative from

Witness 1 in Korean.

28.     Witness 1's narrative corroborated the information Witness 1 told the SEC staff

during our telephone interview.  Below is a summary of selected points from the translation of

Witness 1's narrative.

- Lee sends money from Beespoke in the United States to Beespoke Korea and Jong Sun Kim for office expenses and employee wages for eight (8) employees.

- From 2019 to 2021, about 46 billion KRW (about 37,000,000 USD) was sent to the bank accounts of Ameritrust and Beespoke in the United States from Korea.  Beespoke Korea employees were told by Lee not to identify the money transfers as being for stock purchases or general investment.

- Since November 2022, Lee has given lectures to about 50 people at once through a video call, snapshots of which are in the two JPEG files attached to Witness 1's email.

- Lee would send out emails or videos approximately 5-6 times a year, constantly saying that the company would be listed on Nasdaq soon, and that stockholders would become rich.

29.     On January 13, 2023, after the SEC staff's telephone interview with Witness 1, I

sent an email to Witness 1 asking additional questions and requesting various follow-up

information on a voluntary basis.  Witness 1 initially agreed to provide a written declaration to

the SEC staff.

30.     On January 17, 2023, Witness 1 sent an email to the SEC staff in English,

expressing concerns about providing further information to the SEC.

31.     I made an additional attempt to communicate with Witness 1 by email, on January

23, 2023, but received no response.

Interview of Witness 2

32.     On December 15, 2022, the SEC staff conducted a two-hour telephone interview with a witness in Korea, Witness 2.  I was the primary person asking questions.  Witness 2 speaks Korean, and a member of the SEC staff who is fluent in Korean acted as an interpreter during the interview.  Another SEC staff member took notes.  Following is a summary of information the SEC staff learned from Witness 2 during the interview.

33.     From 2019 through 2021, Witness 2 worked as a recruiter for Ameritrust in Korea, soliciting individuals in Korea to purchase shares of Ameritrust.

34.     Witness 2 learned of Ameritrust in July 2019 when Witness 2 attended an information session at a church in Seoul, Korea.  Witness 2 heard about Ameritrust and the information session from a friend.  Approximately 40-50 people attended the information session.  Two individuals who identified themselves as pastors hosted the information session. In the information session, the hosts told the attendees that they were selling stock of Ameritrust, a company in the United States, for $1 per share.  The information session hosts said purchasers would be guaranteed to make money because the company planned to conduct stock splits, which, according to the hosts, would first increase the share price from $1 to $10, and then again increase the price ten times more.  After the information session, Witness 2 asked the hosts about how Ameritrust could guarantee returns because what they said during the information session did not make sense to Witness 2.  One of the hosts asked Witness 2 to work with the company to promote the stock and said Witness 2 would receive a certain salary and a number of shares if Witness 2 worked for the company to promote the stock and recruit new investors.  Witness 2 agreed and started working for Ameritrust soon thereafter.

35.     Witness 2 was part of an initial group of approximately 130 individuals who bought shares of Ameritrust in 2019 for $1 per share.  Witness 2 bought 26,850 shares at $1 per share and was also gifted 100,000 shares.

36.     Between 2019 and 2021, Witness 2 hosted daily information sessions at Ameritrust's office near Seoul, Korea, to recruit new investors for Ameritrust.  The attendees at the information sessions Witness 2 hosted included many senior citizens.  In Witness 2's experience hosting information sessions, each new investor on average paid approximately 34 million Korean won (or, approximately $26,000 USD) and received 26,850 shares in exchange.

37.     Witness 2 estimated that, through information sessions Witness 2 and others hosted, and through other means, Ameritrust recruited a total of more than 4,000 investors in Korea.

38.     Witness 2 would receive information from Ameritrust's management at the beginning of the day about what the purchase price should be for the day.  Witness 2 said that Ameritrust was able to manipulate the price of the shares it offered by setting the purchase price on any particular day, such as $3, $4, or $5 per share. Witness 2's understanding was that the daily price setting information originated from Lee, Ameritrust's Chairman, who was living in the United States.

39.     Witness 2 told us that people in Korea sent money to Ameritrust bank accounts in the United States in exchange for shares of Ameritrust stock.  Lee instructed the information session hosts, such as Witness 2, on telephone calls from the United States, that the memos for the money transfers should not reference that they were for investment purposes, and that the memos for the money transfers instead should reference that they were for support or expenses, so as to avoid having the transactions flagged for a violation of law.

9

40.     At the information sessions, Witness 2 told us he discussed an Ameritrust private placement memorandum, as well as general financial literacy information.  Over time, the Ameritrust information session hosts, including Witness 2, consistently talked about:  (i) the fact that Lee held professional securities licenses and credentials, and (ii) Lee's promise that the company would be listed on Nasdaq or the New York Stock Exchange ("NYSE") once it raised sufficient capital.

41.     According to Witness 2, since 2019, Lee has continued to make the promise to Korean shareholders that he will list Ameritrust's stock on Nasdaq or NYSE.  Witness 2 told us that the listing of the company on a national exchange in the United States is important to Koreans because the company has said in information sessions and otherwise that it assures an increase in the stock price.  Many Koreans hold millions of shares of Ameritrust, so they hope that when Ameritrust is listed, they will become instant millionaires.  When Korean shareholders ask why the company is not listed or why the listing has been delayed, Lee does not provide an answer and only threatens to take shares away from ungrateful investors.

42.     Witness 2 said that Lee did not tell Koreans that Ameritrust would issue restricted shares to them.  Witness 2 said that, when Koreans complained about the restricted shares, Lee initially claimed that the company could not refund their money because they had already bought the shares.  In more recent months, according to Witness 2, Lee has claimed that shares were gifted to Koreans, and not sold to Koreans.

43.     Witness 2 also said that Lee did not tell Koreans that he would use their money for his own personal purposes.

44.     In 2021, Witness 2 stopped hosting information sessions for Ameritrust.

45.     Witness 2 has learned from a friend who still works at Ameritrust that the company continues to hold information sessions for Koreans, and that a recent information session took place on December 14, 2022, with approximately 50 people attending.

46.     According to Witness 2's friend who still works at Ameritrust, Lee has said that Koreans should hold off on sending money to him in the United States for the time being because Lee is currently blocked from receiving money in accounts in the United States, but there are at least 200 people on a waiting list to send money to Lee in the United States.

47.     According to Witness 2's friend who still works at Ameritrust, Lee has told investors not to respond to inquiries from the SEC staff.  Lee has scared and threatened investors by saying that he can do whatever he wants with Ameritrust stock and that, if they wish to keep their Ameritrust shares, they should not cooperate with the SEC.

<u>Emails from Witness 2</u>

48.     Between December 1, 2022 and January 12, 2023, the SEC staff received multiple emails from Witness 2.  Many of these emails forwarded or referenced other communications that, according to Witness 2, Ameritrust or its representatives sent out to Korean shareholders. Following is a summary of selected emails the SEC staff received from Witness 2.

49.     On December 3, 2022, Witness 2 sent an email to the SEC staff forwarding an email dated December 1, 2022 from the email address atccinfo@naver.com, which included a link to a December 1, 2022 video call with Lee, according to the underlying email.  Witness 2 told us that this email address is used by Ameritrust for shareholder communications (and the SEC staff learned in the investigation that Ameritrust's stock trades in the United States on the over-the-counter market or "OTC" under the symbol "ATCC").  The SEC staff obtained a translation of Witness 2's email from an outside translator, and the translation is attached hereto

as **Exhibit 2**.  The SEC staff downloaded the video via the link in the email and retained an

outside translator to transcribe the video in Korean and then translate the Korean transcription to

English, but the audio quality was poor, so the translation is difficult to understand.

50.     On December 3, 2022, Witness 2 sent an email to the SEC staff forwarding an

email dated November 5, 2022 from the email address atccinfo@naver.com, which included a 6-

page narrative attachment dated November 4, 2022.  The staff obtained a translation of the email

and attachment from an outside translator, and the translation is attached hereto as **Exhibit 3**.

The November 5 email described the attachment as an "announcement from Chairman Seong

Yeol Lee."

51.     On December 5, 2022, Witness 2 sent an email to the SEC staff, the text of which

mostly appeared (from the context) to originate from Ameritrust, although the text is pasted into

Witness 2's email and there is no originating email address.  There is a postscript from Witness 2

at the end of the email.  The SEC staff obtained a translation of the email, including Witness 2's

postscript, from an outside translator, and the full translation is attached hereto as **Exhibit 4**.

Witness 2's postscript (Exhibit 4, at p.3), as translated, states in part:

> …There are about 4,200 investors in Korea. Now Seong Yeol Lee is
> claiming all of the stocks he sold to us are gifted stocks. We invested in
> them; we paid for them. In the past, Seong Yeol Lee said that he could
> not give refunds because Koreans have invested in the stocks, and refunds
> are unavailable. Now he is claiming that the stocks are gifted to us. He
> never mentioned that he was selling limited stocks to Korean investors at
> the start. He told us that he was selling FREE stocks, and now that it is
> listed on the OTC, it was not available for trade.
>
> I beg you to investigate this case thoroughly.

52.     On December 13, 2022, Witness 2 sent an email to the SEC staff.  The SEC staff

obtained a translation of Witness 2's email from an outside translator, and the translation is

attached hereto as **Exhibit 5**.  In part, the translated email (Exhibit 5, at p.1) states:

I have been selling stocks to the Korean stockholders and lecturing about ATCC since July 2019 under Seong Yeol Lee's orders. I am currently collecting evidence to answer your questions….

53.     On December 21, 2022, Witness 2 sent approximately thirty (30) emails to the SEC staff.  Many of these emails attached Ameritrust-related documents and/or forwarded other emails, dated between August 2019 and December 2020, which, according to Witness 2, originated from Lee or other Ameritrust representatives.  Various of the forwarded emails were sent from one of the following three email addresses:  (i) ylee37@hotmail.com (which is Lee's email address through which the SEC staff has communicated with Lee during the investigation); (ii) atcc153@naver.com (which, according to the translations the SEC staff obtained, is an email address used by Jong Sun Kim); and (iii) atcc3346@naver.com.  The SEC staff understands from Witness 2's emails that the latter two email addresses were used by Ameritrust to send communications to shareholders.  The SEC staff obtained a translation from an outside translator of certain emails that Witness 2 sent to the SEC staff on December 21, 2022.  Copies (if in English) or translations of selected emails the SEC staff received from Witness 2 are attached hereto as **Exhibits 6 through 15**.  Below is a table listing the original dates and original senders of any forwarded emails, or the date and type of document attached, as applicable.

| Exhibit No. | Original Date | Sender/Document |
| --- | --- | --- |
| 6. | 7/15/2019 | Ameritrust private placement memorandum |
| 7. | 9/9/2019 | atcc153@naver.com |
| 8. | 9/22/2019 | ylee37@hotmail.com |
| 9. | 10/1/2019 | ylee37@hotmail.com |
| 10. | 10/10/2019 | ylee37@hotmail.com |

| 11. | 10/10/2019 | atcc153@naver.com |
| 12. | 9/6/2020 | atcc3346@naver.com |
| 13. | 10/27/2020 | atcc3346@naver.com |
| 14. | 12/4/2020[1] | ylee37@hotmail.com |
| 15. | 12/20/2020 | atcc3346@naver.com |

54.     On December 29, 2022, Witness 2 sent an email to the SEC staff forwarding a December 23, 2022 email from the email address atccinfo@naver.com.  The SEC staff obtained a translation program of this email chain from an outside translator.  The translation of the email chain is attached hereto as **Exhibit 16**.

55.     On January 2, 2023, Witness 2 sent an email to the SEC staff attaching a 6-page document that, based on the context, appears to be a letter from Ameritrust to shareholders, also dated January 2, 2023, although there is no transmitting email address for the letter.  The SEC staff obtained a translation of Witness 2's email and the letter attachment from an outside translator, and the translation is attached hereto as **Exhibit 17**.  The content of the translated attachment appears to be nearly identical the November 2022 letter to shareholders (Exhibit 3).

56.     On January 12, 2023, Witness 2 sent an email forwarding an email dated January 5, 2023 from the email address atccinfo@naver.com.  The SEC staff obtained a translation of this email chain from an outside translator.  The translation of Witness 2's transmittal email and the underlying email from Ameritrust is attached hereto as **Exhibit 18**.[2]  The transmittal email from Witness 2, as translated, states the following:

---

[1]  Due to an apparent translator error, the date of the underlying email is shown as December 4, 2022 in the translated copy in Exhibit 14, but the actual date in the Korean version of the email was December 4, 2020.

[2]  Due to an apparent translator error, the date of the underlying email is shown as January 5, 2022 in the translated copy in Exhibit 18, but the actual date in the Korean version of the email was January 5, 2023.

> The content below contains the announcement by Seong Yeol Lee…. The main detail is that currently about if 200 people send money to BOA for American investment account funds, they will provide 9,000 shares of ATCC stock.
>
> Like this, they are tricking the stockholders to create investment accounts and let them sell the ATCC stocks, and they are providing the stockholders with 9,000 shares of stock once they receive money.
>
> This needs immediate action.

57.      Witness 2 initially was willing to provide a written declaration to the SEC staff, but later expressed concerns about doing so.  I made an additional attempt to communicate with Witness 2 by email, on January 23, 2023.  To date, the SEC staff has not received a signed declaration from Witness 2.

<u>Interview of Witness 3</u>

58.      On December 23, 2022, the SEC staff conducted a two-hour telephone interview with a witness in Korea, Witness 3.  I was the primary person asking questions.  Another SEC staff member took notes.  Witness 3 speaks Korean, and the SEC retained an outside Korean interpreter to translate during the interview.  Following is a summary of information the SEC staff learned from Witness 3 during the interview.

59.      Witness 3 learned of Ameritrust several years ago from a friend and attended an information session with a few other people.

60.      Witness 3 bought shares of Ameritrust in 2019.   Witness 3 sent money to Ameritrust's corporate bank account in the United States and received a stock certificate for Ameritrust from the United States.  Witness 3 bought 26,850 shares for 32 million Korean won (or, approximately $26,000 USD).  Witness 3 knows of other people in Korea, including family members, who also sent money to Ameritrust bank accounts in the United States and in return received Ameritrust stock certificates from the United States.

15

61.     Witness 3 received written information about Ameritrust in the mail, but no longer has the information.  From that information, Witness 3 understood that Ameritrust was involved in in the leasing of buildings in China, that it had made profits from buying a hospital in China, and that it was planning to export processed beef from the United States to China.

62.     At various times, Witness 3 has also received emails from Lee, Ameritrust's Chairman.  Witness 3 understands, from two Korean friends, that Lee has been living in the United States, along with his romantic partner, Jong Sun Kim.  These two friends visited Lee in the United States.  Witness 3 understands that Jong Sun Kim is the Secretary of Ameritrust and is the face of Beespoke, which Witness 3 understands is the Korean branch of Ameritrust.

63.     Witness 3 said that, at various times, Lee said in emails that Ameritrust would pay dividends to shareholders.  Lee also said there would be a stock split that would increase the stock price to $5 per share, and that, after that, Ameritrust stock would be listed on Nasdaq. Based on these statements from Lee, Witness 3 invested in Ameritrust.  To this day, according to Witness 3, Lee has continued to promise that Ameritrust will be listed on Nasdaq.

64.     Witness 3 understood that Witness 3 was buying shares of Ameritrust that would be freely tradeable and that Witness 3 would be able to sell Ameritrust shares.  According to Witness 3, Lee did not keep his promise to Koreans that they would be able to sell their shares. Witness 3 said Lee continues to promise that the shares will be unrestricted soon, but that has not happened.  Witness 3 would not have invested if Witness 3 knew that Koreans would not be able to sell shares of Ameritrust.

65.     Witness 3 sent money and bought shares for the purpose making an investment in Ameritrust, and hoped to make money on the investment.  Witness 3 does not know what happened to the money Witness 3 invested in Ameritrust.  Witness 3 said that Lee did not say

exactly how we would use the money from Koreans, but that Lee did not tell Koreans that he would use their money for his own personal purposes.  Witness 3 would want to know if Lee was using money Witness 3 invested in Ameritrust for Lee's own personal purposes.

66.     Witness 3 understands that Ameritrust continues to recruit investors in Korea and that people in Korea continue to send money to Ameritrust and Lee in the United States.

<u>Email from Witness 3</u>

67.     On December 9, 2022, the SEC staff received an email from Witness 3.  The email had no content, but there was a document attached with a narrative from Witness 3.  An SEC staff member who speaks Korean translated Witness 3's narrative.  The translation of Witness 3's narrative is attached hereto as **Exhibit 19**.

68.     Below are selected excerpts from Witness 3's translated narrative (Exhibit 19, at pp.2-3):

> My name is [Witness 3], and I am a registered stockholder for Ameritrust Corporation.
>
> …
>
> What I wanted to say was that this Ameritrust Corporation is a fake company that Seong Yeol Lee created to scam Koreans, and Beespoke Capital Inc. is a fake company that creates secret funds by scamming Koreans and sends them to Seong Yeol Lee, under Jong Seon Kim, who is his secret mistress. For over five years they have been claiming the company needed to be listed on NASDAQ, and even till this day Koreans are still trusting Seong Yeol Lee and investing money by buying their stocks. I've seen families torn apart and patients not even being able to afford hospital bills due to these frauds.
>
> …
>
> This stock is a fraud that has no source of finances whatsoever, and everything is a scam.
>
> …

Dear United States Securities and Exchange Commission, please investigate this company and stop Seong Yeol Lee and Jong Seon Kim from scamming innocent Korean investors and crushing their hopes.

At this moment he is telling the Koreans to buy his stocks because he needs to make five dollars.

In 2020, he even claimed that Beespoke Capital, LLC was not able to be listed on NASDAQ due to the poor investment of Korean investors.

This "five dollars" that he needs is the payment (which actually exceeds 10 billion KRW) has already been sent over to Seong Yeol Lee's end, and we Korean stockholders have no clear information on what Jong Seon Kim did with the funds.

I am a single mother with two children, and I stepped on a trap that Seong Yeol Lee created for the hopes that my children would be able to live a better life.

…

Please delist this company so they can no longer scam other people….

69.     Witness 3 initially agreed to provide a written declaration to the SEC staff. However, to date, the SEC staff has not received a signed declaration from Witness 3.  I made an additional attempt to communicate with Witness 3 by email on January 23, 2023, but I have not not received any response.

### Emails from Other Witnesses

70.     On December 28, 2022, in response to the SEC staff's email request to Korean individuals, the SEC staff received an email response from Witness 4.  According to records the SEC staff obtained in the investigation, Witness 4 has an address in Korea, but has a mobile phone number with a United States area code.  The SEC staff reached Witness 4 at this phone number, but Witness 4 claimed not to speak English, and the SEC staff not able to secure Witness 4's agreement to an interview through subsequent emails.   Therefore, it is unclear whether Witness 4 lives in the United States or Korea.

71.     Witness 4's email to the SEC staff was in Korean, and the SEC staff obtained translations of the email from an outside translator.  The translation of Witness 4's email is attached hereto as **Exhibit 20**.  In the email, Witness 4 provided yes-or-no answers to the questions in the SEC staff's general outreach email, as follows (Exhibit 20, at p.4):

> Do you know or have you heard of any of the people or companies listed above?
> - Yes
>
> Have you ever invested any money with any of these people or companies, or otherwise sent or given any money to any of these people or companies for any purpose?
> - Yes
>
> If you invested money, what were you told about how your money would be used or invested?
> - No
>
> Did anyone tell you about any promised or guaranteed investment returns?
> - Yes
>
> Do you have any written materials about the companies or your investment[?] (e.g., brochures or account statements)
> - Yes.

72.     Between November 30, 2022 and January 10, 2023, the SEC staff corresponded by email with another witness in Korea, Witness 5.  The SEC staff received a total of seven (7) emails from Witness 5, all in Korean.  The SEC staff obtained translations of these emails from an outside translator.  Following are verbatim translations of Witness 5's emails, which are also in a single file attached hereto as **Exhibit 21**.

73.     Witness 5's first email to the SEC staff, dated November 30, 2022 (Exhibit 21, at p.11), as translated, states:

> I know about Ameritrust.
>
> I have invested in them, and I did send money.

They told me that my investments are towards stock purchases.

I haven't got any benefits or guarantees at this time.

I have no information or documents regarding the investment.

74.    The SEC staff received another email Witness 5 dated November 30, 2022

(Exhibit 21, at p.9), which, as translated, states:

I wish to know if the company called ATCC even exists. If it exists, they claim they are getting ready to list on the New York Stock Exchange, and I wish to know if that is true.

75.    Witness 5's email dated December 4, 2022 (Exhibit 21, at p.8), as translated,

states:

I want to know the problem with ATCC, and why you want these answers.

I need to know the reason why to provide you with more details.

The Seoul Branch of ATCC is already sending emails to individuals saying that this is nothing to worry about and there is no need to reply.

I wish to know why you asked these five questions.

76.    Witness 5's email dated December 12, 2022 (Exhibit 21, at p.4), as translated,

states:

When did you invest in Ameritrust?
- July, 2019

When did you send money to Ameritrust?
- July, 2019

How much money did you send?
- 26,850 USD

How much stock did you purchase?
- 26,850 shares : 1 USD per share

Why did you ask about the New York Stock Exchange?
- Chairman Seong Yeol Lee emailed me that it would be listed on the New York Stock Exchange.

Who told you that Ameritrust would be listed on the New York Stock Exchange?
- Chairman Seong Yeol Lee Told me the company is ready to be listed and will be listed shortly by email.

Who told you not to respond to the SEC?
- The ATCC Seoul Branch emailed me not to respond.

* Please tell me why you are asking these questions about ATCC. If you do not wish to answer my question, please do not ask me more questions.

If you let me know, I will explain the facts in more detail.

77.    Witness 5's email dated December 19, 2022 (Exhibit 21, at p.3), as translated, states:

Chairman Seong Yeol Lee told us to not respond via video call.

According to the SEC, he is pulling off illegal actions.

Which side do I have to trust?

78.    Witness 5's email dated December 20, 2022 (Exhibit 21, at p.2), as translated, states:

I have already said this several times. I do not know why you are digging deep into this information.

I need to know the exact reason why you need this information for me to respond. I cannot say a word unless I get to know the reason why.

Chairman Seong Yeol Lee said that ATCC will be listed on the New York Stock Exchange, and to do so, he is even selling his own share.

79.    Witness 5's email dated January 10, 2023 (Exhibit 21, at p.1), as translated, states:

I am inquisitive if the ATCC can be listed on the New York Stock Exchange.

According to Chairman Seong Yeol Lee, he claims that listing on the NYSE is possible if the Korean stockholders invest 1,000 shares at 5 USD per share through his Korean representative.

21

I want to know if we do that, the company can be listed. He also says investing 1,000 shares at 5 USD per share will make us eligible to create an investment account.

If ATCC gets listed, can I make a personal investment account in the States? I am very, very curious.

80.     Witness 5 repeatedly asked in the emails why the SEC staff was seeking information, and we responded each time that we could explain further by phone.  Despite the SEC staff's requests, Witness 5 did not agree to schedule a telephone interview.

<u>Other Investigative Communications and Documents</u>

81.     At various times during the SEC's investigation, the SEC staff communicated with staff of the Financial Industry Regulatory Authority ("FINRA").  The SEC staff also has access to various FINRA databases.  Through these communications and databases, the SEC staff learned that:

i.     In February 2020, Beespoke Capital, LLC submitted a continuing membership application ("CMA") to FINRA.

ii.     In April 2020, FINRA imposed an interim restriction as to the CMA and prohibited, among other things, Lee from acting as a principal of Beespoke Capital, LLC, based on the fact that FINRA had insufficient information in connection with its review of the CMA.

iii.     In June 2020, the CMA lapsed.

iv.     As of September 2020, Beespoke Capital, LLC's broker-dealer registration with FINRA was terminated.  There is no record of any broker-dealer registration for Beespoke Capital, Inc.

82.     In the SEC's investigation, the SEC staff learned that, based on information contained in reports that OTC is required file with FINRA, as of and since April 19, 2022,

Ameritrust's stock has been traded in the so-called "expert market" on OTC, and Ameritrust's stock is not eligible for proprietary broker-dealer quotations and is eligible only for unsolicited quotes on OTC.

83.     During the SEC's investigation, the SEC staff communicated with the staff of NYSE.  Through these communications, the SEC staff learned that, as of December 2022, NYSE had no record of any communication with anyone from Ameritrust regarding any potential NYSE listing application for Ameritrust.

84.     During the SEC's investigation, the SEC staff communicated with the staff of Nasdaq.  Through these communications, the SEC staff learned that, as of early January 2023, Nasdaq had no record of Ameritrust submitting or commencing a Nasdaq listing application, and no record of any contact with anyone from Ameritrust.

85.     During the SEC's investigation, the SEC staff communicated with an auditor that Ameritrust retained in or around September 2022.  The SEC staff learned from the auditor that:

      i.    Lee initially retained the auditor as to audits for Ameritrust for fiscal years 2020 and 2021, but the engagement was later amended to include only fiscal year 2021, and the engagement never included fiscal year 2022.

      ii.    The auditor made information requests to Lee but never commenced any audit work, and the auditor did not get sufficient responses to its information requests.

      iii.    In the course of the auditor's communications with Lee between September and December 2022, the auditor learned, in emails from Lee, that Ameritrust had not yet completed certain real estate transactions in China that were included in Ameritrust's consolidated (unaudited)

financial statements in its Form 10-Q/A filed on July 25, 2022 for the

quarters ended December 31, 2020, March 31, 2021, and June 30, 2021.

iv.    Lee did not respond to the auditor's suggestion that Ameritrust should file

a Form 8-K as to the real estate transactions that are not yet completed.

v.    In January 2023, Lee terminated the engagement with the auditor.  Prior to

firing the auditor, Lee told the auditor, in words or effect, that Ameritrust

has no assets.

86.    The SEC staff issued subpoenas for documents and testimony to Lee, Ameritrust,

and the Beespoke entities in August 2022.  The SEC staff took Lee's testimony remotely by

telephone only (no video) on October 18, 2022, with a Korean interpreter participating.

87.    The SEC staff issued subpoenas for documents and testimony to Lee's three

daughters in September or October 2022, and the SEC staff took testimony from each of them

remotely by video in October or November 2022.  In particular, the SEC sent a subpoena to

Lee's daughter, Alice Choi, dated September 8, 2022, and the SEC staff took Choi's testimony

remotely by video on October 20, 2022.

88.    In response to the SEC's document subpoena, Choi produced copies of text

messages between Choi and Lee, which were marked as an exhibit at her testimony.  Attached

hereto as **Exhibit 22** is an excerpt of the text messages (Bates labeled CHOI 1093-1094).

Attached hereto as **Exhibit 23** is an excerpt of the transcript from Choi's testimony concerning

the text messages.

89.    On September 10, 2022, after the SEC staff sent a subpoena to Choi, and after

Choi (as she testified) discussed the subpoena with Lee, Lee sent a text message to Choi that

read, in part: "I gave you $600,000 for your mortgage loan.  Thus, you state that you borrowed the money for the mortgage payments…" (Exhibit 22; Exhibit 23, at pp. 147-148, 158-159).

The foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  February 1, 2023

*Naomi Sevilla*

_____
Naomi Sevilla
Senior Counsel
Division of Enforcement
SEC Boston Regional Office