**From:**
**To:** SECAmeritrustInvestigation
**Subject:** Fwd: 회사소개
**Date:** Wednesday, December 21, 2022 7:43:48 PM
**Attachments:** PPM (10).docx



**PLAINTIFF'S EXHIBIT**

**6**

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

ATCC  PPM

---------- Forwarded message ---------
보낸사람:
Date: 2019년 9월 25일 (수) 오후 2:08
Subject: Fwd: 회사소개
To:

---------- Forwarded message ---------
보낸사람:
Date: 2019년 9월 25일 (수) 오후 12:45
Subject: Fwd:
To:

---------- Forwarded message ---------
보낸사람:
Date: 2019년 7월 27일 (토) 오후 3:25
Subject:
To:

# AMERITRUST CORPORATION

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

Name of Offeree: _____     Document Number: _____

## Shares

---------------------------------------

Shares Offered: 6,903,103,842

Min Price Per Share: $1.00

Minimum Investment: $250,000

| Investment Overview | Risk Factors |
|---|---|

**AMERITRUST CORP., INC (the "Company") a Michigan Corporation, was formed to operate as a closed-ended real estate development company. The Company will invest the proceeds from investor subscription commitments, purchased through this offering, into commercial and/or residential development properties throughout the world, including but not limited to China and Korea. AMERITRUST CORP, INC , a MICHIGAN Corporation, will direct all investments for the Company and act as the management company through its management.**

**The Company is offering a minimum of 6,903,103,842 at $1.00 per share. The offering price per share has been arbitrarily determined by the Company See "Risk Factors: Offering Price."**

## Shares

**-----------------------------------**

**Shares Offered: 6,903,103,842**

**Price Per Share: $1.00**

**Minimum Investment: $250,000**

**THIS OFFERING INVOLVES CERTAIN RISKS. IN MAKING AN INVESTMENT DECISION REGARDING THE FUND, EACH PROSPECTIVE INVESTOR MUST RELY ON ITS OWN EXAMINATION OF THE FUND AND THE TERMS OF THIS OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. SEE "RISK FACTORS".**

THESE ARE SPECULATIVE SECURITIES WHICH INVOLVE A HIGH DEGREE OF RISK.

ONLY THOSE INVESTORS WHO CAN BEAR THE LOSS OF THEIR ENTIRE INVESTMENT SHOULD INVEST IN THESE SHARES.

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), THE SECURITIES LAWS OF THE STATE OF CALIFORNIA, OR UNDER THE SECURITIES LAWS OF ANY OTHER STATE OR JURISDICTION IN RELIANCE UPON THE EXEMPTIONS FROM REGISTRATION PROVIDED BY THE ACT AND REGULATION D RULE 506 PROMULGATED THEREUNDER, AND THE COMPARABLE EXEMPTIONS FROM REGISTRATION PROVIDED BY OTHER APPLICABLE SECURITIES LAWS.

| | Sale Price | Selling Commissions | Net Proceeds |
|---|---|---|---|
| Per Share | $1.00 | $0.00 | $6,903,103,842 |
| | | | |
| | | | |

## The Effective Date of this Memorandum is JULY 15, 2019

(1) The Company reserves the right to waive the 250,000 Share minimum subscription for any investor. The Offering is not underwritten.  The Shares are offered on a "best efforts" basis by the Company through its officers and directors. All proceeds from the sale of Shares up to $6,903,103,842 will be deposited in an escrow account at Bank of New York Mellon.  Upon the sale of the Shares, all proceeds will be delivered directly to the Company's corporate account and be available for use by the Company at its discretion.

(2) Shares may also be sold by FINRA member brokers or dealers who enter into a Participating Dealer Agreement with the Company, who may receive commissions of up to 10% of the price of the Shares sold.  The Company reserves the right to pay expenses related to this Offering from the proceeds of the Offering.  See "PLAN OF PLACEMENT and USE OF PROCEEDS" section.

(3) The Offering will terminate on the earliest of:  (a) the date the Company, in its discretion, elects to terminate, or (b) the date upon which all Shares have been sold, or (c) January 15, 2020, or such date as may be extended from time to time by the Company, but not later than 180 days thereafter (the "Offering Period".)

THIS OFFERING IS NOT UNDERWRITTEN.  THE OFFERING PRICE HAS BEEN ARBITRARILY SET BY THE MANAGEMENT OF THE COMPANY.  THERE CAN BE NO ASSURANCE THAT ANY OF THE SECURITIES WILL BE SOLD.

THE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES AGENCY, NOR HAS ANY SUCH REGULATORY BODY REVIEWED THIS OFFERING MEMORANDUM FOR ACCURACY OR COMPLETENESS.  BECAUSE THESE SECURITIES HAVE NOT BEEN SO REGISTERED, THERE MAY BE RESTRICTIONS ON THEIR TRANSFERABILITY OR RESALE BY AN INVESTOR.

EACH PROSPECTIVE INVESTOR SHOULD PROCEED ON THE ASSUMPTION THAT HE MUST BEAR THE ECONOMIC RISKS OF THE INVESTMENT FOR AN INDEFINITE PERIOD, SINCE THE SECURITIES MAY NOT BE SOLD UNLESS, AMONG OTHER THINGS, THEY ARE SUBSEQUENTLY REGISTERED UNDER THE APPLICABLE SECURITIES ACTS OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.  THERE IS NO TRADING MARKET FOR THE COMPANY'S SHARES AND THERE CAN BE NO ASSURANCE THAT ANY MARKET WILL DEVELOP IN THE FUTURE OR THAT THE SHARES WILL BE ACCEPTED FOR INCLUSION ON NASDAQ OR ANY OTHER TRADING EXCHANGE AT ANY TIME IN THE FUTURE.  THE COMPANY IS NOT OBLIGATED TO REGISTER FOR SALE UNDER EITHER FEDERAL OR STATE SECURITIES LAWS THE SHARES PURCHASED PURSUANT HERETO, AND THE ISSUANCE OF THE SHARES IS BEING UNDERTAKEN PURSUANT TO RULE 506 OF REGULATION D UNDER THE SECURITIES ACT.  ACCORDINGLY, THE SALE, TRANSFER, OR OTHER DISPOSITION OF ANY OF THE SHARES, WHICH ARE PURCHASED PURSUANT HERETO, MAY BE RESTRICTED BY APPLICABLE FEDERAL OR STATE SECURITIES LAWS (DEPENDING ON THE RESIDENCY OF THE INVESTOR) AND BY THE PROVISIONS OF THE SUBSCRIPTION AGREEMENT REFERRED TO HEREIN.  THE OFFERING PRICE OF THE SECURITIES TO WHICH THE CONFIDENTIAL TERM SHEET RELATES HAS BEEN ARBITRARILY ESTABLISHED BY THE COMPANY AND DOES NOT NECESSARILY BEAR ANY SPECIFIC RELATION TO THE ASSETS, BOOK VALUE OR POTENTIAL EARNINGS OF THE COMPANY OR ANY OTHER RECOGNIZED CRITERIA OF VALUE.

No person is authorized to give any information or make any representation not contained in the Memorandum and any information or representation not contained herein must not be relied upon. Nothing in this Memorandum should be construed as legal or tax advice.

The Management of the Company has provided all of the information stated herein.  The Company makes no express or implied representation or warranty as to the completeness of this information or, in the case of projections, estimates, future plans, or forward looking assumptions or statements, as to their attainability or the accuracy and completeness of the assumptions from which they are derived, and it is expected that each prospective investor will pursue his, her, or its own independent investigation.  It must be recognized that estimates of the Company's performance are necessarily subject to a high degree of uncertainty and may vary materially from actual results.

No general solicitation or advertising in whatever form will or may be employed in the offering of the securities, except for this Memorandum (including any amendments and supplements hereto), the exhibits hereto and documents summarized herein, or as provided for under Regulation D of the Securities Act of 1933.  Other than the Company's Management, no one has been authorized to give any information or to make any representation with respect to the Company or the Shares that is not contained in this Memorandum.   Prospective investors should not rely on any information not contained in this Memorandum.

This Memorandum does not constitute an offer to sell or a solicitation of an offer to buy to anyone in any jurisdiction in which such offer or solicitation would be unlawful or is not authorized or in which the person making such offer or solicitation is not qualified to do so.

This Memorandum does not constitute an offer if the prospective investor is not qualified under applicable securities laws.

This offering is made subject to withdrawal, cancellation, or modification by the Company without notice and solely at the Company's discretion.  The Company reserves the right to reject any subscription or to allot to any prospective investor less than the number of shares subscribed for by such prospective investor.

This Memorandum has been prepared solely for the information of the person to whom it has been delivered by or on behalf of the Company.  Distribution of this Memorandum to any person other than the prospective investor to whom this Memorandum is delivered by the Company and those persons retained to advise them with respect thereto is unauthorized.  Any reproduction of this Memorandum, in whole or in part, or the divulgence of any of the contents without the prior written consent of the Company is strictly prohibited.  Each prospective investor, by accepting delivery of this Memorandum, agrees to return it and all other documents received by them to the Company if the prospective investor's subscription is not accepted or if the Offering is terminated.

By acceptance of this Memorandum, prospective investors recognize and accept the need to conduct their own thorough investigation and due diligence before considering a purchase of the Shares.  The contents of this Memorandum should not be considered to be investment, tax, or legal advice and each prospective

investor should consult with their own counsel and advisors as to all matters concerning an investment in this Offering.

[ This page left blank intentionally ]

## TABLE OF CONTENTS

I.     **Jurisdictional (NASAA) Legends** ................................................................................ 9

II.    **Summary of the Offering** ...................................................................................... 24

    A.     The Company ................................................................................................ 24

    B.     Operations .................................................................................................... 25

    TYPES OF FINANCING STRUCTURES OFFERED TO DEVELOPERS .................... 29

    C.     Summary of Terms ....................................................................................... 38

    D.     Business Plan ................................................................................................ 40

    E.     The Offering ................................................................................................. 40

    F.     Risk Factors ................................................................................................. 40

    G.     Use of Proceeds ........................................................................................... 40

    H.     Minimum Offering Proceeds - Escrow of Subscription Proceeds ................ 40

    I.      Shares ........................................................................................................... 40

    J.      Registrar ....................................................................................................... 41

    K.     Subscription Period ...................................................................................... 41

III.   **TERMS AND CONDITIONS** .............................................................................. 41

IV.    **Requirements for Purchasers** ............................................................................ 44

    A.     General Suitability Standards ....................................................................... 45

    B.     Accredited Investors ..................................................................................... 45

    C.     Other Requirements ...................................................................................... 46

V.     **Forward Looking Information** ........................................................................... 47

VI.    **Risk Factors** ....................................................................................................... 47

    A.     General Real Estate Risks ............................................................................ 48

    B.     Development Stage Business ........................................................................ 48

    C.     Investments through Partnerships and Joint Ventures .................................. 49

    D.     Inadequacy of Funds .................................................................................... 49

    E.     Dependence on Management ........................................................................ 49

    F.     Risks Associated with Expansion ................................................................ 49

    G.     Customer Base and Market Acceptance ....................................................... 50

    H.     Investments Fail to Meet Expectations ........................................................ 50

    I.      Competition .................................................................................................. 50

    J.      Trend in Consumer Preferences and Spending ............................................ 50

    K.     Risks of Borrowing ...................................................................................... 50

    L.     Unanticipated Obstacles to Execution of the Business Plan ........................ 51

    M.     Management Discretion as to Use of Proceeds ............................................ 51

    N.     Control By Management ............................................................................... 51

    O.     Return of Profits ........................................................................................... 52

    P.     No Assurances of Protection for Proprietary Rights; Reliance on Trade Secrets ............. 52

    Q.     Limited Transferability and Liquidity ......................................................... 52

    R.     Broker - Dealer Sales of Shares ................................................................... 53

    S.     Long Term Nature of Investment ................................................................. 53

T.   No Current Market For Shares ....................................................................................53
U.   Compliance with Securities Laws .............................................................................53
V.   Offering Price ...........................................................................................................54
W.   Lack of Firm Underwriter .......................................................................................54
X.   Projections:  Forward Looking Information ...........................................................54

**VII.   Use Of Proceeds .............................................................................................................55**
A.   Sale of Equity ...........................................................................................................55
B.   Offering Expenses & Commissions .........................................................................55

**VIII.  Management .....................................................................................................................56**

**IX.    Management Compensation............................................................................................56**

**X.     Board of Advisors ...........................................................................................................56**

**XI.    Dilution ............................................................................................................................57**

**XII.   Current Management ......................................................................................................57**

**XIII.  Description of Shares ......................................................................................................58**

**XIV.   Transfer Agent and Registrar ......................................................................................58**

**XV.    Plan of Placement ...........................................................................................................59**
A.   Escrow of Subscription Funds ...............................................................................59
B.   How to Subscribe for Shares ..................................................................................59

**XVI.   Additional Information ..................................................................................................60**

**Exhibits**

Exhibit A - Business Plan

Exhibit B – Articles of incorporation

Exhibit C – Subscription Agreement

Exhibit D - Investor Suitability Questionnaire

Exhibit E - Management Resumes

Exhibit F - Initial Project

# Jurisdictional (NASAA) Legends

**FOR RESIDENTS OF ALL STATES: THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THAT STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OR SALE MAY BE MADE IN A PARTICULAR STATE. IF YOU ARE UNCERTAIN AS TO WHETHER OR NOT OFFERS OR SALES MAY BE LAWFULLY MADE IN ANY GIVEN STATE, YOU ARE HEREBY ADVISED TO CONTACT THE COMPANY. THE SECURITIES DESCRIBED IN THIS MEMORANDUM HAVE NOT BEEN REGISTERED UNDER ANY STATE SECURITIES LAWS (COMMONLY CALLED "BLUE SKY" LAWS). THESE SECURITIES MUST BE ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION OF SUCH SECURITIES UNDER SUCH LAWS, OR AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED. THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THE STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OF SALE MAY BE MADE IN ANY PARTICULAR STATE.**

Jurisdictional Legends

1. NOTICE TO ALABAMA RESIDENTS ONLY: THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THIS PRIVATE PLACEMENT MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

2. NOTICE TO ALASKA RESIDENTS ONLY: THE SECURITIES OFFERED HAVE NOT BEEN REGISTERED WITH THE ADMINISTRATOR OF SECURITIES OF THE STATE OF ALASKA UNDER PROVISIONS OF 3 AAC 08.503. THE INVESTOR IS ADVISED THAT THE ADMINISTRATOR HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS DOCUMENT SINCE THE DOCUMENT IS NOT REQUIRED TO BE FILED WITH THE ADMINISTRATOR. THE FACT OF REGISTRATION DOES NOT MEAN THAT THE ADMINISTRATOR HAS PASSED IN ANY WAY UPON THE MERITS, RECOMMENDED, OR APPROVED THE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A VIOLATION OF 45.55.170. THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF

THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

3. NOTICE TO ARIZONA RESIDENTS ONLY: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ARIZONA SECURITIES ACT IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION PURSUANT TO A.R.S. SECTION 44-1844 (1) AND THEREFORE CANNOT BE RESOLD UNLESS THEY ARE ALSO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

4. NOTICE TO ARKANSAS RESIDENTS ONLY: THESE SECURITIES ARE OFFERED IN RELIANCE UPON CLAIMS OF EXEMPTION UNDER THE ARKANSAS SECURITIES ACT AND SECTION 4(2) OF THE SECURITIES ACT OF 1933. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THIS OFFERING OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

5. FOR CALIFORNIA RESIDENTS ONLY: THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS OFFERING HAS NOT BEEN QUALIFIED WITH COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFORE PRIOR TO SUCH QUALIFICATIONS IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPTED FROM QUALIFICATION BY SECTION 25100, 25102, OR 25104 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS OFFERING ARE EXPRESSLY CONDITION UPON SUCH QUALIFICATIONS BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

6. FOR COLORADO RESIDENTS ONLY: THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE RESOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991, IF SUCH REGISTRATION IS REQUIRED.

7. NOTICE TO CONNECTICUT RESIDENTS ONLY: SHARES ACQUIRED BY CONNECTICUT RESIDENTS ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER

SECTION 36b-31-21b-9b OF THE CONNECTICUT, UNIFORM SECURITIES ACT. THE SHARES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF CONNECTICUT. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SHARES.

8. NOTICE TO DELAWARE RESIDENTS ONLY: IF YOU ARE A DELAWARE RESIDENT, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE DELAWARE SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

9. NOTICE TO DISTRICT OF COLUMBIA RESIDENTS ONLY: THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES BUREAU OF THE DISTRICT OF COLUMBIA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

10. NOTICE TO FLORIDA RESIDENTS ONLY: THE SHARES DESCRIBED HEREIN HAVE NOT BEEN REGISTERED WITH THE FLORIDA DIVISION OF SECURITIES AND INVESTOR PROTECTION UNDER THE FLORIDA SECURITIES ACT. THE SHARES REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF SAID ACT. THE SHARES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, ALL OFFEREES WHO ARE FLORIDA RESIDENTS SHOULD BE AWARE THAT SECTION 517.061(11)(a)(5) OF THE ACT PROVIDES, IN RELEVANT PART, AS FOLLOWS: "WHEN SALES ARE MADE TO FIVE OR MORE PERSONS IN [FLORIDA], ANY SALE IN [FLORIDA] MADE PURSUANT TO [THIS SECTION] IS VOIDABLE BY THE PURCHASER IN SUCH SALE EITHER WITHIN 3 DAYS AFTER THE FIRST

TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER OR AN ESCROW AGENT OR WITHIN 3 DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER." THE AVAILABILITY OF THE PRIVILEGE TO VOID SALES PURSUANT TO SECTION 517.061(11) IS HEREBY COMMUNICATED TO EACH FLORIDA OFFEREE. EACH PERSON ENTITLED TO EXERCISE THE PRIVILEGE TO AVOID SALES GRANTED BY SECTION 517.061 (11) (A)(5) AND WHO WISHES TO EXERCISE SUCH RIGHT, MUST, WITHIN 3 DAYS AFTER THE TENDER OF ANY AMOUNT TO THE COMPANY OR TO ANY AGENT OF THE COMPANY (INCLUDING THE SELLING AGENT OR ANY OTHER DEALER ACTING ON BEHALF OF THE PARTNERSHIP OR ANY SALESMAN OF SUCH DEALER) OR AN ESCROW AGENT CAUSE A WRITTEN NOTICE OR TELEGRAM TO BE SENT TO THE COMPANY AT THE

ADDRESS PROVIDED IN THIS CONFIDENTIAL EXECUTIVE SUMMARY. SUCH LETTER OR TELEGRAM MUST BE SENT AND, IF POSTMARKED, POSTMARKED ON OR PRIOR TO THE END OF THE AFOREMENTIONED THIRD DAY. IF A PERSON IS SENDING A LETTER, IT IS PRUDENT TO SEND SUCH LETTER BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ASSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME IT WAS MAILED. SHOULD A PERSON MAKE THIS REQUEST ORALLY, HE MUST ASK FOR WRITTEN CONFIRMATION THAT HIS REQUEST HAS BEEN RECEIVED.

11. NOTICE TO GEORGIA RESIDENTS ONLY: THESE SECURITIES ARE OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE GEORGIA SECURITIES ACT PURSUANT TO REGULATION 590-4-2-02. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

12. NOTICE TO HAWAII RESIDENTS ONLY: NEITHER THIS PROSPECTUS NOR THE SECURITIES DESCRIBED HEREIN BEEN APPROVED OR DISAPPROVED BY THE COMMISSIONER OF SECURITIES OF THE STATE OF HAWAII NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS.

13. NOTICE TO IDAHO RESIDENTS ONLY: THESE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT IN RELIANCE UPON EXEMPTION FROM REGISTRATION PURSUANT TO SECTION 30-14-203 OR 302(c) THEREOF AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SAID ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SAID ACT.

14. NOTICE TO ILLINOIS RESIDENTS: THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF THE STATE OF ILLINOIS NOR HAS THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THE PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

15. NOTICE TO INDIANA RESIDENTS ONLY: THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-2-1 OF THE INDIANA SECURITIES LAW AND HAVE NOT BEEN REGISTERED UNDER SECTION 23-19-3. THEY CANNOT THEREFORE BE RESOLD UNLESS THEY ARE REGISTERED UNDER SAID LAW OR UNLESS AN EXEMPTION FORM REGISTRATION IS AVAILABLE. A CLAIM OF EXEMPTION UNDER SAID LAW HAS BEEN FILED, AND IF SUCH

EXEMPTION IS NOT DISALLOWED SALES OF THESE SECURITIES MAY BE MADE. HOWEVER, UNTIL SUCH EXEMPTION IS GRANTED, ANY OFFER MADE PURSUANT HERETO IS PRELIMINARY AND SUBJECT TO MATERIAL CHANGE.

16. NOTICE TO IOWA RESIDENTS ONLY: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED; THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

17. NOTICE TO KANSAS RESIDENTS ONLY: IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 81-5-15 OF THE KANSAS SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

18. NOTICE TO KENTUCKY RESIDENTS ONLY: IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER TITLE 808 KAR 10:210 OF THE KENTUCKY SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

19. NOTICE TO LOUISIANA RESIDENTS ONLY: IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER RULE 1 OF THE LOUISIANA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

20. NOTICE TO MAINE RESIDENTS ONLY: THE ISSUER IS REQUIRED TO MAKE A REASONABLE FINDING THAT THE SECURITIES OFFERED ARE A SUITABLE INVESTMENT FOR THE PURCHASER AND THAT THE PURCHASER IS FINANCIALLY ABLE TO BEAR THE RISK OF LOSING THE ENTIRE AMOUNT INVESTED.

THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION UNDER §16202(15) OF THE MAINE UNIFORM SECURITIES ACT AND ARE NOT REGISTERED WITH THE SECURITIES ADMINISTRATOR OF THE STATE OF MAINE.

THE SECURITIES OFFERED FOR SALE MAY BE RESTRICTED SECURITIES AND THE HOLDER MAY NOT BE ABLE TO RESELL THE SECURITIES UNLESS:

(1)     THE SECURITIES ARE REGISTERED UNDER STATE AND FEDERAL SECURITIES LAWS, OR

(2)     AN EXEMPTION IS AVAILABLE UNDER THOSE LAWS.

21. NOTICE TO MARYLAND RESIDENTS ONLY: IF YOU ARE A MARYLAND RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THIS MEMORANDUM, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 11-602(9) OF THE MARYLAND SECURITIES ACT. THE SHARES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MARYLAND. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SHARES.

22. NOTICE TO MASSACHUSETTS RESIDENTS ONLY: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MASSACHUSETTS UNIFORM SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THIS OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

23. NOTICE TO MICHIGAN RESIDENTS ONLY: IN MAKING AN INVESTMENT DECISION, PURCHASERS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED BY

SUBSECTION (E) OF SEC RULE 147, 17 CFR 230.147(E), OR SUBSECTION (E) OF SEC RULE 147A, 17 CFR 230.147A(E), AS PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. PURCHASERS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

24. NOTICE TO MINNESOTA RESIDENTS ONLY: THESE SECURITIES BEING OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

25. NOTICE TO MISSISSIPPI RESIDENTS ONLY: THE SHARES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE MISSISSIPPI SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE MISSISSIPPI SECRETARY OF STATE OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE SECRETARY OF STATE NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, OR APPROVED OR DISAPPROVED THIS OFFERING. THE SECRETARY OF STATE DOES NOT RECOMMEND THE PURCHASE OF THESE OR ANY OTHER SECURITIES. EACH PURCHASER OF THE SECURITIES MUST MEET CERTAIN SUITABILITY STANDARDS AND MUST BE ABLE TO BEAR AN ENTIRE LOSS OF THIS INVESTMENT. THE SECURITIES MAY NOT BE TRANSFERRED FOR A PERIOD OF ONE (1) YEAR EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE MISSISSIPPI SECURITIES ACT OR IN A TRANSACTION IN COMPLIANCE WITH THE MISSISSIPPI SECURITIES ACT.

26. FOR MISSOURI RESIDENTS ONLY: THE SECURITIES OFFERED HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE PURCHASER IN A TRANSACTION EXEMPT UNDER SECTION 4.G OF THE MISSOURI SECURITIES LAW OF 1953, AS AMENDED. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MISSOURI. UNLESS THE SECURITIES ARE SO REGISTERED, THEY MAY NOT BE OFFERED FOR SALE OR RESOLD IN THE STATE OF MISSOURI, EXCEPT AS A SECURITY, OR IN A TRANSACTION EXEMPT UNDER SAID ACT.

27. NOTICE TO MONTANA RESIDENTS ONLY: IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A MONTANA RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) IN EXCESS OF FIVE (5) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE SHARES.

28. NOTICE TO NEBRASKA RESIDENTS ONLY: IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER CHAPTER 15 OF THE NEBRASKA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

29. NOTICE TO NEVADA RESIDENTS ONLY: IF ANY INVESTOR ACCEPTS ANY OFFER TO PURCHASE THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION NRS 92.520 OF THE NEVADA SECURITIES LAW. THE INVESTOR IS HEREBY ADVISED THAT THE ATTORNEY GENERAL OF THE STATE OF NEVADA HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING AND THE FILING OF THE OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE, OR SALE THEREOF, BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEVADA. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. NEVADA ALLOWS THE SALE OF SECURITIES TO 25 OR FEWER PURCHASERS IN THE STATE WITHOUT REGISTRATION. HOWEVER, CERTAIN CONDITIONS APPLY, I.E., THERE CAN BE NO GENERAL ADVERTISING OR SOLICITATION AND COMMISSIONS ARE LIMITED TO LICENSED BROKER-DEALERS. THIS EXEMPTION IS GENERALLY USED WHERE THE PROSPECTIVE INVESTOR IS ALREADY KNOWN AND HAS A PRE-EXISTING RELATIONSHIP WITH THE COMPANY. (SEE NRS 90.530.11.)

30. NOTICE TO NEW HAMPSHIRE RESIDENTS ONLY: NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE UNDER THIS CHAPTER HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

31. NOTICE TO NEW JERSEY RESIDENTS ONLY: IF YOU ARE A NEW JERSEY RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THIS MEMORANDUM, YOU ARE HEREBY ADVISED THAT THIS MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY THE ATTORNEY

GENERAL OF THE STATE OF NEW JERSEY PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

32. NOTICE TO NEW MEXICO RESIDENTS ONLY: THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE NEW MEXICO DEPARTMENT OF BANKING NOR HAS THE SECURITIES DIVISION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PRIVATE PLACEMENT MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

33. NOTICE TO NEW YORK RESIDENTS ONLY: THIS DOCUMENT HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE COMPANY HAS TAKEN NO STEPS TO CREATE AN AFTER MARKET FOR THE SHARES OFFERED HEREIN AND HAS MADE NO ARRANGEMENTS WITH BROKERS OF OTHERS TO TRADE OR MAKE A MARKET IN THE SHARES. AT SOME TIME IN THE FUTURE, THE COMPANY MAY ATTEMPT TO ARRANGE FOR INTERESTED BROKERS TO TRADE OR MAKE A MARKET IN THE SECURITIES AND TO QUOTE THE SAME IN A PUBLISHED QUOTATION MEDIUM, HOWEVER, NO SUCH ARRANGEMENTS HAVE BEEN MADE AND THERE IS NO ASSURANCE THAT ANY BROKERS WILL EVER HAVE SUCH AN INTEREST IN THE SECURITIES OF THE COMPANY OR THAT THERE WILL EVER BE A MARKET THEREFORE.

34. NOTICE TO NORTH CAROLINA RESIDENTS ONLY: IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FORGOING AUTHORITIES HAVE NOT CONFIRMED ACCURACY OR DETERMINED ADEQUACY OF THIS DOCUMENT. REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

35. NOTICE TO NORTH DAKOTA RESIDENTS ONLY: THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES COMMISSIONER OF THE STATE OF NORTH DAKOTA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

36. NOTICE TO OHIO RESIDENTS ONLY: IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 1707.3(X) OF THE OHIO SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

37. NOTICE TO OKLAHOMA RESIDENTS ONLY: THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF OKLAHOMA IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION FOR PRIVATE OFFERINGS. ALTHOUGH A PRIOR FILING OF THIS MEMORANDUM AND THE INFORMATION HAS BEEN MADE WITH THE OKLAHOMA SECURITIES COMMISSION, SUCH FILING IS PERMISSIVE ONLY AND DOES NOT CONSTITUTE AN APPROVAL, RECOMMENDATION OR ENDORSEMENT, AND IN NO SENSE IS TO BE REPRESENTED AS AN INDICATION OF THE INVESTMENT MERIT OF SUCH SECURITIES. ANY SUCH REPRESENTATION IS UNLAWFUL.

38. NOTICE TO OREGON RESIDENTS ONLY: THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE CORPORATION COMMISSION OF THE STATE OF OREGON UNDER PROVISIONS OF ORS 59.049. THE INVESTOR IS ADVISED THAT THE COMMISSIONER HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS DOCUMENT SINCE THE DOCUMENT IS NOT REQUIRED TO BE FILED WITH THE COMMISSIONER. THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE COMPANY CREATING THE SECURITIES, AND THE TERMS OF THE OFFERING INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

39. NOTICE TO PENNSYLVANIA RESIDENTS ONLY: EACH PERSON WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION BY SECTION 203(d), DIRECTLY FROM THE ISSUER OR AFFILIATE OF THIS ISSUER, SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE WITHOUT INCURRING ANY LIABILITY TO THE SELLER, UNDERWRITER (IF ANY) OR ANY OTHER PERSON WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF HIS WRITTEN BINDING CONTRACT OF PURCHASE OR, IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO BINDING CONTRACT OF PURCHASE, WITHIN TWO (2) BUSINESS DAYS AFTER HE MAKES THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED. IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE

THESE SECURITIES MADE PURSUANT TO A PROSPECTUS WHICH CONTAINS A NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(m) OF THE PENNSYLVANIA SECURITIES ACT OF 1972 (70 PS § 1-207(m), YOU MAY ELECT, WITHIN TWO (2) BUSINESS DAYS AFTER THE FIRST TIME YOU HAVE RECEIVED THIS NOTICE AND A PROSPECTUS TO WITHDRAW FROM YOUR PURCHASE AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONEYS PAID BY YOU. YOUR WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A LETTER OR TELEGRAM TO THE ISSUER (OR UNDERWRITER IF ONE IS LISTED ON THE FRONT PAGE OF THE PROSPECTUS) INDICATING YOUR INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF YOU ARE SENDING A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD YOU MAKE THIS REQUEST ORALLY, YOU SHOULD ASK WRITTEN CONFIRMATION THAT YOUR REQUEST HAS BEEN RECEIVED. NO SALE OF THE SECURITIES WILL BE MADE TO RESIDENTS OF THE STATE OF PENNSYLVANIA WHO ARE NON-ACCREDITED INVESTORS IF THE AMOUNT OF SUCH INVESTMENT IN THE SECURITIES WOULD EXCEED TWENTY (20%) OF SUCH INVESTOR'S NET WORTH (EXCLUDING PRINCIPAL RESIDENCE, FURNISHINGS THEREIN AND PERSONAL AUTOMOBILES). EACH PENNSYLVANIA RESIDENT MUST AGREE NOT TO SELL THESE SECURITIES FOR A PERIOD OF TWELVE (12) MONTHS AFTER THE DATE OF PURCHASE, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION. THE SECURITIES HAVE BEEN ISSUED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF THE PENNSYLVANIA SECURITIES ACT OF 1972. NO SUBSEQUENT RESALE OR OTHER DISPOSITION OF THE SECURITIES MAY BE MADE WITHIN 12 MONTHS FOLLOWING THEIR INITIAL SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION, AND THEREAFTER ONLY PURSUANT TO AN EFFECTIVE REGISTRATION OR EXEMPTION.

40. NOTICE TO RHODE ISLAND RESIDENTS ONLY: THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE DEPARTMENT OF BUSINESS REGULATION OF THE STATE OF RHODE ISLAND NOR HAS THE DIRECTOR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

41. NOTICE TO SOUTH CAROLINA RESIDENTS ONLY: THESE SECURITIES ARE BEING OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE SOUTH CAROLINA UNIFORM SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE SOUTH CAROLINA SECURITIES COMMISSIONER. THE COMMISSIONER DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR

COMPLETENESS OF THIS PRIVATE PLACEMENT MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

42. NOTICE TO SOUTH DAKOTA RESIDENTS ONLY: THESE SECURITIES ARE BEING OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 47-31, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATION OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THIS MEMORANDUM IS TRUE, COMPLETE, AND NOT MISLEADING, NOR HAS THE DIRECTOR OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

43. NOTICE TO TENNESSEE RESIDENT ONLY: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.

THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD. EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

44. NOTICE TO TEXAS RESIDENTS ONLY: THE SECURITIES OFFERED HEREUNDER HAVE NOT BEEN REGISTERED UNDER APPLICABLE TEXAS SECURITIES LAWS AND, THEREFORE, ANY PURCHASER THEREOF MUST BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SECURITIES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH SECURITIES LAWS OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. FURTHER, PURSUANT TO §109.13 UNDER THE TEXAS SECURITIES ACT, THE COMPANY IS REQUIRED TO APPRISE PROSPECTIVE INVESTORS OF THE FOLLOWING: A LEGEND SHALL BE PLACED, UPON ISSUANCE, ON CERTIFICATES REPRESENTING SECURITIES PURCHASED

HEREUNDER, AND ANY PURCHASER HEREUNDER SHALL BE REQUIRED TO SIGN A WRITTEN AGREEMENT THAT HE WILL NOT SELL THE SUBJECT SECURITIES

WITHOUT REGISTRATION UNDER APPLICABLE SECURITIES LAWS, OR EXEMPTIONS THEREFROM.

45. NOTICE TO UTAH RESIDENTS ONLY: THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE UTAH SECURITIES ACT. THE SECURITIES CANNOT BE TRANSFERRED OR SOLD EXCEPT IN TRANSACTIONS WHICH ARE EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

46. NOTICE TO VERMONT RESIDENTS ONLY: THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE STATE OF VERMONT NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

47. NOTICE TO VIRGINIA RESIDENTS ONLY: IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION UNDER SECTION 13.1-514 OF THE VIRGINIA SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

48. NOTICE TO WASHINGTON RESIDENTS ONLY: ANY PROSPECTIVE PURCHASER IS ENTITLED TO REVIEW FINANCIAL STATEMENTS OF THE ISSUER WHICH SHALL BE FURNISHED UPON REQUEST."; (ii) "RECEIPT OF NOTICE OF EXEMPTION BY THE WASHINGTON ADMINISTRATOR OF SECURITIES DOES NOT SIGNIFY THAT THE ADMINISTRATOR HAS APPROVED OR RECOMMENDED THESE SECURITIES, NOR HAS THE ADMINISTRATOR PASSED UPON THE OFFERING. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE."; and (iii) "THE RETURN OF THE FUNDS OF THE PURCHASER IS DEPENDENT UPON THE FINANCIAL CONDITION OF THE ORGANIZATION.

49. NOTICE TO WEST VIRGINIA RESIDENTS ONLY: IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 15.06(b)(9) OF THE WEST VIRGINIA SECURITIES LAW AND MAY NOT BE REOFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

50. NOTICE TO WISCONSIN RESIDENTS ONLY: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

IT IS THE RESPONSIBILITY OF ANY PERSON WISHING TO PURCHASE THE SECURITIES TO SATISFY HIMSELF AS TO FULL OBSERVANCE OF THE LAWS OF ANY RELEVANT

TERRITORY OUTSIDE THE U.S. IN CONNECTION WITH ANY SUCH PURCHASE, INCLUDING OBTAINING ANY REQUIRED GOVERNMENTAL OR OTHER CONSENTS OR OBSERVING ANY OTHER APPLICABLE FORMALITIES.

51. FOR WYOMING RESIDENTS ONLY: ALL WYOMING RESIDENTS WHO SUBSCRIBE TO PURCHASE SHARES OFFERED BY THE COMPANY MUST SATISFY THE FOLLOWING

MINIMUM FINANCIAL SUITABILITY REQUIREMENTS IN ORDER TO PURCHASE SHARES:

(1) A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) OF TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000 ); AND

(2) THE PURCHASE PRICE OF SHARES SUBSCRIBED FOR MAY NOT EXCEED TWENTY PERCENT (20%) OF THE NET WORTH OF THE SUBSCRIBER; AND

(3) "TAXABLE INCOME" AS DEFINED IN SECTION 63 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, DURING THE LAST TAX YEAR AND ESTIMATED "TAXABLE INCOME" DURING THE CURRENT TAX YEAR SUBJECT TO A FEDERAL INCOME TAX RATE OF NOT LESS THAN THIRTY-THREE PERCENT (33%).

IN ORDER TO VERIFY THE FOREGOING, ALL SUBSCRIBERS WHO ARE WYOMING RESIDENTS WILL BE REQUIRED TO REPRESENT IN THE SUBSCRIPTION AGREEMENT THAT THEY MEET THESE WYOMING SPECIAL INVESTOR SUITABILITY REQUIREMENTS.

DURING THE COURSE OF THE OFFERING AND PRIOR TO ANY SALE, EACH OFFEREE OF THE SHARES AND HIS OR HER PROFESSIONAL ADVISOR(S), IF ANY, ARE INVITED TO ASK QUESTIONS CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING AND TO OBTAIN ANY ADDITIONAL INFORMATION NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN.  SUCH INFORMATION WILL BE PROVIDED TO THE EXTENT THE COMPANY POSSESS SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

EACH PROSPECTIVE INVESTOR WILL BE GIVEN AN OPPORTUNITY TO ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM, MANAGEMENT OF THE COMPANY CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORTS OR EXPENSE, NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM.  IF YOU HAVE ANY QUESTIONS WHATSOEVER REGARDING THIS OFFERING, OR DESIRE ANY ADDITIONAL INFORMATION OR DOCUMENTS TO VERIFY OR SUPPLEMENT THE INFORMATION CONTAINED IN THIS MEMORANDUM, PLEASE WRITE OR CALL:

# AMERITRUST CORPORATION

## C/o SEONG Y. LEE

44709 Gwinnett Loop

Novi, MI 48377 (248)789-1617 (203) 276-8794

## Summary of the Offering

The following material is intended to summarize information contained elsewhere in this Limited Offering Memorandum (the "Memorandum"). This summary is qualified in its entirety by express reference to the materials referred to and contained herein. Each prospective subscriber should carefully review the entire Memorandum and all materials referred to herein and conduct his or her own due diligence before subscribing for Shares.

## A.  The Company

AMERITRUST CORPORATION was incorporated in September 3, 2008 as Panko Financial Corporation under the Michigan General Corporation Law. On November 20, 2019, we amended with Ameritrust Corporation, which was originality incorporated in 2019 under the Michigan Department of Licensing and Regulatory Affairs relating to investment companies, and thereupon assumed all of our predecessor's assets, liabilities and obligations. Operating directly and through subsidiaries and associated companies in which we have equity investments, we offer a wide variety of Real Estate Investment and financial services to and through franchised Ameritrust Corporation in USA. We also offer financial services to other Real Estate

dealerships and to the customers of those dealerships. Other financial services we offer include Insurance, Guarantee Insurance Policies and Mortgage Banking.

**Investment Objectives**

Our principal businesses are:

- to finance the acquisition by franchised Ameritrust Corporation in Korea, China, Russia, Brazil and Mongolia for resale of various new Real Estate Investment and develop Buildings by Ameritrust Corporation in Korea and China;

● to acquire from such dealers, either directly or indirectly, installment obligations covering retail sales and leases of Real Estate Properties by Ameritrust Corporation in Korea and China as well as used units of any make;

● to finance new Real Estate Properties of other Real Estate Construction Companies; and

● to lease Real Estate Properties and certain types of Real Estate Property to others.

The Real Estate Investment and financing industry is highly competitive. Our principal competitors are affiliated finance subsidiaries of other major Real Estate Construction Companies as well as a large number of banks, commercial finance companies, savings and loan associations and credit unions. Our business is influenced by our ability to offer competitive financing rates which in turn is directly affected by our access to capital markets.

**Investment Strategy**

- The Fund will direct investments through joint-ventures with local operating partners that have extensive experience in development projects, including those directed by our management, Seong Y. Lee;

- The joint ventures formed will allow the Company to leverage the visionary mindset these developers possess, while offering financial expertise that is in high demand in this target market;

- High returns will be targeted through developments that add-value to small and middle market consumers and mitigate escalating capitalization rates paid into larger and slow growth real estate markets.

## B.  Operations

AMERITRUST CORPORATION, INC ("ATCC" or the "Management Company"), will provide investment capital for specific projects as directed by the Fund Manager, SEONG Y. LEE.  The primary focus of ATCC is to provide investment management services to its investors and equity financing to developers.  AMERITRUST CORPORATION is managed by SEONG Y. LEE. Over the past three months, the Management of AMERITRUST CORPORATION has been able to establish valuable relationships with real estate executives and government officials in China and Korea.

**MISSION**

AMERITRUST CORPORATION PROVIDES TWO SERVICES:

1. **Investment Management:** Alternative investment opportunities in real estate to investors that would not normally be available; for example, AMERITRUST CORPORATION will routinely invest in commercial real estate properties, either through developer financing or outright purchases.  Investors will be able to reap the investment returns from all investments in the portfolio, generating higher returns and mitigating risk factors.  Investors will also have the opportunity, if desired, to select what investment opportunities they wish to invest in, which is a valuable service to risk adverse investors; and

2. **Financing Alternatives:** Capital to established real estate developers and sellers in the form of equity investment joint-ventures, debt financing, and 100% equity acquisitions.

Since inception, AMERITRUST CORPORATION has been able to form business relationships with numerous developers and has earned the opportunity to move forward on several projects.  Due to a lax in funding from investors, several projects have been put on hold but the opportunity to resume negotiations is apparent.  ***The primary mission of AMERITRUST CORPORATION is to maintain the highest in ethical investment practices and offer both developers and investors for superior real estate capitalization.***

It is the view of the Company that not every real estate asset will be a perfect match for investment and each investment must be uncovered through sound analytical analysis and exhaustive due diligence.  Each property considered for acquisition or investment is negotiated and analyzed with the investor's interest at heart.  Uncovering each risk and determining return expectations is the fundamental responsibility to AMERITRUST CORPORATION investors.  In addition to the investment analysis performed, the Company's legal team reviews all agreements pertaining to the purchase or investment in each real estate property.

AMERITRUST CORPORATION is in the business of sourcing, investing, and managing real estate investments and providing services that are unparalleled to any firm in operation.  AMERITRUST CORPORATION prides itself in the importance of understanding the real estate market, the economic climate, and developer and investor needs and expectations.

**OPPORTUNITY/STRUCTURE**

The Fund will be structured similar to a closed-ended opportunity fund and is outlined below:



1. The investor(s) and the Management Company will enter into a Subscription Agreement stating the amount of capital committed and verification of eligibility (i.e. accredited investor)

2. The Fund's articles of incorporation will be executed between the investor(s) and the Management Company stating the terms of the partnership including:

    a. Investor Ownership Percentage
    b. Distribution of Capital
    c. Capital Reinvestment terms
    d. Management Fee
    e. Investment Term
    f. Management and Control
    g. Other Agreed Upon Conditions

3. Two banking accounts will be opened at Bank of New York Mellon (i) Funding Account; and (ii) Collections Account.  This method will segregate funding capital from returns

4.   Capital funded into the Fund's funding account, which will be used for all real estate investments It should be noted that all investments made will be owned by the Fund.  The Management Company is being paid to manage and execute the investments, but the true ownership of the assets remains with the investor(s).

5.   Your attorney (the Fund's attorney) will be the executor and trustee of the funding account at Bank of New York Mellon.

**INVESTMENT STRATEGY**

The Fund will seek to invest in a diversified portfolio of development properties that reflect a balance of property risk profiles.  The Fund will target class A and middle market developers seeking a financial partner to provide private equity commitments in return for cash flow, engineering and/or development participation.  The strategy of the Fund is focused yet flexible to differentiating market conditions.  The Fund's investment strategy is designed to enable the Fund to capitalize on AMERITRUST CORPORATION's growing presence in the real estate development market in China and Korea.  By targeting new developments with a range of investment returns, AMERITRUST CORPORATION believes the Fund presents an investment vehicle that will offer the potential for attractive returns generated by new asset value creation.  AMERITRUST CORPORATION will target investment opportunities that are expected to generate, upon stabilization of the Fund, total returns of 15% to 21%.

Each investment the Fund makes will be providing the operating partner capital for:

- Land acquisition for future project development;
- Construction costs for new project; and
- Liquidity or cash-out of project

In return for the capital provided to each project, the Fund will take an ownership interest in the property through individually tailored joint-ventures and have specific transaction structures.  Each joint-venture's terms will vary based on the type of property, location, demographic market, and risk profile.  In addition, the credit profile and experience of the developer will play a large role in the amount of structural mechanics

designed to maintain expected returns.  A brief description of the current real estate structures provided to developers are outlined below:

| TYPES OF FINANCING STRUCTURES OFFERED TO DEVELOPERS | |
|---|---|
| **Development & Management Agreement:** | AMERITRUST CORPORATION Partners take complete ownership of the property and provides 100% of the financing through both debt and equity. Through a development agreement, AMERITRUST CORPORATION contracts the developer to build and manage the asset in return for participation in the property's cash flows.  This structure is ideally suited for developers with very low access to capital. |
| **Mezzanine with Equity "Kicker:"** | Mezzanine Financing is most appropriate for developers needing capital to bridge the gap between 1st lien bank debt and the total cost of the project. Mezzanine financing is typically structured so that AMERITRUST CORPORATION receives its cost of investment plus a preferred IRR and participation in profits to achieve the target IRR. |
| **Mezzanine Debt:** | Mezzanine debt provides developers with subordinated debt, while maintaining 100% of the cash flows.  Mezzanine debt acts primarily as additional debt but is subordinated to 1st lien mortgages and has a higher coupon. |
| **Joint-Venture:** | A traditional equity investment into the ownership of the property is made to capitalize on property cash flow and to provide a financial partner to the developer.  Cash flow of the property is distributed on a pro rata ownership basis. |

*Note: Each structure  is reviewed quarterly to ensure that the target return rates are reached.*

The Fund will seek to assemble a diversified portfolio that will reflect a mix of risk profiles by targeting development properties within varied markets located throughout the China region.  The property mix will vary by asset type and will include: high rise condos, apartment buildings, retail shopping centers, hospitals, office, and industrial properties.  While investment opportunities will change over time and vary between markets, the following represents a summary of the type of opportunities the Fund intends to pursue in the current investment environment.

**Balance of Property Risk**

In addition to an investment portfolio focusing on diversified development projects, the Fund intends to assemble a portfolio of properties that reflects a balance of property risk profiles by targeting a mix of Rental Income and Foreclosure/Wholesale Purchasing development projects.  This strategy is designed to generate Foreclosure/Wholesale Purchasing returns through new asset creation, while mitigating risk through partnerships with operating partners.  As a result, AMERITRUST CORPORATION firmly believes that the Fund will have the potential to generate returns that adequately compensate investors for the risk assumed.

**Rental Income Opportunities**

The Fund will focus on making real estate investments that enable it to capitalize on Rental Income development transactions.  Rental Income is defined as the process of changing or transforming a product from it original state to a more valuable state.  These types of real estate investments involve properties and/or land that are not performing at their full potential and where the game plan is to bring to bear the talent and experience of an operating partner to increase the property's value and thus investment returns to investors.  Examples of Rental Income investments include:

- Development of vacant land;
- Renovation of older properties to increase rents; and
- Re-positioning strategies

These types of investments involve more risk because of the uncertainty of the success of the Rental Income projects, and thus strive for higher returns.  Typical Rental Income returns range between 14-20% over the life of the project.

**Foreclosure/Wholesale Purchasing Opportunities**

The Fund will also focus on making Foreclosure/Wholesale Purchasing real estate investment to boost returns and leverage the financial capabilities of AMERITRUST CORPORATION.

Foreclosure/Wholesale Purchasing investments are available through real estate market inefficiencies. Foreclosure/Wholesale Purchasing investments will include:

- Purchasing land for development below market prices;
- Developing a commercial property below replacement cost of an existing property; and
- Providing capital for property upgrades or improvements that increase the asset value over historical averages.

These types of investments require an experienced operating partner and financial partner. AMERITRUST CORPORATION prides itself in understanding each target market and capitalizing on the experience of each operating partner. The Fund plans to execute Foreclosure/Wholesale Purchasing investments that reward it for higher risk investments. Typical Foreclosure/Wholesale Purchasing investments range above 20%.

**REAL ESTATE PROJECT LIFE CYCLE**

The life cycle of a commercial real estate property varies on a property-by-property basis, but generally all properties experience periods of development, stabilization, and decline. The art of real estate investment is determining at what cycle to invest and ultimately when to exit. A large part of being an effective real estate investor is knowing when to leave and not holding on to the property too long. It is the view of AMERITRUST CORPORATION that understanding and capitalizing on each period will maximize returns.



## PROPERTY CONSTRUCTION PROCESS

Property developers follow a sequence of steps from the moment they conceive a project to the time they complete the construction and begin the asset management functions.  It is important for investors to understand this process and the properties that AMERITRUST CORPORATION directs investments in. The process can be summed up into an eight step sequence of events, beginning with inceptions of an idea. The following diagram outlines the process:

**8 Step Construction Process**



1. The developer, with extensive background knowledge and a great deal of current market data, looks for real estate opportunities and puts thoughts to paper;

2. The developer finds a specific site for the idea and researches physical feasibility; gradually talks to lenders and equity providers, and possible tenants;

3. The developer conducts formal market studies to estimate market absorption and capture rates; conducts feasibility study comparing estimated value of project with costs; processes plans through government agencies;

4. The developer decides on final design based on what market study says end users want and will pay for; contracts are negotiated with lenders and equity providers;

5. Contracts, often contingent on each other, are signed;

6. The developer switches to formal accounting system, seeking to keep all costs within budget; approves all changes suggested by marketing professionals; resolves construction disputes, signs checks, keeps work on schedule;

7. The developer brings in full-time operating staff; utilities are connected; tenants move in;

8. The developer oversees project or outsources asset management duties.

AMERITRUST CORPORATION management plays an integral part in the construction process by supplying needed engineering, development and financial expertise.  Not only is AMERITRUST CORPORATION consulted as to the feasibility of funding the project, but also evaluates the project's expected returns and the risks associated with such a project.  Ideally, AMERITRUST CORPORATION is brought into the process in step 2, whereby the developer can assess if equity investors are willing to commit to the project; however, some projects are not presented until step 4.  In any case, AMERITRUST CORPORATION has the capabilities to access each development's risk profile in a timely manner.

## DEVELOPMENT PROPERTIES

The Fund will pursue development opportunities in the regions of China and Korea, including hotels, condos, hospitals and/or build-to-suite opportunities where the economics are compelling and other developments where supply and demand constraints offer the potential for attractive risk-adjusted investment returns.  These types of opportunities, which will leverage the considerable development expertise of the sponsor, can provide the Fund with access to high quality real estate assets at wholesale pricing.  Build-to-suit opportunity to fulfill the space requirements of a large anchor tenant;

- The development of a project on excess land acquired;
- The development of a shopping center, multi-family housing, office, or industrial property

## SHOPPING CENTER

Shopping centers present the Fund with Rental Income and Foreclosure/Wholesale Purchasing opportunities.  Shopping centers include multi-tenant buildings centrally located in high traffic locations throughout the region.  The typical tenants in shopping centers are retail stores, restaurants, food stores, electronic stores, and jewelry stores.  Most shopping centers are triple net lease, which means the respective tenants are required to pay for all related costs of the center.  These costs include utilities, taxes, and interior structural changes.  Shopping centers are the least capital-intensive property type and have reasonable construction timeframes of 12-24 months.

The Fund intends to finance several Rental Income retail shopping centers that offer acceptable returns and strong leasing platforms.  Shopping centers are most valuable in high population growth areas with strong economic outlooks.

**LAND ACQUISITION**

Land acquisition is the acquisition of undeveloped land purchased for the intent to construct new real estate assets.  The Fund intends to pursue land that can be purchased below market in order to capitalize on Foreclosure/Wholesale Purchasing returns.  The land acquired is developed in high growth areas where population and business growth are expected to be high.  The land is ultimately developed for hotels, condos, offices, and shopping centers.  AMERITRUST CORPORATION is able to capitalize on land acquisition through the numerous real estate professionals that can offer the sale of land at below market prices.  The Fund will work to uncover target areas where new developments will create significant value, which will return higher Foreclosure/Wholesale Purchasing returns.

**OFFICE**

Office properties include multi-tenant office parks and single and multi-tenant office buildings.  While office markets tend to be more volatile than other property types (due to longer development and construction cycles), that same volatility can present compelling investment opportunities.  Office properties are also the most capital-intensive property type as a result of ongoing tenant improvement requirements and other capital costs.

Office properties provide significant Rental Income opportunities where market inefficiencies are present in the leasing and retention of tenants.  Development opportunities that present an opportunity to offer improvements in business housing, while earning above-market rental rates, will be the focus of this asset class.  When identifying possible office property prospects, AMERITRUST CORPORATION places a high priority on locating an area with good long-term growth, convenient access and nearby amenities.  A diversify rent toll and long lease agreements will also help diversify credit risk.  The Fund will be open to investing in office buildings, but because of the cost to develop new office buildings, adequate investments that meet the investment criteria may be hard to obtain.

**LEVERAGE**

Each investment into development projects will have a conservative amount of commercial real estate mortgage debt comprised of (i) 1st lien commercial mortgages; (ii) construction loans; and (iii) acquisition and development loans.  In most cases, the developer will be required to secure the corresponding bank

financing and provide the appropriate guarantees.  However, investment opportunities do arise where the Fund will secure senior bank financing as a result of owning a majority interest in the project.  This type of situation would occur when the Fund has structured a management and development agreement with an approved operating partner.

 Leverage will be based on a project-by-project basis and the Fund will not leverage the capital commitments received from this offering.  Each project that incorporates debt into the capital structure will have secured bank loans and not be guaranteed by the Fund.  AMERITRUST CORPORATION has extensive capitalization experience and will offer the least expensive capital structure to each project investment.

**DEVELOPERS (SPONSORS)**

The Fund will invest in new development projects throughout the world by providing developers (operating partners) with private equity commitments.    By partnering with established land developers, AMERITRUST CORPORATION is able to capitalize on the experience and local market knowledge that operating partners possess.  Operating partners offer the Fund investment opportunities, a highly motivated managing partner, a value enhancement strategy, and the ability to execute the construction plan.

The Fund intends to provide private equity capital to quality, well established developers as demonstrated by their prior projects and success history.  Stringent due diligence will be performed on all projects, with strict attention to the developer and their abilities to complete each project.  The Fund will rely heavily on each operating partner's ability to manage the construction process and manage the property upon stabilization of the rental income.  The Fund will have an integral part in each project as the financial provider and have certain governance rights including: resale, financing, annual budgets, major leases.  All developer ownership interest in each joint-venture will be transferable to the Fund should the operating partner not meet construction expectations.

As a result of the partnership the Fund will partake in, for each project, AMERITRUST CORPORATION will perform a series of due diligence checks and verifications before investing in any project. AMERITRUST CORPORATION utilizes a "know your developer" philosophy and understands the

importance of partnering with operating partners that are highly motivated and passionate about each investment.  Due diligence will include, but not limited, to the following:

- Face-to-face introductions;
- Evaluation of each property through feasibility analysis;
- Criminal and civil background checks; and
- Full property projection analysis

## MARKET

AMERITRUST CORPORATION currently focuses its real estate investment into new commercial and residential developments throughout the China and Korean region.  Commercial real estate investments are directed into income-producing properties including: condos, apartment buildings, office buildings, and industrial buildings.  By providing equity investments to established developers in the form of joint ventures and/or subordinated debt, AMERITRUST CORPORATION is able to leverage developer expertise and market knowledge, while earning exceptional return on investment.

The real estate markets have been moving full steam ahead over the past two years with increasing capitalization rates driving demand in the region.  As a result, institutional and private capital have flooded the market.

The Company intends to leverage these opportunities in the market and build a balanced portfolio of strong growth market developments.  In addition, due to the relatively low appearance of large ($1Bn + investment management houses) real estate private equity players, the Company is poised to capitalize on opportunities where local operating partners need institutional financial advice without suffering the consequences of expensive money.

## MANAGEMENT

AMERITRUST CORPORATION is managed with an entrepreneurial spirit that strives to make informed investment decisions based on sound financial analysis.  The founder is Seong Y. Lee with extensive experience in the areas of capital raising and portfolio management in regard to commercial real estate.  In addition to his professional career, the Fund Manager is also an experienced real estate investor with a portfolio of residential real estate assets valued at over $10,000,000 USD.

**KEYS TO SUCCESS**

The keys to a successful expansion of the Fund's business platform are to:

1. Expand the developer base
2. Maintain open communication between the Company and its customers (developers, investors, and sellers)
3. Continue to invest in high-quality real estate assets that increase the level of return to investors
4. Upgrade technological advancements that will enable the Company to continue to analyze each real estate market to make informed investment decisions

## C. Summary of Terms

The following is a brief summary of certain terms of the offering described in this offering memorandum. It is not intended to be complete and is qualified by the more detailed information contained elsewhere in this memorandum and in the text of the documents referred to herein.

**Fund Size**

- Target $6,903,103,842

**Fund Structure**

- Private closed-ended commingled real estate development fund

- Investors will purchase Shares of the Company

- Michigan Corporation (Formed September, 2008)

**Minimum Equity Commitment**

- $250,000

**Investment Strategy**

- Provide equity and debt commitments into commercial and residential real estate development projects

- Form individual partnerships or joint ventures with local operating partners to leverage asset management and market expertise

- Retail shopping centers, condos, hotels, office building, apartment/loft building, hospitals and industrial buildings

- Rental Income and Foreclosure/Wholesale Purchasing opportunities that create the most optimal position for high investor returns

- Aggressive market exit strategy

**Leverage**

- Non anticipated, but allowable with majority consent from investors

**Target Investment Size**

- $5,000,000 to $600,000,000 per property

- Target developments in niche large market locations

**Investment Period**

- Matures July 1st, 2030

**Expected Life of the Fund**

- 10 years following the expiration of the Investment Period

- Extensions with the approval of the majority in interest of the investors

**Distributions**

- 4% preferred return, payable per annum, plus all capital contributions to investors;

**Exclusivity**

- Exclusive fund for new private equity investments into development projects

## I.  Business Plan

Portions of our Business Plan, included as a separate document, were prepared by the Company using assumptions, including several forward looking statements.  Each prospective investor should carefully review the Business Plan in association with this Memorandum before purchasing Shares.  Management makes no representations as to the accuracy or achievability of the underlying assumptions and projected results contained herein.

## II.  The Offering

The Company is 6,903,103,842 Shares at a price of $1.00 per Share. Each purchaser must execute a Subscription Agreement making certain representations and warranties to the Company, including such purchaser's qualifications as an Accredited Investor as defined by the Securities and Exchange Commission in Rule 501(a) of Regulation D promulgated, or one of 35 Non-Accredited Investors that may be allowed to purchase Shares in this offering.  See "REQUIREMENTS FOR PURCHASERS" section.

## III. Risk Factors

See "RISK FACTORS" section in this Memorandum for certain factors that could adversely affect an investment in the Shares.  Those factors include, but are not limited to unanticipated obstacles to execution of the Business Plan, general economic factors, our management's inability to foresee exuberant market downturns and other unforeseen events.

## IV. Use of Proceeds

Proceeds from the sale of Shares will be used to invest in certain commercial and/or residential real estate projects.  See "USE OF PROCEEDS" section.

## V.  Minimum Offering Proceeds – Escrow of Subscription Proceeds

The Company has set a minimum offering proceeds figure of $15,000,000 (the "minimum offering proceeds") for this Offering.  The Company has established an Investment Holding Account with Bank of New York Mellon into which the minimum offering proceeds will be placed.  At least 15,000,000 Shares must be sold for $15,000,000 before such proceeds will be released from the escrow account and utilized by the Company. After the minimum number of Shares is sold, all subsequent proceeds from the sale of Shares will be delivered directly to the Company.  See "PLAN OF PLACEMENT - ESCROW ACCOUNT ARRANGEMENT" section.

## VI. Shares

Upon the sale of the maximum number of Shares from this Offering, the number of issued and outstanding shares of the Company's stock will be held as follows:

| | |
|---|---|
| **Present Shareholders** | **0%** |
| **New Shareholders** | **100%** |

## VII.   Registrar

Unless otherwise indicated in the accompanying Private Placement Memorandum, the Common Stock-I or Common Stock-II will be issued in the form of one or more fully registered global Securities (collectively, the "Global Equity Security") which will be deposited with, or on behalf of The Depository Trust Company, New York, New York (the "Depositary" or "DTC") and registered in the name of the Depositary's nominee. Except as set forth below, the Global Equity Security may be transferred, in whole and not in part, only to another nominee of the Depositary or to a successor of the Depositary or its nominee.

## VIII.   Subscription Period

The Offering will terminate on the earliest of:  (a) the date the Company, in its discretion, elects to terminate, or (b) the date upon which all Shares have been sold, or (c) February 1, 2020, or such date as may be extended from time to time by the Company, but not later than 180 days thereafter (the "Offering Period".)

## I.   TERMS AND CONDITIONS

The following is a summary of the certain principal terms of stock ownership into AMERITRUST CORPORATION.

| | |
|---|---|
| **The Company** | The Company's objectives are to: |
| | (i)   assemble a diversified portfolio of commercial and residential development properties throughout the United States, China, and Korea with varying risk profiles, including Rental Income and Foreclosure/Wholesale Purchasing development projects; |

41

(ii)   provide equity and debt commitments to qualified developers and acquire ownership interests in a portfolio of new development properties; and

(iii)  maintain a balanced approach to income and growth by targeting preferred returns of 8% to 12% per annum.

| | |
|---|---|
| **Investment Objectives** | (iv) |
| **Fund Manager** | Seong Y. Lee |
| **Management of the Company** | By investing substantially all of its assets as a limited partner, the Company will in effect be delegating to the Fund Manager a significant portion of the responsibility for the business and operations of the Company, subject to the terms of the articles of incorporation.  AMERITRUST CORPORATION will nominate officers, directors or employees of, or other individuals affiliated with AMERITRUST CORPORATION to serve as the Company's officers and directors.  Initially, the board of directors of the Company will consists of at least 2 directors. |
| **Minimum Capital Commitment** | Each investor will be required to make a capital commitment to the Fund of at least $250,000, subject in each case to the right of the Fund Manager to permit smaller commitments at its discretion. |
| **The Offering** | The Company is seeking capital commitments of $6,903,103,842 from accredited investors.  The securities being offered hereby consists of up to 6,903,103,842 ownership interests of the Company, priced at $1.00 per share, subject to the Company's discretion to increase the size of the offering.  The purchase price for the stock interest is to be paid in cash as called by the Company. |
| **Investment Period** | The investment period will begin on the initial closing and will extend 2 years.  At any time, the investors, with a majority vote, may elect to cause the Company to cease making investments in new properties (other than investments in new properties that the Company has committed to).  Upon the occurrence of a "Key Event", the Investment period will be temporarily suspended, subject to the right of the investors to terminate the investment period by a two-thirds majority vote. |
| **Term of the Company** | The Fund Manager will endeavor to dissolve the Company and distribute all proceeds within 10 years after the initial closing.  The term of the Company may be extended by |

the Fund Manager with the approval of the investors holding a majority of the ownership interest in the Company.

**Reinvestment**     Prior to the third anniversary of the initial closing date, the Fund Manager may reinvest any proceeds constituting a return of capital from the sale or refinancing of the Fund's investments in new development properties.  The reinvestment will not reduce the investor's commitment.

**Diversification**     The Company will not make any investment that exceeds 20% of the total aggregate proceeds, or $1 billion into any single property, unless all Shareholders vote to approve such an investment.

**Key Event**     The following will constitute a Key Event:

- Bankruptcy of the Fund Manager
- Death or disability to SEONG Y. LEE
- Aggregate portfolio does not meet the preferred return consistently for 24 months
- Other agreed upon events

**Management Fees**     The Company will pay to the Management Company as compensation for various services to the Company an annual fee for ongoing asset management services payable quarterly in arrears of 2.5% of the aggregate capital commitments.  This fee shall be payable for the life of the Fund and will allow the Management Company to operate the Company in an efficient and effective manner.  The management fee will be netted out of all real estate returns paid to the Company.  Any costs that exceed the Management Fee will be the responsibility of the Management Company.

SEONG Y. LEE will be providing the following services of which the management fee will compensate:

- Sourcing and execution of private equity investments in development properties
- Complete financial analysis
- Asset valuation
- Construction supervision

43

- Leasing strategies

- Asset management

**Distributions**    All collections received by the Company in its capacity as a private equity provider will be distributed promptly to the investors in proportion to the number of shares held at the time of the distribution.

The distribution of collections has been structured to compensate the investor first and align the interests of the investors and the Management Company. The Management Company are provided with incentives to perform above expectations and provide exceptional returns before being compensated.

Dividend will accrue from July 15, 2019 at the rate of 4% per year payable semi-annually in arrears on January 1 and July 1 of each year, Commencing on January 1, 2019. The Common Stock-II will not be redeemable prior to maturity unless certain events occur involving United States

**Reports to Investors**    The Company will furnish to the investors after the close of each fiscal year an annual report containing audited financial statements of the Company prepared in accordance with generally accepted accounting principles and a statement setting forth any distributions to the investors for the fiscal year.  The Company will also furnish un-audited quarterly statements to investors.

**Valuations**    The Fund Manager will, at least once per year, perform an internal valuation of the Company's properties, using accepted valuation techniques, to establish the fair market value of the properties as the end of such year.  The fair market value of the properties will be deemed to be the ownership interest in each property valued at the current capitalization rate for each market.  In addition, detailed financial modeling will be performed using "current market assumptions" and discounted cash flow analysis.

**Indemnification**    The Company will indemnify, defend and hold the Fund Manager, the members of the board of directors harmless from and against any losses, damages, costs that relate to the operations of the Fund, unless the Fund Manager acted in an unethical manner related to directing investments into development properties.

## A.  Requirements for Purchasers

Prospective purchasers of the Shares offered by this Memorandum should give careful consideration to certain risk factors described under "RISK AND OTHER IMPORTANT FACTORS" section and especially to the speculative nature of this investment and the limitations described under that caption with respect to the lack of a readily available market for the Shares and the resulting long term nature of any investment in the Company. This Offering is available only to suitable Accredited Investors or one of 35 Non-Accredited Investors that may be allowed to purchase Shares, having adequate means to assume such risks and of otherwise providing for their current needs and contingencies should consider purchasing Shares.

## B.  General Suitability Standards

The Shares will not be sold to any person unless such prospective purchaser or his or her duly authorized representative shall have represented in writing to the Company in a Subscription Agreement that:

a)  The prospective purchaser has adequate means of providing for his or her current needs and personal contingencies and has no need for liquidity in the investment of the Shares;

b)  The prospective purchaser's overall commitment to investments which are not readily marketable is not disproportionate to his, her, or its net worth and the investment in the Shares will not cause such overall commitment to become excessive; and

c)  The prospective purchaser is an "Accredited Investor" (as defined below) suitable for purchase in the Shares.

d)  Each person acquiring Shares will be required to represent that he, she, or it is purchasing the Shares for his, her, or its own account for investment purposes and not with a view to resale or distribution. See "SUBSCRIPTION FOR SHARES" section.

## C.  Accredited Investors

The Company will conduct the Offering in such a manner that Shares may be sold only to "Accredited Investors" as that term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933 (the "Securities Act"), or to a maximum of 35 Non-Accredited Investors that may be allowed to purchase Shares in this offering. In summary, a prospective investor will qualify as an "Accredited Investor" if he, she, or it meets any one of the following criteria:

e)  Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and who has a reasonable expectation of reaching the same income level in the current year;

f) Any bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual

g) or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities and Exchange Act of 1934 (the "Exchange Act"); any insurance company as defined in Section 2(13) of the Exchange Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company (SBIC) licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income

h) Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment advisor, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons who are Accredited Investors;

i) Any private business development company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940;

j) Any organization described in Section 501(c)(3)(d) of the Internal Revenue Code, corporation, business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

k) Any director or executive officer, or general partner of the issuer of the securities being sold, or any director, executive officer, or general partner of a general partner of that issuer;

l) Any trust, with total assets in excess of $5,000,000, not formed for the    specific    purpose    of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Section 506(b)(2)(ii) of Regulation D adopted under the Act; and

m) Any entity in which all the equity owners are Accredited Investors.

## D.  Other Requirements

No subscription for the Shares will be accepted from any investor unless he is acquiring the Shares for his own account (or accounts as to which he has sole investment discretion), for investment and without any view

to sale, distribution or disposition thereof.  Each prospective purchaser of Shares may be required to furnish such information as the Company may require to determine whether any person or entity purchasing Shares is an Accredited Investor, or select Non-Accredited Investor who may purchase Shares.

## II.  Forward Looking Information

Some of the statements contained in this Memorandum, including information incorporated by reference, discuss future expectations, or state other forward looking information.  Those statements are subject to known and unknown risks, uncertainties and other factors, several of which are beyond the Company's control, which could cause the actual results to differ materially from those contemplated by the statements.  The forward looking information is based on various factors and was derived using numerous assumptions.  In light of the risks, assumptions, and uncertainties involved, there can be no assurance that the forward looking information contained in this Memorandum will in fact transpire or prove to be accurate.

Important factors that may cause the actual results to differ from those expressed within may include, but are not limited to:

- The success or failure of the Company's efforts to successfully find real estate investments, consummate the required closing transactions and develop the property in a timely manner;

- The Company's ability to attract, build, and maintain a vendor base;

- The Company's ability to attract and retain quality employees, contractors, vendors, tenants;

- The effect of changing or even turbulent economic conditions;

- The ability of the Company to obtain adequate debt financing if only a fraction of this Offering is sold;

These along with other risks, which are described under "RISK FACTORS" may be described in current or future communications to shareholders.  The Company makes no representation and undertakes no obligation to update the forward looking information to reflect actual results or changes in assumptions or other factors that could affect those statements.

## III. Risk Factors

**Investing in the Company's Shares is very risky.  You should be able to bear a complete loss of your investment.  You should carefully consider the following factors, including those listed in the accompanying business plan.**

## A. General Real Estate Risks

Real property investments are subject to varying degrees of risk.  The yields available from equity investments in real estate depend on the amount of income earned and capital appreciation generated by the related properties as well as the expenses incurred in connection therewith.  If any of the Funds development properties does not generate income sufficient to meet operating expenses, the Company's stock interests could adversely be affected.  Income from, and the value of, the Fund's properties may be adversely affected by the general economic climate, local conditions such as oversupply of properties or a reduction in demand for properties in the areas in which they are located, the attractiveness of the properties to potential tenants, competition from other developers, and the Fund's ability to provide adequate structures.  Revenues from development properties are also affected by such factors as the costs of construction and local market conditions.

Because real estate investments are relatively illiquid, the Fund's ability to vary its portfolio promptly in response to economic or other conditions is limited.  The relative illiquidity of its holdings could impede the Fund's ability to respond to adverse changes in the performance of its investments.  No assurance can be given that the fair market value of the assets acquired by the Fund will not decrease in the future.  Investors have no right to withdrawal their equity commitment or require the Company to repurchase their respective ownership interest and the transferability of the shares is limited.  Accordingly, investors should be prepared to hold their stock interest until the Fund is dissolved and its assets are liquidated.

## B. Development Stage Business

AMERITRUST CORPORATION, commenced operations in September, 2008 and is organized as a Corporation under the laws of the State of Michigan.  Accordingly, the Management Company has only a limited history upon which an evaluation of its prospects and future performance can be made.  The Company's proposed operations are subject to all business risks associated with new enterprises.  The likelihood of the Company's success must be considered in light of the problems, expenses, difficulties, complications, and delays frequently encountered in connection with the expansion of a business, operation in a competitive industry, and the continued development of advertising, promotions and a corresponding customer base.  There is a possibility that the Company could sustain losses in the future.  There can be no assurances that AMERITRUST CORPORATION will operate profitably.

### C.  Investments through Partnerships and Joint Ventures

The Fund will invest in the projects directly, or as a partner or as a co-venture.  Partnerships or joint venture investments may, under certain circumstances, involve risks not otherwise present, including the possibility that the Fund's partner or co-venture might become bankrupt, that such partner or co-venture might at any time have economic or other business interests or goals which are inconsistent with the business interests or goals of the Fund, and that such partner may be in a position to take action contrary to the instructions or the requests of the Fund or contrary to the Fund's underwriting policies or objectives.  Such investments may also have the potential risk of an impasse on decisions because neither partner may have full control over the partnership or joint venture.  The Fund will, however, seek to maintain sufficient rights with respect to such partnerships or joint ventures to permit the Fund's objectives to be achieved.

### D.  Inadequacy of Funds

Gross offering proceeds of a minimum of $15,000,000 and a maximum of $6,903,103,842 may be realized. Management believes that such proceeds will capitalize and sustain our company sufficiently to allow for the implementation of the Company's Business Plans.  If only a fraction of this Offering is sold, or if certain assumptions contained in Management's business plans prove to be incorrect, the Company may have inadequate funds to fully develop its business and may need debt financing or other capital investment to fully implement the Company's business plans.

### E.  Dependence on Management

In the early stages of development the Company's business will be significantly dependent on the Company's management team.  The Company's success will be particularly dependent upon: SEONG Y. LEE  The loss of either could have a material adverse effect on the Company.  See "MANAGEMENT" section.

### F.  Risks Associated with Expansion

The Company plans on expanding its business through the introduction of a sophisticated marketing campaign detailed in our attached Business Plan.  Any expansion of operations the Company may undertake will entail risks.   Such   actions   may   involve   specific   operational   activities,   which   may negatively impact the profitability of the Company.  Consequently, shareholders must assume the risk that (i) such expansion may ultimately involve expenditures of funds beyond the resources available to the Company at that time, and (ii) management of such expanded operations may divert Management's attention and resources away from its existing operations, all of which factors may have a material adverse effect on the Company's present and prospective business activities.

## G.  Customer Base and Market Acceptance

The Fund has the possibility to be adversely affected by the negative market acceptance of its services.  The Company's market reputation and the reputation of the Fund Manager could adversely affect the opportunity to invest in available developments.  The Fund could also be adversely affected if the marketing strategy does not create a substantial developer following, thus decreasing the investment opportunities the Fund seeks.

## H.  Investments Fail to Meet Expectations

The Fund intends to provide equity and debt commitments in the form of joint ventures to established developers, which entails risk that investments will fail to perform in accordance with the expectations.  Estimates of the desired returns through real estate assumption could prove to be wrong, thus affecting total returns to investors.  The Fund will make investments based on the Fund Manager's projections of internal rates of return.  Investors have no assurance that the Fund will achieve its targeted total return on its investments.  Management will make every precaution necessary to achieve the expected returns but no guarantee is provided to investors.

## I.  Competition

Competition exists for development properties in most markets of the real estate industry, including all sectors in which the Fund intends to operate.  The Fund may be competing for assets with entities that have substantial greater economic and personnel resources than the Fund or better relationships with developers.  These entities may also generally be able to accept more risk than the Fund can manage.  Competition may reduce the number of suitable prospective assets offered to the Fund and increase the bargaining power of developers seeking equity investments.  Although the target market is small local developers, which many competitors overlook, there is certain risk that the Company will not be able to secure available investments.

## J.  Trend in Consumer Preferences and Spending

The Company's operating results may fluctuate significantly from period to period as a result of a variety of factors, competitive investment structures, debt service and principal reduction payments, and general economic conditions.  There is no assurance that the Company will be successful in marketing any of its services, or that the revenues from the sale of such products will be significant.  Consequently, the Company's revenues may vary by quarter, and the Company's operating results may experience fluctuations.

## K.  Risks of Borrowing

Although the Company does not intend to incur any debt from the equity commitments provided, should the Company secure bank debt in the future, possible risks could arise.  If the Company incurs indebtedness, a

portion of its cash flow will have to be dedicated to the payment of principal and interest on such indebtedness. Typical loan agreements also might contain restrictive covenants, which may impair the Company's operating flexibility.  Such loan agreements would also provide for default under certain circumstances, such as failure to meet certain financial covenants.  A default under a loan agreement could result in the loan becoming immediately due and payable and, if unpaid, a judgment in favor of such lender which would be senior to the rights of shareholders of the Company.  A judgment creditor would have the right to foreclose on any of the Company's assets resulting in a material adverse effect on the Company's business, operating results or financial condition.

## L.  Unanticipated Obstacles to Execution of the Business Plan

The Company's business plans may change significantly.  Many of the Company's potential business endeavors are capital intensive and may be subject to statutory or regulatory requirements.  Management believes that the Company's chosen activities and strategies are achievable in light of current economic and legal conditions with the skills, background, and knowledge of the Company's principals and advisors. Management reserves the right to make significant modifications to the Company's stated strategies depending on future events.

## M. Management Discretion as to Use of Proceeds

The net proceeds from this Offering will be used for the purposes described under "Use of Proceeds."  The Company reserves the right to use the funds obtained from this Offering for other similar purposes not presently contemplated which it deems to be in the best interests of the Company and its shareholders in order to address changed circumstances or opportunities.  As a result of the foregoing, the success of the Company will be substantially dependent upon the discretion and judgment of Management with respect to application and allocation of the net proceeds of this Offering.  Investors for the Shares offered hereby will be entrusting their funds to the Company's Management, upon whose judgment and discretion the investors must depend.

## N.  Control By Management

As of July 1, 2019  the Company's Management owned approximately 100% of the Company's outstanding shares.  Upon completion of this Offering, the Company's Management will own approximately 0% of the issued and outstanding shares.  Investors will own a majority percentage of the Company and will have majority voting rights.  Investors will have the ability to control either a vote of the Company's Management or any appointed officers.  See "Management" section.

## O.  Return of Profits

The Company intends to retain any initial future earnings to fund operations and expand the Company's business.  A shareholder will be entitled to receive revenue profits proportionate to the amount of shares held by that member.  See "TERMS AND CONDITIONS" section.

## P.  No Assurances of Protection for Proprietary Rights; Reliance on Trade Secrets

In certain cases, the Company may rely on trade secrets to protect intellectual property, proprietary technology and processes, which the Company has acquired, developed or may develop in the future.  There can be no assurances that secrecy obligations will be honored or that others will not independently develop similar or superior products or technology.  The protection of intellectual property and/or proprietary technology through claims of trade secret status has been the subject of increasing claims and litigation by various companies both in order to protect proprietary rights as well as for competitive reasons even where proprietary claims are unsubstantiated.  The prosecution of proprietary claims or the defense of such claims is costly and uncertain given the uncertainty and rapid development of the principles of law pertaining to this area.  The Company, in common with other firms, may also be subject to claims by other parties with regard to the use of intellectual property, technology information and data, which may be deemed proprietary to others.

## Q.  Limited Transferability and Liquidity

To satisfy the requirements of certain exemptions from registration under the Securities Act, and to conform with applicable state securities laws, each investor must acquire his Shares for investment purposes only and not with a view towards distribution.  Consequently, certain conditions of the Securities Act may need to be satisfied prior to any sale, transfer, or other disposition of the Shares.  Some of these conditions may include a minimum holding period, availability of certain reports, including financial statements from AMERITRUST CORPORATION, limitations on the percentage of Shares sold and the manner in which they are sold. Management can prohibit any sale, transfer or disposition unless it receives an opinion of counsel provided at the holder's expense, in a form satisfactory to us, stating that the proposed sale, transfer or other disposition will not result in a violation of applicable federal or state securities laws and regulations.  No public market exists for the Shares and no market is expected to develop.  Consequently, owners of the Shares may have to hold their investment indefinitely and may not be able to liquidate their investments or pledge them as collateral for a loan in the event of an emergency.

## R.  Broker - Dealer Sales of Shares

The Company's Shares are not presently included for trading on any exchange, and there can be no assurances that the Company will ultimately be registered on any exchange.

No assurance can be given that the Share of the Company will ever qualify for inclusion on any trading market. As a result, the Company's Shares are covered by a Securities and Exchange Commission rule that opposes additional sales practice requirements on broker-dealers who sell such securities to persons other than established customers and accredited investors.  For transactions covered by the rule, the broker-dealer must make a special suitability determination for the purchaser and receive the purchaser's written agreement to the transaction prior to the sale.  Consequently, the rule may affect the ability of broker-dealers to sell the Company's securities and will also affect the ability of shareholders to sell their shares in the secondary market.

## S.  Long Term Nature of Investment

An investment in the Shares may be long term and illiquid.  As discussed above, the offer and sale of the Shares will not be registered under the Securities Act or any foreign or state securities laws by reason of exemptions from such registration, which depends in part on the investment intent of the investors. Prospective investors will be required to represent in writing that they are purchasing the Shares for their own account for long-term investment and not with a view towards resale or distribution.  Accordingly, purchasers of Shares must be willing and able to bear the economic risk of their investment for an indefinite period of time.  It is likely that investors will not be able to liquidate their investment in the event of an emergency.

## T.  No Current Market For Shares

There is no current market for the Shares offered in this private Offering and no market is expected to develop in the near future.

## U.  Compliance with Securities Laws

The Shares are being offered for sale in reliance upon certain exemptions from the registration requirements of the Securities Act, applicable Illinois Securities Laws, and other applicable state securities laws.  If the sale of Shares were to fail to qualify for these exemptions, purchasers may seek rescission of their purchases of Shares.  If a number of purchasers were to obtain rescission, we would face significant financial demands, which could adversely affect our company as a whole, as well as any non-rescinding purchasers.

## V.  Offering Price

The price of the Shares offered has been arbitrarily established by our current Shareholders, considering such matters as the state of the Company's business development and the general condition of the industry in which it operates.  The Offering price bears little relationship to the assets, net worth, or any other objective criteria.

## W. Lack of Firm Underwriter

The Shares are offered on a "best efforts" basis by the Fund Manager, without compensation and on a "best efforts" basis through certain FINRA registered broker-dealers, which enter into Participating Broker-Dealer Agreements with the Company.  Accordingly, there is no assurance that the Company, or any FINRA broker-dealer, will sell the maximum Shares offered or any lesser amount.

## X.  Projections:  Forward Looking Information

Management has prepared projections regarding anticipated financial performance.  The Company's projections are hypothetical and based upon a presumed financial performance of the Company, the addition of a sophisticated and well-funded marketing plan, and other factors influencing the business. The projections are based on Management's best estimate of the probable results of operations of the Company and the investments made by management, based on present circumstances, and have not been reviewed by independent accountants and/or auditing counsel.  These projections are based on several assumptions, set forth therein, which Management believes are reasonable.  Some assumptions upon which the projections are based, however, invariably will not materialize due the inevitable occurrence of unanticipated events and circumstances beyond Management's control.  Therefore, actual results of operations will vary from the projections, and such variances may be material.  Assumptions regarding future changes in sales and revenues are necessarily speculative in nature.  In addition, projections do not and cannot take into account such factors as general economic conditions, unforeseen regulatory changes, the entry into a market of additional competitors, the terms and conditions of future capitalization, and other risks inherent to the Company's business.  While Management believes that the projections accurately reflect possible future results of operations, those results cannot be guaranteed.

## Y.  General Economic Conditions

The financial success of the Company may be sensitive to adverse changes in general economic conditions in the United States, such as recession, inflation, unemployment, and interest rates.  Such changing conditions could reduce demand and the return(s) promised in the marketplace for the Company's investments. Management believes that the impending growth of the market, mainstream market acceptance and the targeted investments will insulate the Company from excessive reduced demand.  Nevertheless, we have no control over these changes.

# IV. Use Of Proceeds

The Company seeks to raise minimum gross $15,000,000 up to $6,903,103,842 and  intends to apply these proceeds substantially as set forth herein, subject only to reallocation by Management in the best interests of the Company.  We will add the net proceeds from the sale of the securities to our general funds. We will initially use the Entire Amount of the Proceeds to purchase US Treasury Notes and Treasury Bills, and deposit some cash into the Bank of New York Mellon

| Category | Maximum Proceeds | Percentage of Total Proceeds |
|---|---|---|
| **Proceeds from Sale of Shares** | **$6,903,103,842** | **100%** |

**Offering Expenses & Commissions**

| Category | Maximum Proceeds | Percentage of Total Proceeds |
|---|---|---|
| **Offering Expenses (1)** | **$6,903,103,842** | **2.5%** |

Footnotes:
 (1) Includes estimated memorandum preparation, filing, printing, legal, accounting and other fees and expenses related to the Offering.
 (2) This Offering is being sold by the Management of the Company.  No compensatory sales fees or related commissions will be paid to such Management.  Registered broker or dealers who are members of the NASD and who enter into a Participating Dealer Agreement with the Company may sell shares.  Such brokers or dealers may receive commissions up to ten percent (10%) of the price of the Shares sold.

# V. Management

At the present time, two individuals are actively involved in the management of the Corporation.  The Managers are:

| | |
|---|---|
| Seong Yeol Lee --------------------- | Chairman and CEO, Ameritrust Corporation & Fund Manager |
| Thomas McMurrain -------------- | Director and VP,   Assistant Fund Manger |
| C. Michael Malaren -------------- | Director and President, Assistant Fund Manger |
| Ketan Masters --------------------- | Director and VP, Assistant Fund Manger |
| Ajit Vijay Joshi -------------------- | Director and VP, Assistant Fund Manger |

**[SEE EXHIBIT "E" – MANAGEMENT RESUMES]**

# VI. Management Compensation

The Management Fee of 2.5% of the aggregate equity commitments will serve as the operating capital for the Company.  The Company will be managed by AMERITRUST CORPORATION and its Management, and thus only the management fee will serve as monies for the operation of the Company.  Any excess costs over and above the Management Fee shall be the responsibility of AMERITRUST CORPORATION and its Fund Manager SEONG Y. LEE.

# VII.    Board of Advisors

The Company has established a Board of Advisors, which includes a highly qualified business and industry professional.  The Board of Advisors will advise the Management team in making appropriate decisions and taking effective action. However, the Board of Advisors will not be responsible for Management decisions and has no legal or fiduciary responsibility to the Company. Currently there is one member on the Board of Advisors:

- Thomas J. Reid, Attorney at Law

## VIII.    Dilution

The purchasers of the Shares offered by this Memorandum will experience an immediate and substantial dilution of their investments.  There are no authorized shares of the Company of which are currently issued and outstanding.  The net tangible book value per share of the Company's ownership was approximately $0 on July 1, 2019.  Net tangible book value per share of ownership is equal to the Company's total tangible assets less its total liabilities, divided by the total number of outstanding shares of ownership.  Upon completion of this Offering, the net tangible book value for the Shares, which are now outstanding, will be increased with corresponding dilution for the Shares sold to investors.

The following reflects the dilution to be incurred by the investors.  "Dilution" is determined by subtracting the net tangible book value per Share after the Offering from the Offering price.  If the expected maximum number of Shares offered hereby is sold, of which there can be no assurance, there will be 0 Shares of ownership outstanding.

The following table contains certain information as of July 1, 2019 as to the number of shares beneficially owned by (i) each person known by the Company to own beneficially more than 5% of the Company's shares, (ii) each person who is an Officer of the Company, (iii) all persons as a group who are Fund Managers and/or Officers of the Company, and as to the percentage of the outstanding shares held by them on such  dates and as adjusted to give effect to this Offering.

| Seong Y. Lee | CEO | 100% |
| TBD | CFO | 0% |

Footnotes:

 (1)  Management will retain 0% of stock ownership following the completion of this offering.  In addition, Management will not be committing any additional capital to the Company.

**Litigation**

The Company is not presently a party to any material litigation, nor to the knowledge of Management is any litigation threatened against the Company, which may materially affect the business of the Company or its assets.

## IX. Description of Shares

The Company is offering 6,903,103,842 Shares at a price of $1.00 per Share, $1.00 par value per share. Upon completion of the Offering 0 shares will be outstanding. The shares of ownership are equal in all respects, and upon completion of the Offering, the shares will comprise the only representation of ownership that the Company will have issued and outstanding to date, upon close of the Offering.

Each shareholder is entitled to one vote for each share held on each matter submitted to a vote of the shareholder.

Shares are not redeemable and do not have conversion rights. The Shares currently outstanding are, and the Shares to be issued upon completion of this Offering will be, fully paid and non-assessable.

In the event of the dissolution, liquidation or winding up of the Company, the assets then legally available for distribution to the shareholders will be distributed ratably among such shareholders in proportion to their shares.

Members are only entitled to profit distributions proportionate to their shares of ownership when and if declared by the Management out of funds legally available therefore. The Company to date has not given any such profit distributions. Cash flow distribution is outlined in the TERMS AND CONDITIONS section.

### TRANSFER AGENT AND REGISTRAR

Unless otherwise indicated in the accompanying Private Placement Memorandum, the Common Stock-I or Common Stock-II will be issued in the form of one or more fully registered global Securities (collectively, the "Global Equity Security") which will be deposited with, or on behalf of The Depository Trust Company, New York, New York (the "Depositary" or "DTC") and registered in the name of the Depositary's nominee. Except as set forth below, the Global Equity Security may be transferred, in whole and not in part, only to another

nominee of the Depositary or to a successor of the Depositary or its nominee.   The company may determine to hire a third party transfer agent at any time during the offering.

# X. Plan of Placement

The Shares are offered directly by the Management of the Company on the terms and conditions set forth in this Memorandum.  FINRA brokers and dealers may also offer shares.  The Company is offering the Shares on a "best efforts" basis.  The Company will use its best efforts to sell the Shares to investors.  There can be no assurance that all or any of the Shares offered, will be sold.

## A.  Escrow of Subscription Funds

Commencing on the date of this Memorandum all funds received by the Company in full payment of subscriptions for Shares will be deposited in an escrow account. The Company has set a minimum offering proceeds figure of $15,000,000 for this Offering.   The Company has established an Investment Holding Account with Bank of New York Mellon, into which the minimum offering proceeds will be placed.  At least 15,000,000 Shares must be sold for $15,000,000 before such proceeds will be released from the escrow account and utilized by the Company.  After the minimum number of Shares are sold, all subsequent proceeds from the sale of Shares will be delivered directly to the Company and be available for its use.  Subscriptions for Shares are subject to rejection by the Company at any time.

## B.  How to Subscribe for Shares

A purchaser of Shares must complete, date, execute, and deliver to the Company the following documents, as applicable. All of which are included as part of the Investor Subscription Package:

An Investor Suitability Questionnaire;

n)   An original signed copy of the appropriate Subscription Agreement;

o)   A AMERITRUST CORPORATION Articles of incorporation; and

p)   A check payable to "AMERITRUST CORPORATION" in the amount of $1.00 per Share for each Share purchased as called for in the Subscription Agreement (minimum purchase of 250,000 Shares for $250,000).

Purchasers of Shares will receive an Investor Subscription Package containing an Investor Suitability Questionnaire and two copies of the Subscription Agreement.

Subscribers may not withdraw subscriptions that are tendered to the Company (Florida, Georgia and Pennsylvania Residents See NASAA Legend in the front of this Memorandum for important information).

## XI. Additional Information

Each prospective investor may ask questions and receive answers concerning the terms and conditions of this offering and obtain any additional information which the Company possesses, or can acquire without unreasonable effort or expense, to verify the accuracy of the information provided in this Memorandum.  The principal executive offices of the Company are located at:

## AMERITRUST CORPORATION

## 44709 Gwinnett Loop

## Novi, MI 48377 USA

## (248)789-1617

## (203)276-8794

# Exhibit A
# BUSINESS PLAN

# AMERITRUST CORPORATION
# BUSINESS PLAN

Prepared by:

SEONG YEOL LEE

44709 Gwinnett Loop
Novi, Michigan 48377
4752176124
ylee37@hotmail.com

www.ameritrustcorporation.com

## I.   EXECUTIVE SUMMARY

AMERITRUST CORPORATION (REFERRED TO FROM HEREON IN AS THE ("ATCC" OR "COMPANY") ESTABLISHED AS A C-CORPORATION AT 44709 GWINNETT LOOP, NOVI, MICHIGAN 48377 WITH THE EXPECTATION OF RAPID EXPANSION IN THE FINANCIAL BANKING SERVICES AND REAL ESTATE MANAGEMENT INDUSTRY.

## NEW SERVICES

**HOTELS:** MARRIOTT HOTEL AT SHENYANG NORTH STATION, HOLIDAY INN EXPRESS AT SHENYANG NORTH STATION, HOLIDAY INN EXPRESS AT PANJIN CITY, HOLIDAY INN EXPRESS AT ANSHAN CITY IN LIAONING ARE PRESENTLY OPERATING. AMERITRUST WILL BUILD AND OPERATE MARRIOTT HOTEL IN HAIDIAN QU, BEIJING CITY, MARRIOTT HOTEL IN SHANGHAI CITY, MARRIOTT HOTEL IN YINGKOU CITY, MARRIOTT HOTEL IN DALIAN CITY, MERRIOTT HOTEL IN FUSHUN CITY, MARRIOTT HOTEL IN CHANGCHUN CITY, MARRIOTT HOTEL IN HARBIN CITY, AND MARRIOTT HOTEL IN SANYA CITY OF HAINANDO PROVINCE.

**GENERAL HOSPITALS AND MEDICAL UNIVERSITIES:** 10,000 BEDS OF LIAONING MT. SINAI QUATERNARY GENERAL HOSPITAL WILL BE BUILT BY 2020 100% OWNED BY AMERITRUST CORPORATION AND OPERATION THE HOSPITAL DIRECTLY. PRESENTLY THE HOSPITAL FACILITIES ARE COMPLETED. WE WILL BUILD QUATERNARY GENERAL HOSPITALS AT BEIJING, SHANGHAI, SHENYANG, CHANGCHUN AND HARBIN CITIES, WHICH POPULATIONS ARE MORE THAN 5,000,000.
WE HAVE ONE HUNDRED PERCENT OWNED HOSPITAL AT HARBIN CITY. IT'S POPULATION IS OVER 7,000,000 NOW. WE ALSO OWNED ONE MEJOR MEDICAL UNIVERSITY ("LIAONING MEDICAL UNIVERSITY") IN DALIAN CITY, WHICH POPULATION IS 8,000,000. WE WILL BUILD WORLD LARGEST AND QUATERNARY MEDICAL UNIVERSITY AT YINGKOU CITY. THE YINGKOU CITY POPULATION IS 2,500,000. WE OWN LAND SIZE IS 817 ACRES IN YINGKOU CITY, LIAONING PROVINCE.

**SHOPPING PLAZAS:** WE ARE PRESENTLY OPERATING 5 SHOPPING PLAZAS. FOUR SHOPPING CENTERS IN SHENYANG AND ONE IS IN DALIAN CITY. WE WILL BUILD AND OPERATE SHOPPING PLAZAS AT, BEIJING CITY, SHANGHAI CITY, YINGKOU, ANSHAN, FUSHUN, CHANGCHOON, HARBIN, AND SANYA CITIES.

**APARTMENTS:** 3,600 APARTMENT UNITS FOR DOCTORS AND .NURSES. EACH APARTMENT UNIT SIZE IS 1,440 SQ. FT., WE ALSO BUILD HUNDREDS' THOUSANDS OF SELLING APARTMENT UNITS BETWEEN 2019 THROUGH 2022. WE BUILD $2,400 PER SQ. METER. WE SELL THEM TO $5,600 PER SQ. METER.

**COMMERCIAL PROPERTIES:** PRESENTLY WE HAVE SHENYANG BAONENG GFC WHICH IS 568M TALL. THE BAONENG GFC IS THE HIGHEST IN FAR ESTERN CHINA, KOREA AND JAPAN AS WELL AS NEW YORK AND LOS ANGELES.
THE WORLD TRADE CENTER AT DALIAN IS LARGEST TRADE CENTER IN FAR ESTERN CHINA, KOREA AND JAPAN.
SHENYANG GLOBAL FINANCIAL CENTER, PANJIN CITY FINANCIAL CENTER, ANSHAN FINANCIAL CENTER, SHENYANG FINANCIAL CENTER BUILDINGS ARE 35 FLOORS UP TO 58 FLOORS TALL BUILDINGS. WE LEASE

THOSE FACILITIES TO BANKS, INSURANCE COMPANIES AND SECURITIES COMPANIES NOW AS WELL AS PROFESSIONAL ENTITIES.

**RESORT AND ENTERTAINMENTS:** THERE ARE TWO RESORT AND ENTERTAINMENT DEVELOPMENT PROJECTS. ONE IS IN JEJUDO ISLAND PROVINCE OF KOREA. THE FACILITIES ARE COMPLETED BY 28% NOW. THE OTHER IS IN SANYA CITY, WHICH IS LOCATED THE SOUTHEND OF HAINANDO ISLAND PROVINCE IN CHINA. THIS RESORT PROJECT DEVELOPMENT WILL START FROM THE BEGINNING FEBRUARY 2020.

MEAT PROCESSING AND MANUFACTURING: THIS PROJECT IS MAJOR DEVELOPMENT REQUIRED BOTH AMERICA AND CHINA. PRESENTLY CHINES GOVERNMENT HAS APPROVED AND SET ASIDE THE 2,450 ACRES DEVELOPMENT LAND AT NEXT TO THE SHENYANG INTERNATIONAL AIRPORT TO ME FOR THE FREIGHT AIRCRAFT LANDING FACILITY.

(1) MEAT PROCESSING AND MANUFACTURING BASE IN CHINA WILL BE BUILT BY ME. THIS BASE WILL P ROCESS AND MANUFACTURE 6,000,000 METRIC TONS UP TO 7,000,000 METRIC TONS OF BEEF SN D PORK. 20,000 METRIC TONS OF MEAT WILL BE IMPORT FROM OVERSEAS. I NEGOTIATED AND RE CEIVED APPROVAL THE IMPORT FROM THE UNITED STATES.

(2) THUS, I WILL BUILD A MAJOR SLAUGHTERING FACTORIES AT IX RANCH, IN BIG SANDY, MONTANA. FROM THIS BASE I WILL EXPORT 20,000 METRIC TONS OF BEEF AND PORKS TO CHINA. EMPORTER AND IMPORTER ARE ONLY MYSELF.

(3) I NEED TO ESTABLISH FREIGHT AIRCRAFT COMPANY BECAUSE WE HAVE TO TRANSPORT 20,000 ME TRICTONS OR MORE EVERY DAY FROM IX RANCH TO SHENYANG, LIAONING. I AM GOING TO BUY A BOUT 360 USED BA 747-8F FREIGHT AIRCRAFTS FOR THE FULLFILL OF EXPORT TRANSPORTATIONS.

TRADE WAR BETWEEN USA AND CHINA IS BETWEEN TRUMP AND XI JINPING. EXPORT AND IMPORT BETWEEN USA AND CHINA WILL BE OPERATED BY ME. I HAVE ALL APPROVALS FROM CHINA ALREADY. THERE WILL BE $77,000,000,000 AND OVER EVERY YEAR.

**KINGDOM LOUNGE RESTAURANT CENTERS:** I WILL BUILD 25,000 KINGDOM LOUNGE RESTAURANT CENTERS IN CHINA. THOSE CENTERS WILL SERVE 6 BEST FOOD CULTURAL MENU BY REGION INCLUDING AMERICAN FOOD, CHINESE FOOD, EUROPEAN FOOD, FAST FOOD, 700 FOOD BUFFET AND COFFEE SHOP. ALL MEAT AND MANUFACTURED MEET PRODUCTS WILL BE SUPPLIED TO 25,000 KINGDOM LOUNGE RESTAURANT CENTERS. THUS, EXPORT ➔ IMPORT ➔ SUPPLY KINGDOM LOUNGE RESTAURANT CENTERSARE DONE BY ONLY MYSELF.

**AIRCRAFT MRO:** AMERITRUST CORPORATION WILL ACQUISITE THE SMALL AND MEDIUM SIZE AIRCRAFT MANUFACTURING COMPANY IN LIAONING PROVINCE. THE AIRCRAFT MANUFACTURING COMPANY IN LIAONING PROVINCE IS OWNED BY MY FRIEND. IF AMERITRUST CORPORATION WANT TO BUY IT, HE WILL TRANSFER TO ME. THUS, IF I COULD BUYOUT IT, I WILL BUILD AIRCRAFT MRO CENTER IN SHENYANG. CHINA HAS THE MOST AIRCRAFTS AND WE WILL HAVE MORE THAN 360 FREIGHT AIRCRAFTS SOON. I NEED TO ESTABLISH AND OPERATE A MAINTENANCE, REPAIR AND OVERHAUL FACTORY.

**SHIPBUILDING:** STX IN KOREA HAS BACKRUPTED IN FEW YEARS AGO. I WIL ACQUISITE IT AT LOW PRICE. AND THEN, I WILL BUILD FISHERY TRAWLER, SEINER AND FREEZER SHIPS. MOST FISHERY FLEET SIZE WILL BE 85m X 19m,

| Gross Tons | 5,400 Tons |
|---|---|
| Net Tons | 1,800 Tons |

| Deadweight Tons | 2,800 Tons |
|---|---|

**FINANCIAL SERVICES:**

(1) ONE COMMERCIAL BANK IN CHINA HAS SUBSCRIBED TO EXCHANGE WITH AMERITRUST CORPORAT ION COMMON STOCK. AS SOON AS EXCHANGED THE OWNERSHIP OF THE BANK AND AMERITRUST CORPORATION STOCK, I WILL BE 100% OWNER OF THE COMMERCIAL BANK IN CHINA. I WILL PROV IDE AMERICAN BANKING STYLE SERVICES TO CHINESE ENTITIES AND INDIVIDUAL PEOPLE

(2) I WILL ESTABLISH A CREDIT GUARANTEE INSURANCE COMPANY IN THE UNITED STATES WITH TWO MAJOR BRANCHES IN KOREA AND CHINA SOON. I WILL PROVIDE FINANCIAL LEDING SERVICES AND ISSUE CREDIT GUARANTEE POLICIES TO CHINESE AND KOREAN INDIVIDUALS AND CORPORATION W ITH LIEN OF THEIR PROPERTIES. IF AMERITRUST CORPORATION'S FINANCIAL CAPACITY IS NOT ENO UGH, I WILL PROVIDE FINANCIAL SERVICES USING CO-FINANCE COMPANY OR RE-INSURANCE COM PANY.

(3) PRESENTLY, I WILL ESTABLISH FINANCIAL SERVICES BRANCHES OF AMERITRUST CORPORATION IN K OREA' AND CHINA AS MANY AS I CAN. AND THEN, I WILL PROVIDE MANY AMERICAN SECURITIES P RODUCTS TO INVESTORS IN CHINA AND KOREA.

## FOUNDER

CHAIRMAN SEONG YEOL LEE WAS THE PRESIDENT OF AMERITRUST SECURITIES, INC. LICENSED OF FINRA 6, 7, 22, 63, 65, 24 LICENSED., FULL LINES OF INSURANCE BROKER LICENSED INCLUDING LIFE, HEALTH, PROOPERTY AND CASUALTY LICENSED IN CONNECTICUT. HE WAS A MEMBER OF CHF, RIA, CFS MEMBER. HE HAVE SERVED A S SECURITIES PRINCIPAL WITH METLIFE, AND PRUDENTIAL. HE ALSO SERVED AT PHOENIX FINANCIAL GROUP AT 1 AMERICAN ROW, HARTFORD, CONNECTICUT BEFORE 1990 YEAR AS ACTUARIAL SYSTEMS ANALYST.

## II.   BUSINESS SUMMARY

### INDUSTRY OVERVIEW

IN THE UNITED STATES THE FINANCIAL BANKING SERVICES AND REAL ESTATE MANAGEMENT INDUSTRY PRESENTLY MAKES ZERO DOLLARS IN SALE NOW. WE WILL PROVIDE FINANCIAL SERVICES $700 BILLION DOLLARS OR MORE IN SALES IN CHINA AND KOREA.

### LEGAL ISSUES

AMERITRUST CORPORATION AFFIRMS THAT ITS PROMOTERS HAVE ACQUIRED ALL LEGALLY REQUIRED TRADEMARKS AND PATENTS. IF WE NEED MORE LEGAL DOCUMENTS OR LEGALLY REQUIRED, CHINESE GOVERNMENT WILL SUPPORT FRIENDLY AND QUICKLY AS WE NEEDED.

## III.   MARKET SUMMARY

TARGET MARKETS

AMERITRUST CORPORATION'S MAJOR TARGET MARKETS ARE AS FOLLOWS:

STOCK INVESTMENTS:

REAL ESTATE BULDINGS:

(1) COMMERCIAL BUILDINGS

(2) APARTMENTS

(3) HOSPITALS

BANKING, HOSPITALS, HOTELS, RESTAURANTS AND CREDIT GUARANTEE INSURANCE CLIENTS AND APARTMENT UNIT BUYERS…ETC. THE ESTAIMATED NUMBER OF POTENTIAL CLIENTS WITHIN THE AMERITRUST CORPORATION'S GEOGRAPHIC SCOPE IS OVER 1,000,000,000 OR MORE.

FIRST-RATE SERVICE IS INTENDED TO BE THE FOCUS OF THE AMERITRUST CORPORATION AND A CORNERSTONE OF THE BRAND'S SUCCESS. ALL CLIENTS WILL RECEIVE CONSCIENTIOUS, ONE-ON-ONE, TIMES SERVICE IN ALL CAPACITIES, BE THEY TRANSACTIONS, CONFLICTS OR COMPLAINTS. THIS IS EXPECTED TO CREATE A LOYAL BRAND FOLLOWING AND RETURN BUSINESS.

## IV. FINANCIAL PLAN

AMERITRUST CORPORATION WILL PROVIDE 10% OF CASH DOWN PAYMENT OF COSTS OF
- 25,000 KINGDOM LOUNGE RESTAURANT CENTER CONSTRUCTIONS,
- ESTABLISH AND DEVELOPMENT OF EXPORT FACILITIES AND FACTORIES,
- CONSTRUCTIONS OF IMPORT FACILITIES AND FACTORIES,  AND
- 360 USED FREIGHT AIRCRAFT ACQUISITION COST etc.

90% OF EXPENSES AND COST WILL BORROW FROM USA EX-IM BANK, SBA, AND USDA AGAINST THOSE PROPERTY AS THE COLLATERALS.

ALL OTHER REAL ESTATE PROPERTIES WILL EXCHANGE WITH AMERITRUST CORPORATION'S COMMON STOCKS. THUS, AMERITRUST CORPORATION DOES NOT NEED CASH OUT LAY FOR THOSE REAL ESTATE PROPERTIES SUCH AS A COMMERCIAL BANK, HOTELS, SHOPPING PLAZAS, HOSPITALS, UNIVERSITIES, COMMERCIAL BUILDINGS, RESORT AND ENTERTAINMENT FACILITIES, RESIDENTIAL BUILDINGS, FINANCIAL CENTERS AND TRADE CENTERS.

# Exhibit B

AMERITRUST CORPORATION ARTICLES OF INCORPORATION

## BY- LAWS OF
## AMERITRUST CORPORATION

### ARTICLE I OFFICES

**1.1** **Principal Office.** The principal office of the Corporation shall be at such place within the State of Michigan as the Board of Directors shall determine from time to time.

**1.2** **Other Offices.** The Corporation may also have offices at such other places as the Board of Directors from time to time determines or the business of the Corporation requires.

### ARTICLE II SEAL

2.1   Seal.  **The Corporation may have a seal in such form as the Board of Directors may from time to time determine. The seal may be used by causing it or a facsimile to be impressed, affixed, reproduced or otherwise.**

### ARTICLE III CAPITAL STOCK

**3.1** **Issuance of Shares.** The shares of the Corporation may be represented

by certificates or by appropriate entries in the books and records of the Corporation without the issuance of certificates as permitted by Section 336 of the Michigan Business Corporation Act and as determined from time to time by the Board of Directors. A Shareholder holding shares not represented by a certificate may request the issuance of one or more certificates for his or her shares at any time. Shareholders holding shares represented by one or more certificates may surrender the certificates to the Corporation at any time in exchange for shares not represented by certificates. In the case of shares issued without certificates, the Corporation shall send the Shareholder a written statement containing the information required by Section 332 of the Michigan Business Corporation Act and such other information as the Board of Directors deems appropriate.

3.2      **Certificates for Shares.** In the event the shares of the Corporation are represented by certificates, the certificates shall be signed by the Chairman of the Board, President or a Vice-President and by the Treasurer, Assistant Treasurer, Secretary or Assistant Secretary of the Corporation, and may be sealed with the seal of the Corporation or a facsimile thereof. The signatures of the officers may be facsimiles if the certificate is countersigned by a transfer agent or registered by a registrar other than the Corporation itself or its employee. In case an officer who has signed or whose facsimile signature has been placed upon a certificate ceases to be such officer before the certificate is issued, it may be issued by the Corporation with the same effect as if he were such officer at the date of issuance. A certificate representing  shares shall state upon its face that the Corporation is formed under the laws of the State of Michigan; the name of the person to whom it is issued; the number and class of shares, and the designation of the series, if any, which the certificate represents; the par value of each share represented by the certificate, or a statement that the shares are without par value; and such other provisions as may be required by the laws of the State of Michigan.

3.3      **Transfer of Shares.** The shares of the capital stock of the Corporation

67

are transferable only on the books of the Corporation upon presentation of a properly executed assignment and such evidences of the ownership of the shares and the validity of the assignment as the Corporation may require. In addition, shares represented by certificates may be transferred only upon the surrender thereof. Within a reasonable time after the transfer of shares without certificates, the Corporation shall send the Shareholder a written statement described in Section 3.1 above.

3.4     **Registered Shareholders.** The Corporation shall be entitled to treat the  person in whose name any share of stock is registered as the owner thereof for purposes of dividends and other distributions in the course of business, or in the course of recapitalization, consolidation and other distributions in the course of business, or in the course of recapitalization, consolidation, merger, reorganization, sale of assets, liquidation or otherwise and for the purpose of votes, approvals and consents by Shareholders, and for the purpose of notices to Shareholders, and for all other purposes whatever, and shall not be bound to recognize any equitable or other claim to or interest in such shares on the part of any other person, whether or not the Corporation shall have notice thereof, save as expressly required by the laws of the State of Michigan.

3.5     **Lost or Destroyed Certificates.**   Upon the presentation to the Corporation of a proper affidavit attesting the loss, destruction or mutilation of any certificate or certificates for shares of stock of the Corporation, the Board of Directors shall direct the issuance of a new certificate or certificates to replace the certificates so alleged to be lost, destroyed or mutilated. The Board of Directors may require as a condition precedent to the issuance of new certificates any or all of the following:

a.   Presentation of additional evidence or proof of the loss, destruction or mutilation claimed;

b.  Advertisement of loss in such manner as the Board of Directors may direct or approve;

c.  A bond or agreement of indemnity, in such form and amount and with such sureties, or without sureties, as the Board of Directors may direct or approve;

d.  The order or approval of a court or judge.

**3.6** **Lien.** The Corporation shall have a lien upon all capital stock and property invested in the Corporation for all debts due to the corporation from the owners thereof. The right of the Corporation to such lien shall be expressly stated on the certificates representing the capital stock in the Corporation.

## ARTICLE IV

## SHAREHOLDERS AND MEETINGS OF SHAREHOLDERS

**4.1** **Place of Meetings.** All meetings of Shareholders shall be held at the principal office of the Corporation or at such other place as shall be determined by the Board of Directors and stated in the notice of meeting.

**4.2** **Annual Meeting.** The annual meeting of the Shareholders of the Corporation shall be held within one hundred twenty (120) days after the end of each fiscal year. Directors shall be elected at each annual meeting and such other business transacted as may come before the meeting.

**4.3** **Special Meetings.** Special meetings of Shareholders may be called by the Board of Directors, the Chairman of the Board (if such office is filled) or the President and shall be called by the President or Secretary at the written request of Shareholders holding a majority of the shares of stock of the Corporation outstanding

and entitled to vote. The request shall state the purpose or purposes for which the meeting is to be called.

      **4.4**      **Notice of Meetings.** Except as otherwise provided by statute, written notice of the time, place and purposes of a meeting of Shareholders shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each Shareholder of record entitled to vote at the meeting, either personally or by mailing such notice to his last address as it appears on the books of the Corporation. No notice need be given of an adjourned meeting of the Shareholders provided the time and place to which such meeting is adjourned are announced at the meeting at which the adjournment is taken and at the adjourned meeting only such business is transacted as might have been transacted at the original meeting. However, if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Shareholder of record on the new record date entitled to notice as provided in this By-Law.

      **4.5**      **Record Dates.** The Board of Directors, the Chairman of the Board (if such office is filled) or the President may fix in advance a date as the record date for the purpose of determining Shareholders entitled to notice of and to vote at a meeting of Shareholders or an adjournment thereof, or to express consent or to dissent from a proposal without a meeting, or  for the purpose of determining Shareholders entitled to receive payment of a dividend or allotment of a right, or for the purpose of any other action. The date fixed shall not be more than sixty (60) nor less than ten (10) days before the date of the meeting, nor more than sixty (60) days before any other action. In such case only such Shareholders as shall be Shareholders of record on the date so fixed shall be entitled to notice of and to vote at such meeting or adjournment thereof, or to express consent or to dissent from such proposal, or to receive payment of such dividend or to receive such allotment of rights, or to participate in any other action, as the case may be, notwithstanding any transfer of any stock on the books of the Corporation, or otherwise, after any

such record date. Nothing in this By-Law shall affect the rights of a Shareholder and his transferee or transferor as between themselves.

      **4.6**      **List of Shareholders.** The Secretary of the Corporation or the agent of the Corporation having charge of the stock transfer records for shares of the Corporation shall make and certify a complete list of the Shareholders entitled to vote at a Shareholders' meeting or any adjournment thereof. The list shall be arranged alphabetically within each class and series, with the address of, and the number of shares held by, each Shareholder; be produced at the time and place of the meeting; be subject to inspection by any Shareholder during the whole time of the meeting; and be prima facie evidence as to who are the Shareholders entitled to examine the list or vote at the meeting.

      **4.7**      **Quorum.** Unless a greater or lesser quorum is required in the Articles of Incorporation or by the laws of the State of Michigan, the Shareholders present at a meeting in person or by proxy who, as of the record date for such meeting, were holders of a majority of the outstanding shares of the Corporation entitled to vote at the meeting shall constitute a quorum at the meeting. Whether or not a quorum is present, a meeting of Shareholders may be adjourned by a vote of the shares present in person or by proxy. When the holders of a class or series of shares are entitled to vote separately on an item of business, this By-Law applies in determining the presence of a quorum of such class or series for transaction of such item of business.

      **4.8**      **Proxies.** A Shareholder entitled to vote at a meeting of Shareholders or to express consent or dissent without a meeting may authorize other persons to act for him by proxy. A proxy shall be signed by the Shareholder or his authorized agent or representative and shall not be valid after the expiration of three (3) years from its date unless otherwise provided in the proxy. A proxy is revocable at the pleasure of the Shareholder executing it except as otherwise provided by the laws of the State of Michigan.

**4.9**     **Inspectors of Election.** The Board of Directors, in advance of a Shareholders' meeting, may, and on request of a Shareholder entitled to vote thereat shall, appoint one (1) or more inspectors. In case a person appointed fails to appear or act, the vacancy may be filled by appointment made by the Board of Directors in advance of the meeting or at the meeting by the person presiding thereat.  If appointed, the inspectors shall determine the number of shares outstanding and the voting power of each, the shares represented at the meeting, the existence of a quorum and the validity and effect of proxies, and shall receive votes, ballots or consents, hear and determine challenges or consents, determine the result, and do such acts as are proper to conduct the election or vote with fairness to all Shareholders. On request of the person presiding at the meeting or a Shareholder entitled to vote thereat, the inspectors shall make and execute a written report to the person presiding at the meeting of any of the facts found by them and matters determined by them. The report shall be prima facie evidence of the facts stated and of the vote as certified by the inspectors.

**4.10**     **Voting.** Each outstanding share is entitled to one (1) vote on each matter submitted to a vote, unless otherwise provided in the Articles of Incorporation. Votes shall be cast in writing, signed by the Shareholder or his proxy. When an action, other than the election of directors, is to be taken by a vote of the Shareholders, it shall be authorized by a majority of the votes cast by the holders of shares entitled to vote thereon, unless a greater plurality is required by the Articles of Incorporation or by the laws of the State of Michigan. Except as otherwise provided by the Articles of Incorporation, Directors shall be elected by a plurality of the vote cast at any election.

**ARTICLE V DIRECTORS**

**5.1**     **Number.** The business and affairs of the corporation shall be managed by a Board of not less than one (1) nor more than five (5) Directors, as shall be fixed

from time to time by the Board of Directors. The Directors need not be residents of Michigan.

        **5.2**        **Election, Term of Office, Resignation and Removal.** Directors shall be elected at each annual meeting of the Shareholders, each to hold office until the next annual meeting of Shareholders and until his successor is elected and qualified, or until his resignation or removal. A Director may resign by written notice to the Corporation. The resignation is effective upon its receipt by the Corporation or a subsequent time as set forth in the notice of resignation. A Director or the entire Board of Directors may be removed, with or without cause, by vote of the holders of a majority of the shares entitled to vote at an election of Directors.

        **5.3**        **Vacancies.** Vacancies in the Board of Directors occurring by reason of death, resignation, removal, increase in the number of Directors or otherwise shall be filled by the affirmative vote of a majority of the remaining Directors though less than a quorum of the Board of Directors, unless filled by proper action of the Shareholders of the Corporation. Each person so elected shall be a Director for a term of office continuing only until the next election of Directors by the Shareholders.

        **5.4**        **Annual Meeting.** The Board of Directors shall meet each year immediately after the annual meeting of the Shareholders, or within thirty (30) days of such time excluding Sundays and legal holidays if such later time is deemed advisable, at the place where such meeting of the Shareholders has been held or such other place as the Board may determine, for the purpose of election of officers and consideration of such business that may properly be brought before the meeting; provided, that if less than a majority of the Directors appear for an annual meeting of the Board of Directors the holding of such annual meeting shall not be required and the matters which might have been taken up therein may be taken up at any later special or annual meeting, or by consent resolution.

**5.5** **Regular and Special Meetings.** Regular meetings of the Board of Directors may be held at such times and places as the majority of the Directors may from time to time determine at a prior meeting or as shall be directed or approved by the vote or written consent of all the Directors. Special meetings of the Board may be called by the Chairman of the Board (if such office is filled) or the President and shall be called by the President or Secretary upon the written request of any two (2) Directors.

**5.6** **Notices.** No notice shall be required for annual or regular meetings of the Board or for adjourned meetings, whether regular or special. Three (3) days' written notice shall be given for special meetings of the Board, and such notice shall state the time, place and purpose or purposes of the meeting.

**5.7** **Proxies.** If and to the extent authorized by law and any resolution adopted by the Board, a Director may authorize another person or persons to act for him or her by proxy. A proxy given by a Director shall be in writing and shall be signed by the Director. A proxy given by a Director shall not be valid after one year from its date unless otherwise provided in the proxy. A proxy is revocable at the pleasure of the Director executing it.

**5.8** **Quorum.** A majority of the Board of Directors then in office, or of the members of a committee thereof, constitutes a quorum for the transaction of business. The vote of a majority of the Directors present in person or by proxy at any meeting at which there is a quorum shall be the acts of the Board or of the committee, except as a larger vote may be required by the laws of the State of Michigan. A member of the Board or of a committee designated by the Board may participate in a meeting by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other. Participation in a meeting in this manner constitutes presence in person at the meeting.

**5.9**     __Executive and Other Committees.__ The Board of Directors may, by resolution passed by a majority of the whole Board, appoint one (1) or more members of the Board as an executive committee to exercise all powers and authorities of the Board in management of the business and affairs of the Corporation, except that the committee shall not have power or authority to:

     a.       Amend the Articles of Incorporation;

     b.       Adopt an agreement of merger or consolidation;

     c.       Recommend to Shareholders the sale, lease or exchange of all or substantially all of the Corporation's property and assets;

     d.       Recommend to Shareholders a dissolution of the Corporation or revocation of a dissolution;

     e.       Amend these By-Laws;

     f.       Fill vacancies in the Board;

     g.       Fix the compensation of the Directors for serving on the Board or on a committee; or

     h.       Unless expressly authorized by the Board, declare a dividend or authorize the issuance of stock.

The Board of Directors from time to time may, by like resolution, appoint such other committees of one (1) or more Directors to have such authority as shall be specified by the Board in the resolution making such appointments. The Board of Directors may designate one (1) or more Directors as alternate members of any committee who may replace an absent or disqualified member at any meeting thereof.

     **5.10**     <u>**Dissents.**</u> A Director who is present at a meeting of the Board of Directors, or  a committee thereof of which he is a member, at which action on a corporate matter is taken is presumed to have concurred in that action unless his dissent is entered in the minutes of the meeting or unless he files his written dissent to the action with the person acting as Secretary of the meeting before the adjournment thereof or shall forward such dissent by registered mail to the Secretary of the Corporation promptly after the adjournment of the meeting. Such right to dissent does not apply to a Director who voted in favor of such action. A Director who is absent from a meeting of the Board, or a committee thereof of which he is a member, at which any such action is taken is presumed to have concurred in the action unless he files his written dissent with the Secretary of the Corporation within a reasonable time after he has knowledge of the action.

     **5.11**     <u>**Compensation.**</u> The Board of Directors, by affirmative vote of a majority of Directors in office and irrespective of any personal interest of any of them, may establish reasonable compensation of Directors for services to the Corporation as Directors or Officers.

### ARTICLE VI  NOTICES, WAIVERS OF NOTICE AND MANNER OF ACTING

     **6.1**     <u>**Notices.**</u> All notices of meetings required to be given to Shareholders, Directors or any committee of Directors may be given by mail or electronic mail to any Shareholder, Director or committee member at his last address as it appears on the books of the Corporation. Such notice shall be deemed to be given at the time when the same shall be mailed or otherwise dispatched.

     **6.2**     <u>Waiver of Notice</u>. Notice of the time, place and purpose of any meeting of Shareholders, Directors or committee of Directors may be waived by mail, electronic mail or other writing, either before or after the meeting, or in such other

manner as may be permitted by the laws of the State of Michigan. Attendance of a person at any meeting of Shareholders, in person or by proxy, or at any meeting of Directors, constitutes a waiver of notice of the meeting except when the person attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

6.3     **Action Without a Meeting.** Any action required or permitted at any meeting of Shareholders or Directors or committee of Directors may be taken without a meeting, without prior notice and without a vote, if all of the Shareholders or Directors or committee members entitled to vote thereon consent thereto in writing.

## ARTICLE VII OFFICERS

7.1     **Number.** The Board of Directors shall elect or appoint a President, a Secretary and a Treasurer, and may select a Chairman of the Board, a Vice-Chairman of the Board and one or more Vice-Presidents, Assistant Secretaries and/or Assistant Treasurers. The President and Chairman of the Board, if any, shall be members of the Board of Directors. Any two (2) of the above offices, except those of President and Vice-President, may be held by the same person, but no Officer shall execute, acknowledge or verify an instrument in more than one capacity.

7.2     **Term of Office, Resignation and Removal.** An Officer shall hold office for the term of which he is elected or appointed and until his successor is elected or appointed and qualified, or until his resignation or removal. An Officer may resign by written notice to the Corporation. The resignation is effective upon its receipt by the Corporation or at a subsequent time specified in the notice of resignation. An Officer may be removed by the Board with or without cause. The removal of an Officer shall be without prejudice to his contract rights, if any. The election or appointment of an Officer does not of itself create contract rights.

7.3     **Vacancies.** The Board of Directors may fill any vacancies in any office occurring for whatever reason.

7.4     **Authority.** All officers, employees and agents of the Corporation shall have such authority and perform such duties in the conduct and management of the business and affairs of the Corporation as may be designated by the Board of Directors and these By-Laws.

## ARTICLE VIII DUTIES OF OFFICERS

8.1     **Chairman of the Board.** The Chairman of the Board, if such office is filled, shall be the Chief Executive Officer of the Corporation and shall preside at all meetings of the Shareholders and of the Board of Directors at which he is present. He shall see that all orders and resolutions of the Board are carried into effect, and he shall have the general powers of supervision and management usually vested in the Chief Executive Officer of a Corporation, including the authority to vote all securities of other corporations and business organizations which are held by the Corporation.

8.2     **Vice-Chairman of the Board.** The Vice-Chairman of the Board, if such office is filled, shall preside at all meetings of the Shareholders and of the Board of Directors if the Chairman is not present and shall perform such other duties as the Board of Directors of the Chairman may from time to time prescribe.

8.3     **President.** If the office of Chairman of the Board is filled, the President shall be the Chief Operating Officer of the Corporation and shall have the general powers of supervision and management over the day-to-day operations of the Corporation. In the absence or disability of the Chairman of the Board and the Vice-Chairman, or if those offices have not been filled, he also shall perform the duties and execute the powers of the Chairman of the Board as set forth in these By-Laws.

8.4     **Vice-Presidents.** The Vice-Presidents, in order of their seniority, shall in the absence or disability of the President, perform his duties and exercise his powers and shall perform such other duties as the Board of Directors or the President may from time to time prescribe.

8.5     **Secretary.** The Secretary shall attend all meetings of the Board of Directors and of Shareholders and shall record all votes and minutes of all proceedings in a book to be kept for that purpose. He shall give or cause to be given notice of all meetings of the Shareholders and of the Board of Directors. He shall keep in safe custody the seal of the Corporation (if the Corporation has a seal) and, when authorized by the Board, affix the same to any instrument requiring it, and when so affixed it shall be attested by his signature, or by the signature of the Treasurer or an Assistant Secretary. The Secretary may delegate any of his duties, powers and authorities to one or more Assistant Secretaries, unless such delegation is disapproved by the Board.

8.6     **Treasurer.** The Treasurer shall have the custody of the corporate funds and securities; shall keep full and accurate accounts of receipts and disbursements in books of the Corporation; and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. He shall render to the President and Directors, whenever they may require it, an account of his transactions as Treasurer and of the financial condition of the Corporation. The Treasurer may delegate any of his duties, powers and authorities to one or more Assistant Treasurers unless such delegation be disapproved by the Board of Directors.

8.7     **Assistant Secretaries and Treasurers.** The Assistant Secretaries, in order of their seniority, shall perform the duties and exercise the powers and authorities of the Secretary in case of his absence or disability. The Assistant Treasurers,

in the order of their seniority, shall perform the duties and exercise the powers and authorities of the Treasurer in case of his absence or disability. The Assistant Secretaries and Assistant Treasurers shall also perform such duties as may be delegated to them by the Secretary and Treasurer, respectively, and also such duties as the Board of Directors may prescribe.

## ARTICLE IX SPECIAL CORPORATE ACTS

9.1     **Orders for Payment of Money.** All checks, drafts, notes, bonds, bills of exchange and orders for payment of money of the Corporation shall be signed by such Officer or Officers or such other person or persons as the Board of Directors may from time to time designate.

9.2     **Contracts and Conveyances.** The Board of Directors of the Corporation may in any instance designate the Officer and/or agent who shall have authority to execute any contract, conveyance, mortgage or other instrument on behalf of the Corporation, or may ratify or confirm any execution. When the execution of any instrument has been authorized without specification of the executing officers or agents, the Chairman of the Board, the President or any Vice-President, and the Secretary or Assistant Secretary or Treasurer or Assistant Treasurer, may execute the same in the name and on behalf of this Corporation and may affix the corporate seal thereto.

## ARTICLE X BOOKS AND RECORDS

10.1     **Maintenance of Books and Records.** The proper officers and agents of the Corporation shall keep and maintain such books, records and accounts of the Corporation's business and affairs, minutes of the proceedings of its Shareholders, Board and committees, if any, and such stock ledgers and lists of Shareholders, as the Board of Directors shall deem advisable, and as shall be required by the laws of the State of Michigan and other states or jurisdictions empowered to impose such

requirements. Books, records and minutes may be kept within or without the State of Michigan in a place which the Board shall determine.

      **10.2**    **<u>Reliance on Books and Records.</u>** In discharging his duties, a Director or an Officer of the Corporation, when acting in good faith, may rely upon the opinion of counsel for the Corporation, upon the report of an independent appraiser selected with reasonable care by the Board, or upon financial statements of the Corporation represented to him to be correct by the President or the Officer of the Corporation having charge of its books of account, or stated in a written report by an independent public or certified public accountant or firm of such  accountants fairly to reflect the financial condition of the Corporation.

ARTICLE XI

## INDEMNIFICATION

**11.1**     **Non-Derivative Actions.** Subject to all of the other provisions of this Article, the Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that he is or was a Director, Officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a Director, Officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a Director, Officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorney fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation or its Shareholders, and with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of  any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Corporation or its Shareholders, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

**11.2**     **Derivative Actions.** Subject to all of the provisions of this Article, the Corporation shall indemnify any person who was or is a party to or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that he is or was a Director, Officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a Director, Officer, employee or agent of

another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation or its Shareholders and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable for negligence or misconduct in the performance of his duty to the Corporation unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

11.3 **Expenses of Successful Defense.** To the extent that a person has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Section 11.1 or 11.2 of these By-Laws, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

**11.4**     **Determination that Indemnification is Proper.** Any indemnification under Section 11.1 or 11.2 of these By-Laws (unless ordered by a court) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the person is proper in the circumstances because he has met the applicable standard of conduct set forth in Section 11.1 or 11.2, whichever is applicable. Such determination shall be made in any of the following ways:

        a.     By the Board by a majority vote of a quorum consisting of Directors who were not parties to such action, suit or proceeding.

        b.     If such quorum is not obtainable, or, even if obtainable, a quorum of disinterested Directors so directs, by independent legal counsel in a written opinion.

        c.     By the Shareholders.

**11.5**     **Expense Advance.** Expenses incurred in defending a civil or criminal action, suit or proceeding described in Section 11.1 or 11.2 of these By-Laws may be paid by the Corporation in advance of the final disposition of such action, suit or proceeding as authorized in the manner provided in Section 11.4 upon receipt of an undertaking by or on behalf of the person involved to repay such amount unless it shall ultimately be determined that he is entitled to be indemnified by the Corporation.

**11.6**     **Former Directors and Officers.** The indemnification provided in the foregoing Sections continues as to a person who has ceased to be a Director, Officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

**11.7**     **Insurance.** The Corporation may purchase and maintain insurance on behalf  of any person who is or was a Director, Officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him and incurred by him in any such capacity or arising out of his status as such, whether or not the corporation would have power to indemnify him against such liability under these By- Laws or the laws of the State of Michigan.

**11.8**     Changes in  Michigan  Law.  In the event of any change of the Michigan statutory provisions applicable to the Corporation relating to the subject matter of Article XI of these By-Laws, then the indemnification to which any person shall be entitled hereunder shall be determined by such changed provisions. The Board of Directors is authorized to amend this By- Law to conform to any such changed statutory provisions.

## ARTICLE XII AMENDMENTS

12.1   Amendments. The By-Laws of the Corporation may be amended, altered or  repealed, in whole or in part, by the Shareholders or by the Board of Directors at any meeting duly held in accordance with these By-Laws, provided that notice of the meeting includes notice of the proposed amendment, alteration or repeal, and provided further that the Board of Directors shall not make or alter any By-Law fixing their number, qualifications, classifications or term of office. Also, provided that no amendment or repeal of these By-Laws shall be prejudicial to the contract rights of a Director, if any.

_____

**Incorporator's Initials**